# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-4022 |
| | ) | |
| THE STATE OF MISSOURI; MICHAEL | ) | |
| L. PARSON, Governor of the State of Missouri, | ) | |
| in his official capacity; and ERIC SCHMITT, | ) | |
| Attorney General of the State of Missouri, in | ) | |
| his official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      This lawsuit challenges a Missouri state statute that purports to invalidate federal firearm laws within the State. The Missouri law uniquely discriminates against federal agencies and employees; impairs law enforcement efforts in Missouri; and contravenes the Supremacy Clause of the United States Constitution.

2.      It is well established that Congress may "impos[e] conditions and qualifications on the commercial sale of arms," and may impose certain "prohibitions on the possession of firearms," including by felons and the mentally ill. *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("[T]he right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'").

3.     Despite the sound constitutional basis for federal firearm laws—and the important public-safety functions that Congress has enacted them to serve—the State of Missouri has adopted legislation that purports to preserve only those federal firearm laws that are also replicated by Missouri state law, nullifying essentially everything else.  *See* Mo. Rev. Stat. §§ 1.410–1.485 (2021) ("H.B. 85").

4.     In particular, H.B. 85 declares that certain categories of federal laws "shall be considered infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States."  H.B. 85, § 1.420.  The statute further commands that those federal firearm laws "shall not be recognized by this state" and "shall be specifically rejected by this state."  *Id.* § 1.430.  The statute imposes a "duty" on "the courts and law enforcement agencies of this state to protect" Missouri citizens from the purported federal infringements.  *Id.* § 1.440.

5.     The statute further declares that "[n]o entity or person . . . shall have the authority to enforce or attempt to enforce" the federal laws identified as "infringements."  *Id.* § 1.450.  Moreover, the law imposes financial penalties on state and local law enforcement agencies that employ any officer who enforces a prohibited federal law, and permanently bans federal officers or agents who enforce a prohibited federal law from subsequent employment by any local government or law enforcement agency in Missouri.  *Id.* §§ 1.460, 1.470.

6.     The Missouri law has had a harmful impact on public safety efforts within the state.  Prior to enactment of H.B. 85, state and local law enforcement officers in Missouri routinely worked shoulder-to-shoulder with federal officers to keep Missourians safe.  They did so by (among other things) sharing evidence, data, and other information critical to law enforcement and by participating in joint federal-state law enforcement task forces.  H.B. 85,

however, now severely impairs federal criminal law enforcement operations within the State of Missouri. H.B. 85 prohibits state and local officers who have been deputized as federal officers from enforcing federal firearm laws. Critical information that state and local offices previously shared with federal law enforcement officers to facilitate public safety and law enforcement is now frequently unavailable to federal law enforcement agencies in the same manner as prior to H.B. 85. Moreover, H.B. 85 has caused rampant confusion about what activities are permissible under state law, which has only exacerbated the law's negative effects.

7.    Although a state may lawfully decline to assist with federal enforcement, *see Printz v. United States*, 521 U.S. 898, 935 (1997), a state may not directly regulate federal authority. H.B. 85 does exactly that by purporting to nullify, interfere with, and discriminate against federal law.

8.    By purporting to nullify federal law, H.B. 85 violates the Supremacy Clause of the United States Constitution. *See* U.S. Const., art. VI, cl. 2 ("This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *see United States v. Reynolds*, 235 U.S. 133, 149 (1914) ("If such state statutes . . . have the effect . . . to nullify statutes passed in pursuance [to the Federal Constitution], they must fail.").

9.    H.B. 85 also purports to directly constrain the conduct of federal actors, impede federal operations, and discriminate against federal employees as well as state and local officials who voluntarily wish to assist the Federal Government in the enforcement of federal firearm laws, whether by obtaining federal deputations or providing other forms of investigative assistance. Accordingly, H.B. 85 is further invalid under the Supremacy Clause because it is preempted and because it violates intergovernmental immunity. *See, e.g.*, *M'Culloch v.*

*Maryland*, 17 U.S. 316, 317 (1819) ("States have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted . . . by Congress to carry into effect the powers vested in the national government.").

10.     In light of H.B. 85's infirmities and the harms to federal law enforcement interests, the United States seeks a declaratory judgment that H.B. 85 is invalid under the Supremacy Clause, is preempted by federal law, and violates intergovernmental immunity.  The United States also seeks an order permanently enjoining the State of Missouri, including its officers, employees, and agents, from implementing or enforcing H.B. 85.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendants reside within this judicial district and because a substantial part of the events or omissions giving rise to this action occurred within this judicial district.

13.     Divisional venue lies in the Central Division of the Western District of Missouri under Local Rule 3.2(b) because the Governor of Missouri legally resides in Jefferson City, Missouri, and because that is where the claim for relief arose.

## PARTIES

14.     Plaintiff is the United States of America.

15.     Defendant the State of Missouri is a State of the United States.  The State of Missouri includes all of its officers, employees, and agents.

16.     Defendant Michael L. Parson is the Governor of Missouri, and is sued in his official capacity.  The Governor is Missouri's chief executive officer.  As such, the Governor

oversees all of Missouri's executive agencies, including the Department of Public Safety and the Missouri State Highway Patrol.

17. Defendant Eric Schmitt is the Attorney General of Missouri, and is sued in his official capacity. The Attorney General is Missouri's chief legal officer.

## STATEMENT OF THE CLAIM

### I. Constitutional and statutory background.

#### A. The Supremacy Clause and preemption.

18. The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

19. As the United States Supreme Court has made clear on many occasions, state legislatures have no authority to invalidate federal statutes or to disregard federal law. *See, e.g.*, *Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958) (reaffirming the "basic principle that the federal judiciary," not an individual State, "is supreme in the exposition of the law of the Constitution"); *United States v. Reynolds*, 235 U.S. 133, 149 (1914) ("If such state statutes . . . have the effect to deny rights secured by the Federal Constitution or to nullify statutes passed in pursuance thereto, they must fail."); *Anderson v. Carkins*, 135 U.S. 483, 490 (1890) ("The law of congress is paramount; it cannot be nullified by direct act of any state, nor the scope and effect of its provisions set at naught indirectly."); *Ableman v. Booth*, 62 U.S. (21 How.) 506, 523–26 (1858); *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809).

20. Additionally, under the doctrine of preemption, state law is invalid to the extent it conflicts with federal law. *Arizona v. United States*, 567 U.S. 387, 399 (2012) (conflict preemption includes both "cases where compliance with both federal and state regulations is a

physical impossibility, and those instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").

**B.      Intergovernmental immunity.**

21.      The doctrine of intergovernmental immunity also arises from the Supremacy Clause and reflects the principle that "[s]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted . . . by Congress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. 316, 317 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920) (holding that state laws cannot "control the conduct of" individuals "acting under and in pursuance of the laws of the United States").

22.      Under this doctrine, states also may not "discriminate[] against the Federal Government or those with whom it deals." *North Dakota v. Dole*, 495 U.S. 423, 435 (1990) (plurality op.).  A state law thus violates intergovernmental immunity when it "treats someone else better than it treats" the federal government. *Washington v. United States*, 460 U.S. 536, 544–45 (1983).

**C.      Federal firearms statutes and regulations.**

23.      Congress regulates the sale, manufacture, and possession of firearms and ammunition through a comprehensive regulatory scheme established by the National Firearms Act ("NFA") and the Gun Control Act ("GCA").  *See* 26 U.S.C. §§ 5811–22, 5841; 18 U.S.C. §§ 921–24.

24.      The NFA requires parties manufacturing or transferring certain firearms, as defined in the Act, to submit an application to the Attorney General for such transactions and pay

certain taxes, and it also requires that such firearms be registered. *See* 26 U.S.C. §§ 5811–5822, 5841.

25.     Firearms regulated under the NFA include machine guns and certain types of rifles and shotguns, as well as silencers and "destructive devices" (such as grenades). *Id.* § 5845. The NFA does not regulate most handguns or rifles, nor does the NFA prohibit ownership of regulated firearms (with the exception of certain machine guns).

26.     Congress enacted the GCA in 1968. Compared to the NFA, the GCA defines "firearms" more broadly, to include "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3).

27.     The GCA contains licensing requirements. It states that any person who "engage[s] in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition" must "receive[] a license to do so from the Attorney General." *Id.* § 923(a); *see also id.* § 922(a)(1)(A) (prohibiting any person who is not "a licensed importer, licensed manufacturer, or licensed dealer, [from] engag[ing] in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce").

28.     License holders (called "Federal Firearms Licensees") must maintain "records of importation, production, shipment, receipt, sale, or other disposition of firearms," and may not transfer a firearm to an unlicensed person unless they complete a Firearms Transaction Record. *Id.* § 923(g)(1)(A); *see also* 27 C.F.R. § 478.121–.125. All such records must be available at the

7

Licensees' business premises for compliance inspections by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). *See* 27 C.F.R. § 478.121(b).

29.     The GCA requires that every firearm that is imported or manufactured by a Licensee must be identified by a serial number and a mark indicating the model of the firearm, the Licensee's name or abbreviation, and the Licensee's location. 18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a)(1).

30.     Licensees must report the theft or loss of any firearm to ATF and local law enforcement authorities. 18 U.S.C. § 923(g)(6). They must also respond to requests by the Attorney General made in the course of a criminal investigation for information concerning the disposition of a firearm. *Id.* § 923(g)(7).

31.     Additionally, the GCA prohibits the possession of firearms by certain categories of persons (when the requisite elements are met). Included among these categories are individuals who have been convicted of a felony, individuals who have been convicted of a misdemeanor crime of domestic violence, individuals who have been dishonorably discharged from the military, individuals who have been adjudicated as "mental defective[s]," noncitizens who are not lawfully in the United States, unlawful users of controlled substances, and others. *Id.* § 922(g).

32.     Before making any over-the-counter firearms transaction, Federal Firearms Licensees must verify the purchaser's identity and must conduct a background check through the National Instant Criminal Background Check System (NICS), which is administered by the Federal Bureau of Investigation (FBI). *Id.* § 922(t); 27 C.F.R. §§ 478.102, 478.124(c).

33.     Subject to the direction of the Attorney General, ATF has the authority to investigate criminal and regulatory violations of federal firearm laws. 28 U.S.C. § 599A; *see*

*also* 28 C.F.R. § 0.130. Penalties for such violations include fines, imprisonment, and forfeiture. *See* 18 U.S.C. § 924. Other federal agencies, such as the FBI and the United States Marshals Service (USMS), also enforce federal firearm laws when appropriate. *See generally* 28 C.F.R. §§ 0.85, 0.111.

## II.   Missouri H.B. 85.

34.   Governor Parson signed H.B. 85 into law on June 12, 2021. *See* Mo. Rev. Stat. §§ 1.410–1.485 (2021) (codifying H.B. 85).

35.   H.B. 85 declares that "federal acts, laws, executive orders, administrative orders, rules, and regulations," falling into five categories "shall be considered infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri." H.B. 85, § 1.420.

36.   The five categories of federal laws and regulations that H.B. 85 declares to be "infringements" are:

a.   "[a]ny tax, levy, fee, or stamp imposed on firearms, firearm accessories, or ammunition not common to all other goods and services and that might reasonably be expected to create a chilling effect on the purchase or ownership of those items by law-abiding citizens," *id.* § 1.420(1);

b.   "[a]ny registration or tracking of firearms, firearm accessories, or ammunition," *id.* § 1.420(2);

c.   "[a]ny registration or tracking of the ownership of firearms, firearm accessories, or ammunition," *id.* § 1.420(3);

d.   "[a]ny act forbidding the possession, ownership, use, or transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens," *id.* § 1.420(4); and

e.  "[a]ny act ordering the confiscation of firearms, firearm accessories, or ammunition from law-abiding citizens," *id.* § 1.420(5).

37.     H.B. 85 is premised on an attempt to nullify these five categories of federal firearm laws.  But all of the federal firearm laws that H.B. 85 purports to nullify, including but not limited to all of the examples listed in the following paragraph, are lawful and consistent with the Second Amendment.

38.     H.B. 85's five categories of federal "infringements" encompass well-established federal requirements for the registration and tracking of firearms and limitations on the possession of firearms by certain persons, as set forth in the NFA, the GCA, and implementing regulations.  *See* 26 U.SC. §§ 5811–22, 5841; 18 U.S.C. §§ 921–24; *see also supra* ¶¶ 24-32. For example:

a.  H.B. 85 purports to invalidate "[a]ny registration or tracking of firearms," as well as "[a]ny registration or tracking of the ownership of firearms," H.B. 85 §§ 1.420(2), 1.420(3).  Both of these prohibitions conflict with the NFA's registration requirements for certain firearms, *see* 26 U.S.C. § 5841, as well as the GCA's recordkeeping requirements for Federal Firearms Licensees.  *See* 18 U.S.C. § 923(g)(1)(A) ("Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business."); *see also* 27 C.F.R. § 478.124 (requiring individuals to provide certain information to Federal Firearms Licensees in connection with transfers of firearms).

b.  H.B. 85 purports to invalidate "[a]ny act forbidding the . . . transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens," *see* § 1.420(4), with the term "law-abiding citizens" defined solely with reference to state law.  *See* § 1.480.1 ("[T]he term 'law-abiding citizen' shall mean a person who is not otherwise precluded under state law from possessing a firearm and shall not be construed to include anyone who is not legally present in the United States or the state of Missouri.").  By authorizing all such "law-abiding citizens" to transfer firearms without regard to federal law, this provision of H.B. 85 conflicts with the GCA's requirement that only Federal Firearms Licensees are allowed to "engage in the business of . . . dealing in firearms," 18 U.S.C. § 923(a), and with other federal limits on the transfer of firearms by unlicensed individuals.  *See, e.g.*, 18 U.S.C. § 922(a)(5) (prohibiting unlicensed individuals from transferring firearms to residents of other states).

c.  H.B. 85 likewise purports to invalidate "[a]ny act forbidding the possession, ownership, [or] use . . . of a firearm, firearm accessory, or ammunition by law-abiding citizens."  *See* §§ 1.420(4); 1.480(1).  This provision would invalidate several important federal criminal prohibitions for which there is no analogous crime under Missouri state law, including prohibitions on possession of a firearm by a person convicted of a domestic-violence misdemeanor, 18 U.S.C. § 922(g)(9); by a person subject to a certain type of restraining order preventing the stalking or harassment of an intimate partner, *id.* § 922(g)(8); or by a person dishonorably discharged from the military, *id.* § 922(g)(6).

11

d. Additionally, Missouri law prohibits only some felons from possessing firearms: only those felons convicted under Missouri state law "or of a crime under the laws of any state or of the United States which, if committed within this state, would be a felony." Mo. Rev. Stat. § 571.070.1(1). Thus, H.B. 85 purports to invalidate the federal prohibition on felons possessing firearms or ammunition, *see* 18 U.S.C. § 922(g)(1), with respect to those individuals convicted of felonies but whose crimes are not considered felonies under Missouri state law. *Compare, e.g.*, 18 U.S.C. § 2101 (federal felony charges pertaining to rioting), *with* Mo. Rev. Stat. § 574.050 (rioting only a misdemeanor); 18 U.S.C. § 247(d)(3) (federal felony charges for individuals who injure others in the free exercise of religious beliefs), *with* Mo. Rev. Stat. § 574.035(3)(2) (injury to persons exercising religious freedom in a house of worship only a misdemeanor). Indeed, there are likely broad swaths of federal felony crimes for which there is no Missouri state equivalent, including federal import-export control violations, federal espionage charges, federal tax crimes, federal environmental crimes, and bankruptcy crimes.

39. The limitation to "law-abiding citizens" in some of H.B. 85's nullification provisions does not save the statute from facially conflicting with federal law. As noted, the statute defines a "law-abiding citizen" as "a person who is not otherwise precluded under *state law* from possessing a firearm," at least so long as the person is "legally present in the United States [and] the state of Missouri." H.B. 85, § 1.480.1 (emphasis added). Thus, even if a person is prohibited from possessing a firearm under federal law, the person is still considered a "law-abiding citizen" under H.B. 85 if Missouri has not enacted a similar state law prohibition on that

person's firearm possession—as in the examples set forth above. Given this definition of "law-abiding citizens," H.B. 85's nullification provisions still facially conflict with federal law.

40. Moreover, H.B. 85 defines the term "law-abiding citizen" to mean "a *person* who is not otherwise precluded under state law from possessing a firearm," H.B. 85 § 1.480.1 (emphasis added). H.B. 85 thus appears to nullify federal laws that prohibit firearm possession in certain *places*, such as airports and other sensitive locations, because those laws generally forbid possession of firearms by everyone (including persons "not otherwise precluded under state law from possessing a firearm"). *See, e.g.*, 49 U.S.C. § 46314 (prohibiting entering an aircraft or airport area in violation of security requirements); 49 C.F.R. § 1540.111(a)(1) (prohibiting the carrying of weapons at airport inspection area); 18 U.S.C. § 922(q)(2)(A) (prohibiting carrying certain firearms in school zones); *id.* § 930 (prohibiting possession of firearms in federal facilities).

41. H.B. 85's nullification provisions purport to declare federal "acts" invalid. *See* H.B. 85, § 1.420. At a minimum, that includes the specific provisions of federal law discussed above.

42. H.B. 85 provides that the five categories of federal laws that constitute "infringements" under § 1.420 "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state." *Id.* § 1.430. H.B. 85 also provides that "[i]t shall be the duty of the courts and law enforcement agencies of this state to protect the rights of law-abiding citizens to keep and bear arms within the borders of this state and to protect these rights from the infringements defined under section 1.420." *Id.* § 1.440.

13

43.     In addition, H.B. 85 purports to divest *all* persons and entities from having authority to enforce the purportedly nullified federal firearm laws within the State: "No entity or person, including any public officer or employee of this state or any political subdivision of this state, shall have the authority to enforce or attempt to enforce any federal acts, laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances infringing on the right to keep and bear arms as described under section 1.420." *Id.* § 1.450.

44.     H.B. 85 also imposes civil penalties that threaten state and local law enforcement agencies with significant financial liability to the extent they participate in enforcement of federal firearm laws.  First, H.B. 85 provides that each time a state or local law enforcement agency enforces or attempts to enforce any of the federal firearm laws purportedly nullified through § 1.420, the agency may be subject to a civil penalty of $50,000 and an injunction.  *Id.* § 1.460.1.

45.     Second, H.B. 85 imposes similar civil penalties on law enforcement and local entities that employ anyone who has ever played any role (since H.B. 85 was enacted) in enforcing federal firearm laws.  Specifically, § 1.470 imposes a civil penalty of $50,000 "per employee" against any law enforcement agency or local government that "knowingly employs an individual acting or who previously acted as an official, agent, employee, or deputy of the government of the United States, or otherwise acted under color of federal law within the borders of [Missouri] who has knowingly" either (1) enforced or attempted to enforce "any of the infringements identified in section 1.420" or (2) has "[g]iven material aid and support to the efforts of another who enforces or attempts to enforce" them.  *Id.* § 1.470.1.  For example, this provision would impose liability on a local government entity in Missouri that hired an ATF official who played a role in enforcing federal firearm laws since June 2021, even if that former

ATF official would play no role in firearms enforcement in his or her new position with the local government. Moreover, H.B. 85 vests "[a]ny person residing in a jurisdiction who believes that an individual has taken action that would violate the provisions of this section" with standing to pursue these monetary penalties, *see id.*, as well as "standing to pursue an action for injunctive relief . . . with respect to the actions of such individual." *Id.* § 1.470.2.

46.     The overall purpose and effect of H.B. 85 are thus to nullify federal firearm laws and to affirmatively interfere with their enforcement. Indeed, the General Assembly's findings and declarations in § 1.410 make clear that H.B. 85's purpose and intent are to nullify federal firearm laws. *See, e.g., id.* § 1.410.2(6) (asserting that Congress does not have "the power to limit citizens' right to keep and bear arms in defense of their families, neighbors, persons, or property nor to dictate what sorts of arms and accessories law-abiding Missourians may buy, sell, exchange, or otherwise possess within the borders of this state").

47.     Both the judicial and executive branches of the government of the State of Missouri are charged with implementing and enforcing H.B. 85. For example, the statute imposes a "duty" on "the courts and law enforcement agencies of this state to protect" against the alleged "infringements defined under section 1.420." H.B. 85 § 1.440. As discussed further below, the Missouri State Highway Patrol has implemented H.B. 85 by withdrawing personnel from federal task forces and restricting the information that can be shared with federal authorities in connection with federal firearm offenses. Additionally, the State of Missouri may initiate enforcement actions under H.B. 85's penalty provisions, §§ 1.460 and 1.470.

### III.     H.B. 85 irreparably injures the United States.

48.     The United States has compelling interests in preventing crime and promoting public safety, particularly with respect to crimes involving firearms that affect or have moved in

interstate commerce. These interests are acute in the State of Missouri, which unfortunately suffers from substantial violent crime, including violent crime involving firearms.

49.     Since its enactment, H.B. 85 has endangered public safety—and the United States' efforts to promote public safety—by imperiling the successful partnerships between federal, state, and local law enforcement agencies that are critical to fighting violent crime within Missouri.

50.     Defendants have acknowledged that law enforcement partnerships with the Federal Government can "help get violent criminals off [Missouri's] streets."[1]  And other law enforcement officials within Missouri have characterized H.B. 85 as a "benefit to criminals."[2] Indeed, in a pending state court case, over sixty Missouri law enforcement officials have filed affidavits confirming that H.B. 85 has hindered law enforcement's ability to defend and protect Missouri citizens.[3]

**A.      H.B. 85 rejects all legal authority to enforce federal law, undermining federal officials and federal task forces.**

51.     Federal law enforcement officials frequently enforce federal firearm laws, including those that H.B. 85 declares invalid.  Federal law enforcement agencies also routinely enforce federal law through partnerships known as task forces.

---

[1] *See Governor Parson Announces State's Plan, Immediate Action Items to Help Combat Violent Crime in the St. Louis Region*, September 19, 2021, https://governor.mo.gov/press-releases/archive/governor-parson-announces-states-plan-immediate-action-items-help-combat.

[2] CBS News (60 Minutes), *Missouri's Second Amendment Preservation Act outlaws local enforcement of federal gun laws* (Nov. 7, 2021), https://perma.cc/EZN2-KHT5.

[3] *See City of Arnold v. State of Missouri*, No. 22JE-CC00010 (Jefferson Cty. Cir. Ct.), *Amicus Brief of the St. Louis Area Police Chiefs Association*, Exhs. A-1 – A-15 (filed Jan. 7, 2022), and *Amicus Brief of the Missouri Police Chiefs Association*, Exhs. A-1 – A-58 (filed Jan. 7, 2022).

16

52.     These task forces typically involve state and local law enforcement officers being deputized as federal law enforcement officers and then serving alongside federal officials to enforce federal law.  Once federally deputized, these state and local officers typically exercise federal authority when enforcing federal law.  *See, e.g.*, 28 U.S.C. §§ 561(f), 566(c); 28 C.F.R. § 0.112(b); *see also* 21 U.S.C. § 878.

53.     As an example, ATF relies on joint task forces to investigate and enforce laws prohibiting the illegal use, possession, and trafficking of firearms.  Additionally, the USMS has several task forces across the State of Missouri, primarily devoted to the apprehension of fugitives, some of whom may be wanted for federal firearm violations.  The state and local law enforcement officers serving on these task forces do so voluntarily and are bestowed with federal authority pursuant to federal deputations, as discussed above.  Joint task force operations within the State of Missouri have produced significant results in fighting violent crime, including crime involving firearms.

54.     H.B. 85 purports to reject, invalidate, and nullify all legal authority to enforce the federal firearm laws declared to be "infringements," including federal authority exercised by federal officials and state and local law enforcement officers with federal deputations.  *See* H.B. 85 §§ 1.420–1.450.  H.B. 85 thus interferes with and undermines federal law enforcement.  H.B. 85 has also harmed joint task forces by prompting some state and local law enforcement agencies to instruct their personnel not to enforce particular federal laws even when acting in a federal capacity.

55.     These impairments caused by H.B. 85 have hindered federal agencies' ability to effectively pursue the enforcement of federal law against violent criminals.   For example, from its creation in January 2020 through August 2021, the Columbia Violent Crimes Task Force

recovered 55 firearms from prohibited persons and made 30 arrests for violation of federal law and 35 arrests for violation of state law.  These arrests stem from collaborative investigations involving violent crime offenses, firearm possession, or association with violent gang organizations.   Since the enactment of H.B. 85, however, cooperative collaborations like this have been hindered across the state.

**B.      H.B. 85 injures the United States by penalizing information-sharing and other investigatory support.**

56.      In addition to task forces, federal law enforcement entities have developed other robust information-sharing networks in which state and local partners assist in solving and combating crime.  These networks include state and local officers assisting with FBI NICS referrals and providing access to state and local crime-related data, police reports, investigative records, background information on investigative targets, and even access to physical evidence such as firearms and ammunition used in crimes.  Federal agents often lack independent access to information contained within state and local databases, and thus they depend on state and local officials to assist in providing such information.  Having complete, timely information relevant to a given crime is critical to solving that crime and preventing similar crimes from happening again.

57.      H.B. 85 has caused many state and local law enforcement agencies to stop voluntarily assisting in the enforcement of any federal firearm offense, or even offer critical investigative assistance to the Federal Government for use in its enforcement activities.  These consequences are the direct result of H.B. 85, which purports to nullify federal firearm laws, declares that "[n]o entity or person" shall have authority to enforce such laws, and threatens state and local law enforcement agencies with lawsuits and significant monetary liability for any acts that could be portrayed as participating or assisting in the enforcement of federal firearm laws.

58. One key information-sharing network is the National Integrated Ballistic Information Network ("NIBIN"). Operated by ATF, NIBIN is the sole inter-jurisdictional automated ballistic imaging network in the country. It is a vital resource for reducing violent crime because it enables investigators to match ballistics evidence in a particular case with other cases, both within the state and across the nation. This ability helps reveal previously hidden connections between violent crimes within the state and across different states and jurisdictions.

59. In the last three years, NIBIN has helped law enforcement officers in Missouri generate over 6,000 leads, including 3,149 leads in jurisdictions outside of where the lead was sourced. Further, from October 2019 to June 2021, NIBIN successfully identified approximately 200 suspects linked to firearm crimes in the State. NIBIN is therefore a critical tool in ATF's effort to combat federal firearm violations and violent crime in Missouri.

60. H.B. 85 significantly reduces the utility of information tools like NIBIN. The efficacy of NIBIN declines if reliable data is not routinely and timely entered into it. And due to H.B. 85, several state and local law enforcement agencies are not inputting data or following up on NIBIN investigatory leads, which undermines this important tool for reducing violent crime in Missouri. While some state and local agencies have recently resumed entering information into NIBIN, they do so only after complying with additional procedures, which delays the entry of information into NIBIN and likewise harms its efficacy.

61. H.B. 85 has also limited federal law enforcement's access to other essential information and investigatory support. The Missouri Information and Analysis Center, an entity operated by the Missouri State Highway Patrol that is intended to facilitate information-sharing between federal, state, and local law enforcement agencies, is no longer cooperating with federal agencies pursuing any federal firearm offenses, even when those offenses are ancillary to arrest

on another charge, thereby denying federal law enforcement access to important background information on investigative targets.

62.     Because of H.B. 85, many local law enforcement agencies refuse to share information with federal partners or participate in federal grand juries pertaining to firearm matters unless they have been served with a formal subpoena compelling them to do so.  Prior to H.B. 85, these activities would typically occur through informal requests and coordination. These disruptions to the free flow of vital information between previously cooperative agencies impairs the work of federal, state, and local law enforcement alike.

63.     Specific events highlight H.B. 85's adverse effects on law enforcement.  For example, on September 5, 2021, a Missouri State Highway Patrol Trooper stopped a vehicle for speeding and determined that the driver was wanted on an arrest warrant for a federal firearm-related violation.  Notwithstanding this federal arrest warrant, the Trooper allowed the driver to continue on his way, apparently based on the Trooper's understanding of what H.B. 85 required. The driver's vehicle was registered in Arizona and the driver had no ties to the state, but instead was just passing through Missouri.  The individual was ultimately detained by local law enforcement in Arizona approximately one month later.

64.     Federal law enforcement agencies are hindered in their mission to promote public safety when state and local partners refuse to provide information in connection with important tools like NIBIN and in individual cases.

**C.     H.B. 85 facially discriminates against federal law and federal employees.**

65.     H.B. 85's scheme of penalties expressly discriminates against individuals who enforce the federal firearm laws deemed invalid, by making those individuals effectively unemployable by "[a]ny political subdivision or law enforcement agency" within the State of Missouri.  *See* H.B. 85 §§ 1.460, 1.470.  Any political subdivision or law enforcement agency

who employs or seeks to employ any such individual would be subject to a civil monetary penalty of $50,000, as well as a suit for "injunctive relief." *Id.*

66.    These penalty provisions impose a unique disability on federal employees—and others acting under color of federal law, such as state and local law enforcement officers deputized to enforce federal law—whose responsibilities involve enforcement of federal firearm laws. Such individuals are precluded from pursuing employment with "any political subdivision or law enforcement agency" in the State of Missouri.

67.    Prior to H.B. 85, it was relatively common for federal employees involved in the enforcement of federal firearm laws to seek and obtain employment with political subdivisions and/or law enforcement agencies within Missouri. The same is true for federally deputized state and local officials involved in the enforcement of federal firearm laws, who also commonly sought and obtained employment with other political subdivisions and/or law enforcement agencies within Missouri. H.B. 85 now renders those individuals unemployable in such jobs, solely as a result of their prior lawful federal service.

68.    By making involvement in federal firearm enforcement a disqualifying characteristic for certain jobs within the State of Missouri, H.B. 85 seeks to undermine current federal officers' willingness to enforce federal firearm laws, and makes becoming a federal officer less attractive by limiting those officers' future job prospects within the State of Missouri. Thus, H.B. 85's discriminatory scheme of employment penalties threatens to undermine the Federal Government's own interests in ensuring that it attracts the best applicants and that those individuals, once they assume federal office, do not face unlawful consequences as a result of their federal service.

69.     Missouri state law, as a result of H.B. 85, uniquely penalizes the exercise of federal authority, and treats federal officers worse than Missouri law enforcement officials, and also worse than other states' law enforcement officials who enforce their state's firearm laws. Unlike federal officers, other states' law enforcement officials remain free to seek employment with the State of Missouri (and its political subdivisions) without penalty or interference, regardless of whether those officials enforced other states' firearm laws that are identical to, or even stricter than, federal firearm laws. Thus, H.B. 85 penalizes federal officers purely because of their federal status.

> **D.     H.B. 85 injures the United States by causing confusion among law enforcement officers, Federal Firearms Licensees, and the public at large.**

70.     Unless enjoined, H.B. 85 will continue to mislead state and local law enforcement officers, the regulated community of Federal Firearms Licensees, and private citizens, all of whom are obligated to comply with federal firearm laws.

71.     State and local officials have expressed confusion and concern to federal counterparts regarding their obligations under H.B. 85. Some state and local officials recognize that H.B. 85 is an invalid attempt to nullify federal law and thus largely disregard it, while other officials feel compelled to treat H.B. 85 as binding unless and until it is overturned.

72.     Moreover, there are numerous aspects of H.B. 85 that are vague and make it difficult for state and local law enforcement officials to definitively know what the law means, how to implement it, or the parameters under which they can still provide assistance to federal law enforcement. For example:

> a.     As noted above, H.B. 85 purports to nullify a non-exhaustive list of categories of federal laws, without specifying the exact federal laws declared invalid or the scope of those laws declared invalid, *see* ¶¶ 36-40, *supra*;

b.   Also as noted above, the definition of "law-abiding citizens" refers only to *persons* precluded from possessing firearms under state law, but says nothing about whether a person is a "law-abiding citizen" if they violate Missouri state law's restrictions on use of firearms or place-based restrictions on firearm possession, *see* ¶ 40, *supra*;

c.   H.B. 85 instructs that "[i]t shall be the duty of . . . law enforcement agencies of this state to protect the rights of law-abiding citizens . . . from the [federal] infringements defined under section 1.420," H.B. 85 § 1.440, but does not specify what exactly that "duty" entails or requires.

d.   H.B. 85 states that "[i]t shall not be considered a violation . . . to provide material aid to federal prosecution for . . . [f]elony crimes against a person when such prosecution includes weapons violations substantially similar to those found in chapter 570 or chapter 571," or to certain drug felonies involving weapons violations, "so long as such weapons violations are merely ancillary to such prosecution."  H.B. 85 § 1.480.4.  But H.B. 85 does not define what it means for weapons violations to be "ancillary" to other charges being prosecuted.  Nor does H.B. 85 define "crimes against a person" which, under Missouri law, could be construed as a very narrow category.  *See* Mo. Rev. Stat. ch. 565 (listing "Offenses Against the Person," including crimes such as murder, manslaughter, assault, and stalking); *but see, e.g.*, *id.* ch. 566 (listing "Sexual Offenses," which include rape, child molestation, and sex trafficking crimes); *id.* chs. 569-70 (listing crimes such as arson, burglary, carjacking, and robbery).

73.     These features of H.B. 85 have generated substantial confusion across federal, state, and local law enforcement.  This confusion has led to inconsistent applications of H.B. 85 across state and local agencies and has made reliance on state and local support a moving target for federal law enforcement officers.  This uncertainty also undermines federal law enforcement's—as well as state and local law enforcement's—ability to protect public safety within Missouri.

74.     Further, since H.B. 85 was passed, ATF became concerned that Federal Firearms Licensees would have questions or be confused about their legal obligations, such as federal recordkeeping and reporting requirements.  As a result, ATF issued an informational letter to all Federal Firearms Licensees in Missouri, explaining that H.B. 85 does not alter the Licensees' legal obligations under federal law.  *See* ATF, Open Letter to All Missouri Federal Firearms Licensees, https://www.atf.gov/firearms/docs/open-letter/missouri-open-letter-all-ffls-house-bill-number-85-second-amendment/download (July 26, 2021).  If a Licensee chooses to disregard those obligations due to H.B. 85, not only will the Licensee put itself at risk of legal consequences, but there also could be significant harm to ATF's ability to trace guns used in crimes and to ensure that prohibited persons do not gain access to guns in the first instance.  Importantly, ATF may not immediately know if a Licensee has chosen to disregard its obligations; such noncompliance may only be discovered after-the-fact, when critical information (such as the information that Licensees are supposed to record for every firearm transaction) may no longer be recoverable.

75.     The above-described harms caused by H.B. 85 are ongoing, and unless enjoined, will continue.  Thus, H.B. 85 should be enjoined to prevent the ongoing irreparable injury to the United States' efforts to promote public safety.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF: SUPREMACY CLAUSE

76.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

77.     The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land" and are binding upon "the Judges in every State," the "Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2.

78.     H.B. 85 violates the Supremacy Clause because it is premised on an attempted nullification of five categories of valid federal firearm laws. All of H.B. 85's operative provisions are designed to implement and incorporate this improper attempt at nullifying federal law, and thus are invalid.

79.     All of H.B. 85's operative provisions are inseparable and intertwined with the H.B. 85's nullification provision, § 1.420. Thus, once § 1.420 is declared unconstitutional, all of H.B. 85 must be declared invalid as non-severable.

80.     Because H.B. 85 is contrary to the established principle that a state cannot "control the operations of the constitutional laws enacted by [C]ongress," *M'Culloch*, 17 U.S. at 322, H.B. 85 is therefore invalid under the Supremacy Clause.

### SECOND CLAIM FOR RELIEF: PREEMPTION

81.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

82.     H.B. 85 violates the Supremacy Clause and is preempted because it is contrary to federal firearm laws, which expressly forbid certain conduct that H.B. 85 allows. *See supra*

25

¶¶ 36-40.  H.B. 85 conflicts with and otherwise impedes the accomplishment and execution of the full purposes and objectives of federal law.

83.     H.B. 85 therefore violates the Supremacy Clause because it is preempted under federal law.

### THIRD CLAIM FOR RELIEF: VIOLATION OF INTERGOVERNMENTAL IMMUNITY

84.     Plaintiff incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

85.     H.B. 85 violates intergovernmental immunity by directly regulating the activities of Federal agents and those with whom the Federal Government deals, including federal law enforcement officers, deputized state and local officers serving on federal task forces, and any other state or local law enforcement officer who seeks to voluntarily enforce federal law or share information regarding federal offenses with the Federal Government.  *See* H.B. 85, §§ 1.420, 1.450, 1.460, 1.470.

86.     H.B. 85 also violates intergovernmental immunity by discriminating specifically against individuals who have previously participated in the lawful exercise of federal authority, and treating them worse than individuals who may have enforced comparable state laws.  *See* H.B. 85, §§ 1.420, 1.470.

87.     H.B. 85 therefore violates intergovernmental immunity and is invalid.

### PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

a.      A declaratory judgment stating that H.B. 85 is invalid, null, void, and of no effect, and further clarifying that state and local officials may lawfully participate in joint federal task

forces, assist in the investigation and enforcement of federal firearm crimes, and fully share information with the Federal Government without fear of H.B. 85's penalties;

      b.      Injunctive relief against the State of Missouri, including its officers, agents, and employees (and any other persons who are in active concert or participation with such individuals), prohibiting any and all implementation and enforcement of H.B. 85;

      c.      Any and all other relief necessary to fully effectuate the injunction against H.B. 85's implementation and enforcement;

      d.      The United States' costs in this action; and

      e.      Any other relief the Court deems just and proper.

Dated: February 16, 2022           Respectfully submitted,

SAYLER A. FLEMING
United States Attorney
Eastern District of Missouri

TERESA A. MOORE
United States Attorney
Western District of Missouri

*/s/ Alan T. Simpson*
ALAN T. SIMPSON (Mo. Bar 65183)
Assistant United States Attorney
Western District of Missouri
400 East 9th Street, Room 5510
Kansas City, MO 64106
Telephone: (816) 426-3130
Fax: (816) 426-3165
Email: alan.simpson@usdoj.gov

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

CRISTEN C. HANDLEY
Counsel, Civil Division

ALEXANDER K. HAAS
Director

*/s/ Daniel Schwei*
DANIEL SCHWEI
Special Counsel
DANIEL RIESS
CASSANDRA M. SNYDER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

Washington, D.C. 20005
Telephone: 202-305-8693
Fax: 202-616-8460
Email: Daniel.S.Schwei@usdoj.gov