# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

    v.

THE STATE OF MISSOURI *et al.*,

                Defendants.

Case No. 2:22-cv-4022-BCW

## UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The United States hereby moves the Court pursuant to Federal Rule of Civil Procedure 56 to grant summary judgment in favor of the United States, for the reasons set forth in the accompanying Memorandum in support of this motion, filed in accordance with W.D. Mo. L.R. 7.0(a) and 56.1(a). Oral argument is requested.

Dated: February 28, 2022

SAYLER A. FLEMING
United States Attorney
Eastern District of Missouri

TERESA A. MOORE
United States Attorney
Western District of Missouri

*/s/ Alan T. Simpson*
ALAN T. SIMPSON (Mo. Bar 65183)
Assistant United States Attorney
Western District of Missouri
400 East 9th Street, Room 5510
Kansas City, MO 64106
Telephone: (816) 426-3130

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director

DANIEL SCHWEI
Special Counsel

*/s/ Cassandra Snyder*
DANIEL RIESS

Fax: (816) 426-3165
Email: alan.simpson@usdoj.gov

CASSANDRA M. SNYDER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 451-7729
Fax: (202) 616-8460
Email: cassandra.m.snyder@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

UNITED STATES OF AMERICA,

        Plaintiff,

   v.

THE STATE OF MISSOURI *et al.*,

        Defendants.

Case No. 2:22-cv-4022-BCW

**UNITED STATES' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

Statement of Undisputed Material Facts ........................................................................... 4

I.  Federal Firearm Statutes and Regulations ........................................................... 4

II.  H.B. 85 and its Attempted Nullification of Federal Firearm Laws ...................... 6

III.  H.B. 85 Causes Significant Harm to Federal Law Enforcement and Public Safety .......... 9

STANDARD OF REVIEW .............................................................................................. 19

ARGUMENT ................................................................................................................... 19

I.  H.B. 85 Is Unconstitutional Under the Supremacy Clause ................................. 19

A.  The Nullification Provision of H.B. 85 Violates Fundamental Constitutional Principles. ....................................................................................................... 19

    1.  H.B. 85 Unconstitutionally Purports to Invalidate Federal Law. ......... 19

    2.  Federal Law Preempts H.B. 85's Nullification Provision. .................. 22

B.  H.B. 85 Should Be Enjoined in Its Entirety. ................................................. 24

C.  Even Under a Section-by-Section Analysis, the Operative Provisions of H.B. 85 are Each Invalid Under the Supremacy Clause. .............................................. 26

    1.  H.B. 85 §§ 1.430, 1.440, and 1.450 Are Independently Invalid As Constraints on Federal Authority and Information-Sharing. ............... 26

    2.  H.B. 85's Penalty Provisions—§ 1.460 and § 1.470—Are Independently Invalid As Discriminatory Against Federal Authority. .......................... 28

II.  Entry of A Permanent Injunction Against H.B. 85's Enforcement is Warranted ............ 29

CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Carkins*,
135 U.S. 483 (1890) ................................................................................2, 19

*Colorado v. Nord*,
377 F. Supp. 2d 945 (D. Colo. 2005) ...............................................................27

*Cooper v. Aaron*,
358 U.S. 1 (1958) ................................................................................ passim

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ................................................................................20, 21

*Dodson v. Ferrara*,
491 S.W.3d 542 (Mo. banc 2016) ...................................................................24

*Eng. v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ................................................................................23

*Hines v. Davidowitz*,
312 U.S. 52 (1941) ................................................................................23

*In re Quarles*,
158 U.S. 532 (1895) ................................................................................28

*Johnson v. Maryland*,
254 U.S. 51 (1920) ................................................................................28

*Leavitt v. Jane L.*,
518 U.S. 137 (1996) ................................................................................24

*Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*,
540 F.3d 752 (8th Cir. 2008) ................................................................................29

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................................21

*M'Culloch v. Maryland*,
17 U.S. (4 Wheat.) 316 (1819) ................................................................. 19, 22, 28

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
138 S. Ct. 1461 (2018) ................................................................................23

*Nat'l Educ. Ass'n v. Mo. Dep't of Labor & Indus. Rels.*,
623 S.W.3d 585 (Mo. banc 2021) ...................................................................25

Case 2:22-cv-04022-BCW   Document 8   Filed 02/28/22   Page 5 of 40

*North Dakota v. United States*,
    495 U.S. 423 (1990) ............................................................................. passim

*Printz v. United States*,
    521 U.S. 898 (1997) .................................................................................22

*Priorities USA v. State*,
    591 S.W.3d 448 (Mo. banc 2020) ....................................... 24, 25, 26

*Reno v. Condon*,
    528 U.S. 141 (2000) .................................................................................27

*Shooting Sports Ass'n v. Holder*,
    727 F.3d 975 (9th Cir. 2013) ...............................................................23

*Shrink Mo. Gov't PAC v. Maupin*,
    71 F.3d 1422 (8th Cir. 1995) ...............................................................25

*Tennessee v. Davis*,
    100 U.S. 257 (1880) .................................................................................26

*Timlin v. Myers*,
    980 F. Supp. 1100 (C.D. Cal. 1997) .................................................29

*United States v. Adams*,
    914 F.3d 602 (8th Cir. 2019) ...............................................................20

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) .............................................................21

*United States v. City of Arcata*,
    629 F.3d 986 (9th Cir. 2010) ...................................................26, 29

*United States v. Cox*,
    906 F.3d 1170 (10th Cir. 2018) ..........................................................23

*United States v. Fincher*,
    538 F.3d 868 (8th Cir. 2008) ...............................................................22

*United States v. Gillock*,
    445 U.S. 360 (1980) ................................................................................. 2

*United States v. Joos*,
    638 F.3d 581 (8th Cir. 2011) ...............................................................21

*United States v. Louisiana*,
    364 U.S. 500 (1960) .................................................................................20

*United States v. Peters,*
9 U.S. 115 (1809) ...................................................................................20

*United States v. Reynolds,*
235 U.S. 133 (1914) ..............................................................................2, 19

*United States v. Salerno,*
481 U.S. 739 (1987) ...............................................................................30

*United States v. Seay,*
620 F.3d 919 (8th Cir. 2010) .................................................................21

*Washington v. United States,*
460 U.S. 536 (1983) ...............................................................................27

*Williams v. Allen,*
439 F.2d 1398 (5th Cir. 1971) ...............................................................28

**Statutes**

18 U.S.C. § 241 .............................................................................................11

18 U.S.C. § 247(d)(3) ....................................................................................11

18 U.S.C. § 921(a)(3) .....................................................................................4

18 U.S.C. § 922(g) .................................................................................passim

18 U.S.C. § 922(g)(1) ....................................................................................11

18 U.S.C. § 922(g)(6) ....................................................................................11

18 U.S.C. § 922(g)(8) ....................................................................................11

18 U.S.C. § 922(g)(9) ....................................................................................11

18 U.S.C. § 922(q)(2)(A) ..............................................................................12

18 U.S.C. § 923(a) .....................................................................................5, 10

18 U.S.C. § 923(g)(1)(A) ................................................................................9

18 U.S.C. § 923(i) ......................................................................................5, 6

18 U.S.C. §§ 921–24 ......................................................................................4

18 U.S.C. §§ 922(a)(1)(A) ............................................................................21

18 U.S.C. §§ 1512(d) ....................................................................................28

21 U.S.C. § 878 ...................................................................................................................13

26 U.S.C. § 5841 .................................................................................................................. 9

26 U.S.C. §§ 5811–22 ....................................................................................................4, 21

28 U.S.C. § 599A ...............................................................................................................12

28 U.S.C. § 561(f) ........................................................................................................13, 27

49 U.S.C. § 44903(c)(1) .....................................................................................................16

49 U.S.C. § 46314 ........................................................................................................12, 16

49 U.S.C. § 46505 ...............................................................................................................16

Mo. Rev. Stat. § 1.140 ........................................................................................................24

Mo. Rev. Stat. § 571.070.1(1) ............................................................................................11

Mo. Rev. Stat. § 574.035(3)(2) ..........................................................................................11

Mo. Rev. Stat. § 574.050 ....................................................................................................11

Mo. Rev. Stat. §§ 1.410–.485 .....................................................................................1, 6, 8

Mo. Rev. Stat. § 1.410(5) ...................................................................................................22

**Rules**

Fed. R. Civ. P. 56(a) ...........................................................................................................19

**Regulations**

27 C.F.R. § 478.121(b) ........................................................................................................ 5

27 C.F.R. §§ 478.121–.125 .................................................................................................. 5

27 C.F.R. § 478.92(a)(1) ...................................................................................................... 5

27 C.F.R. § 478.102 ............................................................................................................. 6

28 C.F.R. § 0.112(b) ...........................................................................................................13

28 C.F.R. § 0.130 ................................................................................................................12

28 C.F.R. § 0.85 ..................................................................................................................12

49 C.F.R. § 1540.5 ..............................................................................................................12

49 C.F.R. § 1503.401 ................................................................................................ 16

49 C.F.R. § 1540.111 ................................................................................................ 12

49 C.F.R. § 1540.111(a)(1) ................................................................................. 12, 16

**Other Authorities**

H.B. 85 ............................................................................................................ passim

Pub. L. No. 73-474 ....................................................................................................... 4

Pub. L. No. 90-618 ....................................................................................................... 4

## INTRODUCTION

The State of Missouri adopted H.B. 85 for the express purpose of nullifying federal firearm laws. *See* Mo. Rev. Stat. §§ 1.410–.485 (2021) (codifying H.B. 85). But it is black-letter law that states lack authority under the U.S. Constitution to do so. *See* U.S. Const., art. VI, cl. 2 ("This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding."); *Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958) (reaffirming the "basic principle that the federal judiciary," not any individual state, "is supreme in the exposition of the law of the Constitution"). Missouri's unconstitutional attempt to nullify federal law directly regulates, discriminates against, and affirmatively penalizes the lawful exercise of federal authority. Accordingly, summary judgment declaring H.B. 85 unconstitutional and enjoining its enforcement is warranted.

H.B. 85 seeks to supplant federal authority in several ways. H.B. 85's cornerstone provision is § 1.420, which unilaterally declares five broad categories of federal firearm laws to violate the Second Amendment. H.B. 85 § 1.420. Section 1.430 then directs that such laws "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state." *Id.* § 1.430. H.B. 85 further imposes a "duty" on "the courts and law enforcement agencies of this state" to "protect" Missouri citizens from the allegedly infringing federal laws. *Id.* § 1.440. Finally, H.B. 85 purports to divest all persons and entities of the authority to enforce those federal firearm laws, *id.* § 1.450, and creates a civil penalty scheme that imposes financial penalties upon local and law enforcement agencies that enforce these laws or hire individuals who previously enforced such laws. *Id.* §§ 1.460, 1.470.

H.B. 85's nullification efforts are contrary to both the Supremacy Clause and binding Supreme Court precedent. State legislators, who are bound by an oath to support the Constitution of

the United States, *see* U.S. Const. art. VI, cl. 3, have no power to "nullify [federal] statutes passed in pursuance" of the Constitution, *United States v. Reynolds*, 235 U.S. 133, 149 (1914); *see also Anderson v. Carkins*, 135 U.S. 483, 489 (1890) (observing that "it is not within the power of a state, directly or indirectly, to nullify or set . . . at naught" federal statutes). H.B. 85 is equally invalid when viewed through a traditional preemption lens, as it purports to authorize conduct that federal law deems illegal. *See, e.g.*, *United States v. Gillock*, 445 U.S. 360, 370 (1980) ("[I]n those areas where the Constitution grants the Federal Government the power to act, the Supremacy Clause dictates that federal enactments will prevail over competing state exercises of power.").

The entirety of H.B. 85 should be declared invalid. All of the operative provisions of H.B. 85 are dependent upon H.B. 85's nullification of federal law. Without the nullification provision, none of the other provisions of H.B. 85 would have practical or legal effect, and the State would have had no occasion or basis to enact any of them. Thus, because the cornerstone nullification provision is invalid, all of the other provisions must likewise be declared invalid as non-severable. Because the entire statute is invalid under principles of non-severability, this Court need not conduct a section-by-section analysis of H.B. 85. Yet a section-by-section analysis yields the same results: each operative provision of H.B. 85 independently violates the Supremacy Clause. In particular, H.B. 85's individual provisions purport to regulate and directly discriminate against federal authority in violation of the doctrine of intergovernmental immunity. *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.). Thus, the entirety of H.B. 85 should be declared invalid.

Moreover, an injunction against H.B. 85's enforcement is warranted to prevent significant harm to public safety. Prior to enactment of H.B. 85, state and local law enforcement officers in Missouri routinely partnered with federal law enforcement by participating in joint task forces and

sharing information. Those partnerships are central to the protection of public safety in Missouri. But H.B. 85 prohibits state and local law enforcement from enforcing certain federal firearm laws, even when they are deputized as federal officers to do so. H.B. 85 has thereby reduced the effectiveness of joint task forces devoted to combating violent crime. Similarly, H.B. 85 has led to a stark decrease in information-sharing between state and local law enforcement and federal law enforcement, including information critical to solving violent crimes. As a result, federal law enforcement has seen a drop in firearms-related seizures and prosecutions, and individuals who have illegally obtained firearms are able to retain them for longer periods of time. More generally, the breadth and vagueness of H.B. 85 have caused confusion among federal and state officers, and the public at large, about its requirements.

In light of the foregoing, this Court should enter a declaratory judgment that H.B. 85 is unconstitutional, as well as an order permanently enjoining the State of Missouri, including its officers, employees, and agents, from implementing or enforcing H.B. 85. This relief is necessary to protect the public safety in Missouri, the federal officers against whom H.B. 85 discriminates, and the sovereign interest of the United States.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. Federal Firearm Statutes and Regulations

1.  Congress has long regulated the sale, manufacture, and possession of firearms and ammunition through a comprehensive regulatory scheme established by the National Firearms Act (NFA) and the Gun Control Act (GCA). *See* 26 U.S.C. §§ 5811–22, 5841; 18 U.S.C. §§ 921–24.

2.  Congress first enacted the NFA in 1934. *See* Act of June 26, 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5811–22, 5841).

3.  The NFA imposes registration and taxation requirements on parties manufacturing or transferring certain "firearms." *See* 26 U.S.C. §§ 5811–22, 5841.

4.  The NFA defines "firearms" to include machineguns, certain types of rifles and shotguns, silencers, and "destructive devices" such as grenades. *See id.* § 5845.

5.  The NFA does not regulate most handguns, nor does it prohibit ownership of regulated firearms. *See id.*

6.  Thirty years later, in 1968, Congress enacted the GCA. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921–24).

7.  The GCA defines "firearms" more broadly than the NFA, to include "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3).

8.  The GCA imposes licensing requirements on any party "engaged in the business of importing, manufacturing, or dealing firearms, or importing or manufacturing ammunition." *Id.* § 923(a).

9. Any party "engaged in the business of importing, manufacturing, or dealing in fire-arms, or importing or manufacturing ammunition," *id.* § 923(a), must receive a license from the Attorney General and pay regular fees, *see id.* (detailing annual fee required based on type of firearm and whether licensing applicant is an importer, manufacturer, or dealer).

10. These 18 U.S.C. § 923(a) license holders (called "Federal Firearms Licensees") must maintain "records of importation, production, shipment, receipt, sale, or other disposition of firearms" and may not transfer a firearm to an unlicensed person unless they complete a Firearms Transaction Record. *Id.* § 923(g)(1)(A); *see also* 27 C.F.R. §§ 478.121–.125.

11. All records must be available at the Licensees' business premises for compliance inspections by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). *See* 27 C.F.R. § 478.121(b).

12. Licensees must ensure that every manufactured or imported firearm is identified by a serial number and a mark indicating the model of the firearm, the Licensee's name or abbreviation, and the Licensee's location. 18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a)(1).

13. The GCA prohibits the possession of firearms by certain categories of individuals. Included among these categories are individuals who have been convicted of a felony, individuals who have been convicted of a misdemeanor crime of domestic violence, individuals who have been dishonorably discharged from the military, noncitizens who are not lawfully in the United States, unlawful users of controlled substances, and others. 18 U.S.C. § 922(g).

14. The GCA also bans the transfer or possession of machineguns not already lawfully possessed prior to 1986, *id.* § 922(o), as well as the manufacture, import, sale, shipping, delivery, possession, transfer, or receipt of any firearm that is either not detectable "by walk-through metal detectors" as an exemplar to be developed by the Attorney General, or which, "when subjected to

5

inspection by the type of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of" any major component thereof, *id*. § 922(p)(1).

15. Licensees must report the theft or loss of any firearm to ATF and local law enforcement authorities, *id*. § 923(g)(6), and must respond to requests by the Attorney General made in the course of a criminal investigation for information concerning the disposition of a firearm, *id*. § 923(g)(7).

16. Before making any over-the-counter firearm transaction, Licensees must verify the purchaser's identity and must conduct a background check through the National Instant Criminal Background Check System (NICS), which is administered by the FBI. *Id*. § 922(t); 27 C.F.R. §§ 478.102, 478.124(c).

## II. H.B. 85 and its Attempted Nullification of Federal Firearm Laws

17. Governor Parson signed H.B. 85—the "Second Amendment Preservation Act"— into law on June 12, 2021. *See* Mo. Rev. Stat. §§ 1.410–.485 (2021) (codifying H.B. 85).

18. H.B. 85 declares that "federal acts, laws, executive orders, administrative orders, rules, and regulations" falling into five categories "shall be considered infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri." H.B. 85 § 1.420.

19. The five categories of allegedly unconstitutional "infringements" include "but [are] not limited to":

> (1) "[a]ny tax, levy, fee, or stamp imposed on firearms, firearm accessories, or ammunition not common to all other goods and services and that might reasonably be expected to create a chilling effect on the purchase or ownership of those items by law-abiding citizens";
>
> (2) "[a]ny registration or tracking of firearms, firearm accessories, or ammunition";
>
> (3) "[a]ny registration or tracking of the ownership of firearms, firearm accessories, or ammunition";

6

(4) "[a]ny act forbidding the possession, ownership, use, or transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens"; and

(5) "[a]ny act ordering the confiscation of firearms, firearm accessories, or ammunition from law-abiding citizens."

*Id.*

20.     Section 1.430 asserts that these five categories of federal laws "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state." *Id.* § 1.430.

21.     Section 1.440 further provides that "[i]t shall be the duty of the courts and law enforcement agencies of this state to protect the rights of law-abiding citizens to keep and bear arms within the borders of this state and to protect these rights from the infringements defined under section 1.420." *Id.* § 1.440.

22.     Section 1.450 purports to divest *all* persons and entities—including federal, state, and local officers and employees—of authority to enforce the allegedly infringing federal firearm laws: "No entity or person, including any public officer or employee of this state or any political subdivision of this state, shall have the authority to enforce or attempt to enforce any federal acts, laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances infringing on the right to keep and bear arms as described under section 1.420." *Id.* § 1.450.

23.     H.B. 85 also creates a civil penalty scheme discriminating against those who have enforced federal firearm laws since H.B. 85 came into effect, or who will do so in the future. *Id.* §§ 1.460–.470.

24.     Specifically, § 1.460 provides for an injunction against, and a $50,000 fine "per occurrence" on, state or local law enforcement agencies that employ an officer who knowingly participates in the enforcement of any of the purportedly infringing federal firearm laws. *Id.* § 1.460.

7

25.     Similarly, § 1.470 effectively bans public officers who have enforced any of the purportedly infringing federal firearm laws in Missouri since H.B. 85 came into effect, or who will do so in the future, from state employment for life. It does so by authorizing an injunction and a $50,000 penalty "per employee" upon agencies who hire them. *Id.* § 1.470 (contemplating such relief when an employee either (1) enforces or attempts to enforce "any of the infringements identified in section 1.420" or (2) "[g]ive[s] material aid and support to the efforts of another who enforces or attempts to enforce" them); *see also id.* § 1.480.2 (defining "material aid" as including "voluntarily giving or allowing others to make use of . . . communications equipment or services . . . ; facilities; weapons; personnel; . . . or other physical assets").

26.     Section 1.470 authorizes "[a]ny person residing or conducting business in a jurisdiction" to pursue these monetary penalties and injunctive relief. *Id.* § 1.470.2.

27.     H.B. 85's core purpose of nullifying federal firearm laws is made plain by its introductory findings, which purport to justify this nullification attempt by relying on a discredited, pre-Civil War nullification doctrine. *Id.* § 1.410.

28.     The introductory provision of H.B. 85 asserts that "each party [to the compact of the Constitution, *i.e.*, each State] has an equal right to judge for itself as to whether infractions of the compact have occurred." *Id.* § 1.410(2)(5).

29.     The language in § 1.410(2)(5) parrots that of the nullification doctrine first found in the Virginia and Kentucky Resolutions of 1798, which in turn inspired the nullification principle championed by Senator John C. Calhoun in 1832 and was later again revived by southern State

8

legislatures attempting to nullify *Brown v. Board of Education. See* 4 *Encyclopedia of the American Constitution* 1832–33 (Levy & Karst eds., 2d ed. 2000) (attached hereto as Ex. 5); *see also Cooper*, 358 U.S. at 17 (rejecting this nullification doctrine).[1]

### III. H.B. 85 Causes Significant Harm to Federal Law Enforcement and Public Safety

30.     H.B. 85 does not specifically enumerate the federal laws it purports to invalidate. But at a minimum, H.B. 85 purports to nullify several broad categories of federal firearm laws. H.B. 85 § 1.420.

31.     H.B. 85 purports to invalidate "[a]ny registration or tracking of firearms" and "[a]ny registration or tracking of the ownership of firearms." *Id.* §§ 1.420(2), 1.420(3).

32.     H.B. 85's purported invalidation of "[a]ny registration or tracking of firearms" and "[a]ny registration or tracking of the ownership of firearms," *id.*, conflicts with the NFA's registration requirements for certain firearms. *See* 26 U.S.C. § 5841; *see also* Ex. 1 (Decl. of Frederic D. Winston) ¶¶ 35–38 (discussing the importance of federal firearm licensees' recordkeeping responsibilities with respect to the enforcement of federal law).

33.     H.B. 85's purported invalidation of "[a]ny registration or tracking of firearms" and "[a]ny registration or tracking of the ownership of firearms," H.B. 85 §§ 1.420(2), 1.420(3), also conflicts with the GCA's recordkeeping requirements. *See* 18 U.S.C. § 923(g)(1)(A) ("Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of business."); *see also* Ex. 1 (Decl. of Frederic D. Winston) ¶¶ 35–38 (discussing the importance of

---

[1] H.B. 85 also contains several non-operative provisions, such as § 1.480, which sets forth an August 28, 2021 effective date and defines certain terms; § 1.485, which consists of a severability clause; and Section B, which states that H.B. 85 takes immediate effect upon becoming law.

federal firearms licensees' recordkeeping responsibilities with respect to the enforcement of federal law).

34. H.B. 85 purports to invalidate "[a]ny act forbidding the . . . transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens." H.B. 85 § 1.420(4).

35. The term "law-abiding citizens" is defined (for H.B. 85 only) to mean any individual who "is not otherwise precluded under state law from possessing a firearm," without reference to federal firearm eligibility, so long as the individual is "legally present in the United States [and] the state of Missouri." *Id.* § 1.480(1).

36. By authorizing any "law-abiding citizen" to transfer firearms, § 1.420 conflicts with the GCA's requirement that anyone regularly "engage[d] in the business of . . . dealing in firearms" must comply with federal licensing requirements. 18 U.S.C. § 923(a).

37. By authorizing any "law-abiding citizen" to transfer firearms, § 1.420 conflicts with federal limitations on the circumstances under which unlicensed individuals may transfer firearms. *See, e.g., id.* § 922(a)(5) (prohibiting unlicensed individuals from transferring firearms to residents of other states).

38. H.B. 85 purports to invalidate "[a]ny act forbidding the possession, ownership, [or] use . . . of a firearm, firearm accessory, or ammunition by law-abiding citizens." H.B. 85 § 1.420(4).

39. Because H.B. 85 defines the term "law-abiding citizen" solely with reference to state law, *see id.* § 1.480(1), § 1.420(4) purports to invalidate many federal prohibitions on firearm possession for which no analogous state law exists. *See* 18 U.S.C. § 922(g).

40. Federal law prohibits possession of a firearm by a person who has committed a domestic-violence misdemeanor. *Id.* § 922(g)(9).

41. Federal law prohibits possession of a firearm by a person subject to a certain type of restraining order preventing the stalking or harassment of an intimate partner. *Id.* § 922(g)(8).

42. Federal law prohibits possession of a firearm by a person dishonorably discharged from the military. *Id.* § 922(g)(6).

43. None of these provisions—18 U.S.C. § 922(g)(9), 18 U.S.C. § 922(g)(8), or 18 U.S.C. § 922(g)(6) —has an analogous Missouri state law prohibition.

44. Additionally, Missouri law does not prohibit all persons convicted of a felony from possessing firearms. Mo. Rev. Stat. § 571.070.1(1).

45. Rather, Missouri law prohibits firearm possession only by those persons convicted either of felonies under Missouri state law "or of a crime under the laws of any state or of the United States which, if committed within this state, would be a felony" under Missouri law. Mo. Rev. Stat. § 571.070.1(1).

46. H.B. 85 thus purports to invalidate the federal prohibition on felons possessing fire-arms, *see* 18 U.S.C. § 922(g)(1), with respect to those individuals convicted of felonies but whose crimes are not considered felonies under Missouri state law. *Compare, e.g., id.* § 2101 (federal felony charges pertaining to rioting), *with* Mo. Rev. Stat. § 574.050 (rioting only a misdemeanor); 18 U.S.C. § 247(d)(3) (federal felony charges for individuals who injure others in the free exercise of religious beliefs), *with* Mo. Rev. Stat. § 574.035(3)(2) (injury to persons exercising religious freedom in a house of worship only a misdemeanor); *see also, e.g.,* 18 U.S.C. § 241 (federal felony charges for conspiracies to deprive individuals of federal rights, with no clear analogue under Missouri law).

47. Moreover, because H.B. 85 defines the term "law-abiding citizen" to mean "a *person* who is not otherwise precluded under state law from possessing a firearm," H.B. 85 § 1.480.1

(emphasis added), H.B. 85 thus operates to nullify federal laws that prohibit firearm possession in certain *places*, such as the sterile area of airports and other sensitive locations, because those laws generally forbid possession of firearms by everyone (including persons "not otherwise precluded under state law from possessing a firearm").[2] *See, e.g.*, 49 U.S.C. § 46314 (prohibiting entering an aircraft or airport area in violation of security requirements); 49 C.F.R. § 1540.111(a)(1) (prohibiting the carrying of weapons at airport inspection area); 18 U.S.C. § 922(q)(2)(A) (prohibiting carrying certain firearms in school zones); *id.* § 930 (prohibiting possession of firearms in federal facilities).

48.     By purporting to nullify the federal laws described above—including by declaring them invalid, by imposing a "duty" on state officials to protect against such laws, and by directing that "[n]o entity or person" shall have authority to enforce such laws—H.B. 85 expressly attempts to directly regulate the Federal Government and constrain its operations. *See* H.B. 85 §§ 1.420–.450.

49.     The federal firearm laws declared invalid—including the NFA, the GCA, and implementing regulations—are routinely enforced by federal agencies such as the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *see* 28 U.S.C. § 599A; *see also* 28 C.F.R. § 0.130, as well as the Federal Bureau of Investigation (FBI), the United States Marshals Service (USMS), and the Transportation Security Administration (TSA), *see generally* 28 C.F.R. §§ 0.85, 0.111; 49 C.F.R. § 1540.111. Moreover, violations of these laws are routinely investigated and prosecuted by the United States Attorney's Offices for the Eastern and Western Districts of Missouri.

---

[2] The "sterile area" of an airport refers the physical portion of an airport "that provides passengers access to boarding aircraft and to which the access generally is controlled by TSA." 49 C.F.R. § 1540.5; *see also* Ex. 4 ¶ 5 (Decl. of Angela Brooks).

50. H.B. 85 has adversely affected public safety by undermining federal law enforcement partnerships with state and local law enforcement, increasing the danger arising from unlawful firearm possession, discriminating against federal law and federal employees, and causing confusion among law enforcement officers, Federal Firearms Licensees, and the general public. *See* Ex. 1 (Winston Decl.) ¶¶ 14–16, 18, 21–28, 32, 37–38; Ex. 2 (Jordan Decl.) ¶¶ 8–10, 12; *See* Ex. 3 (Decl. of Micheal Vernon Stokes) ¶¶ 10–11, 13–15, 17–18.

51. First, H.B. 85 undermines federal joint task forces. These task forces involve state and local law enforcement officers who are deputized as federal law enforcement officers and voluntarily serve alongside federal officials to enforce federal law. *See* Ex. 1 (Winston Decl.) ¶ 16. Once federally deputized, these state and local officers exercise federal authority when enforcing federal law. *See, e.g.*, 28 U.S.C. §§ 561(f), 566(c); 28 C.F.R. § 0.112(b); *see also* 21 U.S.C. § 878.

52. For example, ATF relies on joint task forces to investigate and enforce laws relevant to the illegal use, possession, and trafficking of firearms. *See* Ex. 1 (Winston Decl.) ¶ 16 (explaining that joint "task forces, as well as ATF's overall partnerships with state and local departments and agencies, are key to holding violent persons and those illegally using firearms accountable under the law").

53. Similarly, the USMS has three task forces across the State of Missouri primarily devoted to the apprehension of fugitives. *See* Ex. 2 (Decl. of Jonathan D. Jordan) ¶ 7 (explaining that USMS has two fugitive task force in the Eastern District of Missouri); Ex. 3 (Stokes Decl.) ¶ 7 (explaining that USMS has one fugitive task force in the Western District of Missouri).

54.     Because of H.B. 85, many state and local law enforcement agencies have instructed their personnel either to withdraw from participation in joint task forces or to abstain from enforcing particular federal laws even when acting in a federal capacity. *See* Ex. 1 (Winston Decl.) ¶¶ 14–16; Ex. 2 (Jordan Decl.) ¶¶ 9, 12; *See* Ex. 3 (Stokes Decl.) ¶¶ 14, 17.

55.     H.B. 85 has thereby harmed the ability of task forces to pursue violent criminals and enforce federal law against them. *See, e.g.*, Ex. 1 (Winston Decl.) ¶ 18; *see also id.* ¶ 19 (showing significant drop in firearms-related prosecutions initiated based on ATF investigations); ¶ 32 (explaining that H.B. 85 has also harmed joint task forces' ability to investigate referrals from the FBI regarding illegal possession of firearms, which "allows prohibited persons who were able to purchase firearms to retain them longer").

56.     The Columbia Violent Crimes Task Force, which previously achieved significant results in fighting violent crime, has disbanded as a result of H.B. 85 after state and local law enforcement withdrew their federally deputized officers. *See* Ex. 1 (Winston Decl.) ¶ 16.

57.     Some state and local task force officers now disengage in the middle of actively executing arrest warrants if a gun is found. *See* Ex. 2 (Jordan Decl.) ¶ 12 ("This hesitancy initially impacted fugitive operations in such areas as . . . walking away from an operation when other task force members were actively involved in executing an arrest warrant."); Ex. 3 (Stokes Decl.) ¶ 17 ("[Task Force Officers ("TFOs")] may initially participate in the fugitive operation, but depending on the developments at the scene, including the discovery of a firearm, TFOs have disengaged while execution of the arrest warrant is in process."). This creates "grave security issues" for other task force members during the operation. Ex. 3 (Stokes Decl.) ¶ 17.

58.     Second, H.B. 85 has caused a breakdown in the United States' information-sharing networks. Following H.B. 85, many state and local law enforcement agencies no longer voluntarily

offer critical investigative assistance to the Federal Government. *See* Ex. 1 (Winston Decl.) ¶¶ 21–28 (describing breakdown of information networks); *see, e.g.*, *id.* ¶ 32 (explaining that without this communication, ATF is not "able to investigate [FBI] referrals as quickly, which in turn allows prohibited persons who were able to purchase firearms to retain them longer at greater risk to the public"); Ex. 3 (Stokes Decl.) ¶ 13 (noting that "the filing of federal firearms offenses by local law enforcement agencies" with USMS "has slowed dramatically"); *see id.* ¶ 16 (describing incident on September 5, 2021, when a Missouri State Highway Patrol Trooper allowed a driver to continue on despite determining that the driver was wanted on an arrest warrant for a federal weapons violation).

59.     The Missouri Information and Analysis Center (MIAC)—an entity operated by the Missouri State Highway Patrol to facilitate information-sharing between federal, state, and local law enforcement agencies—now refuses to cooperate with federal agencies pursuing federal firearm offenses. *See* Ex. 1 (Winston Decl.) ¶ 22 (regarding MIAC).

60.     In some localities, federal agents are now required to issue subpoenas for information that is ordinarily available upon informal request. *See* Ex. 1 (Winston Decl.) ¶ 23 (explaining that confusion about the "uncertain ramifications" of H.B. 85 has caused some state and local law enforcement agencies to stop voluntarily cooperating without a subpoena).

61.     Several state and local law enforcement agencies are no longer entering data into the ATF's National Integrated Ballistic Information Network (NIBIN), the sole inter-jurisdictional automated ballistic imaging network in the country. *See id.* ¶ 24–28.

62.     NIBIN allows investigators to match ballistics evidence in a particular case with other cases, both within the state and across states, and its efficacy declines when law enforcement

does not routinely enter new data into it. *See id*. These disruptions to the free flow of vital information between previously cooperative agencies impair the work of federal, state, and local law enforcement alike. *See id*.

63.     Third, H.B. 85 has particularly dangerous implications for sensitive areas such as airports. Federal law generally prohibits the carrying of weapons when entering or in a sterile area at an airport or during TSA inspections prior to entering such an area. *See* 49 U.S.C. § 46314; 49 C.F.R. § 1540.111(a)(1); *see also, e.g.*, 49 U.S.C. § 46505; 49 C.F.R. § 1503.401.

64.     H.B. 85 purports to nullify all such place-based restrictions on firearm possession. Statement of Undisputed Material Facts (SOF) ¶ 47. This increases the risk that an individual might bring a firearm into an airport security checkpoint, which "creates a potentially dangerous and attention-grabbing situation" and makes it harder for TSA to protect the public from terrorism. Ex. 4 (Decl. of Angela Brooks) ¶¶ 5, 15.

65.     H.B. 85's purported nullification of all place-based restrictions on firearm possession, including in airports, is especially problematic in Missouri, where the incidence rate for firearm discovery in airport security checkpoints is almost double the national average. *See id*. ¶ 10.

66.     H.B. 85's implications with respect to airports are especially troubling because TSA must refer firearms violations at airports to on-site state and local police to pursue potential criminal charges and to confiscate the firearm or otherwise ensure that the firearm is not allowed into the sterile area. *See id*. ¶¶ 8, 15; *see also* 49 U.S.C. § 44903(c)(1) (contemplating that airports would rely on "the services of qualified State, local, and private law enforcement personnel" to "provide[] a law enforcement presence and capability . . . that is adequate to ensure the safety of passengers"); *id*. § 44922(a) (providing TSA with deputation authority for state and local law enforcement officers).

67. H.B. 85's nullification proclamation may discourage state and local law enforcement personnel at airports from promptly assisting when firearms are discovered and from providing TSA with information necessary for TSA to carry out subsequent civil enforcement actions. *See* Ex. 4 (Brooks Decl.) ¶¶ 16–17.

68. Any confusion-related delay or even outright refusal on the part of the on-site police with respect to firearms could be disastrous. *See id.* ¶ 18.

69. Fourth, the confusion that H.B. 85 generates has far-reaching consequences. Numerous aspects of H.B. 85 are so vague as to make it difficult for state and local law enforcement officials to interpret the law's precise parameters. Many state and local officials are still uncertain about the exact ramifications of H.B. 85. *See* Ex. 1 (Winston Decl.) ¶ 23. And this confusion leads to inconsistent enforcement of H.B. 85 and federal firearm laws. *See* Ex. 3 (Stokes Decl.) ¶ 16 (describing aforementioned incident in which Missouri State Highway Patrol Trooper released driver who was wanted on a USMS warrant for a federal weapons violation because the Trooper believed H.B. 85 prevented him from making the arrest); *see id.* ¶ 17 (noting that local law enforcement engages in "varying levels of participation" in joint task forces as cases develop).

70. Over sixty local law enforcement officials in Missouri have confirmed that H.B. 85 has caused confusion and hindered law enforcement's ability to defend and protect Missouri citizens. *See* Exhibits to *Amicus Curiae* St. Louis Area Police Chiefs Association, *City of Arnold v. State of Missouri*, No. 22JE-cc00010 (Jeff. Co. Cir. Ct. filed Jan. 7, 2022); Exhibits to *Amicus Curiae* Missouri Police Chiefs Association, *City of Arnold v. State of Missouri*, No. 22JE-cc00010 (Jeff. Co. Cir. Ct. filed Jan. 7, 2022).

71. H.B. 85 also creates confusion among private citizens in Missouri. *See* Ex. 1 (Winston Decl.) ¶ 39 (describing confusion among private citizens).

72.     ATF in particular has recognized confusion among private citizens in Missouri and has issued an informational letter to all FFLs in Missouri reiterating that H.B. 85 does not alter their legal obligations under federal law. *See* ATF, Open Letter to All Missouri Federal Firearms Licensees, https://www.atf.gov/firearms/docs/open-letter/missouri-open-letter-all-ffls-house-bill-number-85-second-amendment/download (July 26, 2021); *see also* Ex. 1 (Winston Decl.) ¶ 37 (describing federal firearms licensees' "confusion about the current status of the law").

73.     Fifth, H.B. 85 facially discriminates against the United States and federal employees. H.B. 85's penalty provisions bar individuals who have "[e]nforce[d] or attempt[ed] to enforce any of the" relevant federal firearm laws from employment with "[a]ny political subdivision or law enforcement agency" within Missouri by imposing a civil monetary penalty of $50,000 and injunctive relief upon the employing agency. *See* H.B. 85 §§ 1.460, 1.470.

74.     H.B. 85 punishes federal employees and those acting under color of federal law—including state and local law enforcement officers deputized to enforce federal law—whose responsibilities involve enforcing federal firearm laws. *See id.*

75.     In sum, H.B. 85 discriminates against the United States and federal employees, sows confusion across law enforcement and the general public, creates particular danger in sensitive areas such as airports, injures the United States' information-sharing networks, and undermines federal joint task forces.[3]

---

[3] H.B. 85 is the subject of two ongoing state-court lawsuits filed by various cities and counties against the state of Missouri: one lawsuit filed by the City of St. Louis, St. Louis County, and Jackson County, *see City of St. Louis v. State of Missouri*, No. 21AC-CC00237 (Cole Co. Cir. Ct.); and one lawsuit filed by the City of Arnold, *see City of Arnold v. State of Missouri*, No. 22JE-cc00010 (Jeff. Co. Cir. Ct.). The Federal Government participated as amicus curiae in *City of St. Louis*, *see City of St. Louis v. State of Missouri*, No. SC99290 (Mo.), in which the Supreme Court of Missouri heard argument on February 7, 2022.

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ARGUMENT

## I.    H.B. 85 Is Unconstitutional Under the Supremacy Clause

H.B. 85 violates the Supremacy Clause by purporting to nullify federal law. The NFA and the GCA also preempt H.B. 85. Because the underlying nullification of federal law in § 1.420 is not severable from the rest of the statute, H.B. 85 is invalid in its entirety. Even if the other provisions of H.B. 85 were severable, each provision independently violates the Supremacy Clause.

### A.  The Nullification Provision of H.B. 85 Violates Fundamental Constitutional Principles.

The Supremacy Clause provides that the "Constitution[] and the Laws of the United States . . . shall be the supreme Law of the Land" and are binding upon "the Judges in every State," the "Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. As Chief Justice Marshall explained, "[S]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 322 (1819). Accordingly, Missouri has no authority to nullify federal firearm laws. Nor does H.B. 85 withstand scrutiny under preemption principles.

### 1.  H.B. 85 Unconstitutionally Purports to Invalidate Federal Law.

It is a fundamental principle of our federal structure that state legislatures have no authority to nullify federal statutes. *See United States v. Reynolds*, 235 U.S. 133, 149 (1914) ("If such state statutes . . . have the effect to deny rights secured by the Federal Constitution or to nullify statutes passed in pursuance thereto, they must fail."); *Anderson v. Carkins*, 135 U.S. 483, 490 (1890)

("The law of [C]ongress is paramount; it cannot be nullified by direct act of any state, nor the scope and effect of its provisions set at naught indirectly."). Nor may state legislatures nullify federal law as announced by the United States Supreme Court. *See Cooper*, 358 U.S. at 18–19 (reaffirming the "basic principle that the federal judiciary," not any individual state, "is supreme in the exposition of the law of the Constitution").

Yet H.B. 85 purports to do just that. The cornerstone provision of H.B. 85 declares five categories of federal firearm laws to be "infringements on the people's right to keep and bear arms." H.B. 85 § 1.420; SOF ¶¶ 17–48. Missouri cannot ground its nullification attempt on the premise that it has independently deemed the federal firearm laws at issue to be unconstitutional "infringements." H.B. 85 § 1.420. The Supreme Court has made clear that any theoretical ability of a state legislature to "interpos[e]" itself against federal law "is illegal defiance of constitutional authority." *United States v. Louisiana*, 364 U.S. 500, 501 (1960) (per curiam) (citation omitted). Indeed, H.B. 85 is premised on the nullification doctrine that the Supreme Court resoundingly rejected over half a century ago in *Cooper v. Aaron*, 358 U.S. at 18. Relying upon "basic constitutional propositions which are settled doctrine," *id.* at 17, the Supreme Court declared that allowing states to unilaterally declare federal law unconstitutional would render the constitution "a solemn mockery," *id.* at 18 (quoting *United States v. Peters*, 9 U.S. 115, 136 (1809)). H.B. 85 attempts to revive this long-defunct nullification doctrine by independently declaring federal law to be unconstitutional and "invalid." H.B. 85 § 1.430; SOF ¶¶ 27–29. H.B. 85's nullification premise is therefore a violation of both the Supremacy Clause and Supreme Court precedent.

Missouri cannot justify H.B. 85's attempt to nullify federal law by resort to the Second Amendment. The Second Amendment affords certain protections relating to the possession of firearms. *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *see United States v. Adams*, 914

F.3d 602, 609–10 (8th Cir. 2019). But, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626; *see McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("[T]he right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'"). In particular, the Supreme Court has reaffirmed that "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms" constitute "presumptively lawful regulatory measures" consistent with the Second Amendment. *Heller*, 554 U.S. at 626–27 & n.26 (noting that such examples are not exhaustive); *see McDonald*, 561 U.S. at 786 ("repeat[ing]" the same "assurances").

The NFA and the GCA—which have both been on the books for decades—are quintessential examples of the "presumptively lawful regulatory measures" described in *Heller*. 554 U.S. at 627 n.26. The NFA regulates the manufacture and transfer of certain firearms by imposing licensing, registration, and tax requirements. *See* 26 U.S.C. §§ 5811–5822, 5841; SOF ¶¶ 1–5. Likewise, the GCA regulates those engaged in the business of manufacturing, importing, and dealing in firearms by imposing licensing, recordkeeping, and marking requirements. *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a); SOF ¶¶ 6–16. The GCA also prohibits the possession of firearms by felons, certain individuals with mental health conditions, and others. 18 U.S.C. § 922(g); SOF ¶ 13. Since *Heller*, the Eighth Circuit has consistently upheld federal statutes that H.B. 85 purports to declare unconstitutionally invalid.[4]

---

[4] *See, e.g.*, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) (upholding 18 U.S.C. § 922(g)(8), prohibiting firearms possession by individuals subject to certain protection orders); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011) (upholding § 922(g)(1), prohibiting possession by felons); *United States v. Seay*, 620 F.3d 919, 924–25 (8th Cir. 2010) (upholding § 922(g)(3), prohibiting possession

Nor can Missouri justify H.B. 85 with reference to the Tenth Amendment. Although Congress cannot require state or local employees to assist with federal enforcement, *see Printz v. United States*, 521 U.S. 898, 935 (1997), H.B. 85 is not a mere decision by the State to withhold its resources. Rather, as part of its sweeping attempt to nullify federal law, H.B. 85 is intended to prohibit even those with federal authority from enforcing federal firearm laws; to restrict federal access to information necessary to investigate and prosecute federal firearm laws violations; and to erect obstacles to the enforcement of federal firearm laws. SOF ¶¶ 21–48; *see* H.B. 85 § 1.410(5) (asserting that "supremacy does not extend to various federal statutes" regulating firearms within Missouri). Nothing in *Printz* or the Tenth Amendment supports such an attempt to directly regulate, discriminate against, and affirmatively penalize the lawful exercise of federal authority. *Cf. North Dakota*, 495 U.S. at 435 (holding that a state law is invalid when it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals"); *M'Culloch*, 17 U.S. at 436 ("[T]he states have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."). In short, H.B. 85 rests on the unconstitutional premise that Missouri can declare federal firearm laws invalid and directly regulate federal authority, and is therefore unlawful under well-established Supremacy Clause precedent.

### 2. Federal Law Preempts H.B. 85's Nullification Provision.

H.B. 85 also fails under a conflict preemption analysis. If "Congress enacts a law that imposes restrictions or confers rights on private actors," and "a state law confers rights or imposes

---

by users of controlled substances); *United States v. Fincher*, 538 F.3d 868, 872–74 (8th Cir. 2008) (upholding prohibition of machinegun possession and expressing "doubt" that challenges to "federal registration requirements . . . would succeed in light of *Heller*").

restrictions that conflict with the federal law," then "the federal law takes precedence and the state law is preempted." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018).

Here, the express purpose of H.B. 85 is to nullify federal law. SOF ¶¶ 17–48. In doing so, H.B. 85 acts as an intentional "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Indeed, H.B. 85 purports to define its own class of "law-abiding citizens" who are deemed entitled to acquire, possess, and transfer firearms free from federal-government regulation. *See* H.B. 85 § 1.420(1)–(5). As described above, this declaration conflicts with a broad swath of federal firearm laws concerning registration, licensing, and tracking, as well as important federal criminal prohibitions on the types of individuals who may possess a firearm and where they may do so. SOF ¶¶ 13, 30–48. H.B. 85 thus directly conflicts with, and is therefore preempted by, federal firearm laws.

Federal courts across the country have confirmed that federal firearm statutes preempt contrary state law. *See Mont. Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 981–83 (9th Cir. 2013) (holding Montana's "Firearms Freedom Act" preempted to the extent it declared the manufacture and sale of unlicensed firearms free from "federal law or federal regulation"); *United States v. Cox*, 906 F.3d 1170, 1189 (10th Cir. 2018) (holding that Kansas's "Second Amendment Protection Act" did not provide a defense to federal firearms prosecution because the State could not "insulate from federal regulation the making, possession, and transfer of firearms within Kansas's borders"). Indeed, just recently, a District Court in this District summarily adopted the report of a Magistrate Judge who concluded that "[t]o the extent Defendant argues [that H.B. 85] . . . somehow invalidated lawfully enacted federal criminal statutes, his arguments are improper and unfounded" because "the Supremacy Clause dictates that federal enactments will prevail over competing state

exercises of power." *United States v. Gilliam*, No. 4:19-cr-00266-RK, ECF No. 127 at 3–4 (W.D. Mo. Feb. 3, 2022), *report and recommendation adopted*, Order (Feb. 24, 2022). The same conclusion applies here: H.B. 85 is invalid as preempted.

### B. H.B. 85 Should Be Enjoined in Its Entirety.

Because H.B. 85's cornerstone nullification provision is invalid, all of H.B. 85 should be declared invalid under well-established severability principles. The Supreme Court of Missouri has established a two-part test for determining severability:

> First, this Court considers whether, after separating the invalid portions, the remaining portions are in all respects complete and susceptible of constitutional enforcement. Then, this Court considers whether the remaining statute is one that the legislature would have enacted if it had known that the rescinded portion was invalid.

*Priorities USA v. State*, 591 S.W.3d 448, 456 (Mo. banc 2020) (quotations omitted) (quoting *Dodson v. Ferrara*, 491 S.W.3d 542, 558 (Mo. banc 2016)); *see also* Mo. Rev. Stat. § 1.140; *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (confirming that state law controls the severability of state statutes); *accord* H.B. 85 § 1.485 (contemplating that "[i]f any provision of" H.B. 85 is held invalid, the severability principle could only save any remaining provisions that "may be given effect without the invalid provision").

Under both parts of the Supreme Court of Missouri's test, because H.B. 85's nullification provision, § 1.420, is invalid, all of H.B. 85's remaining operative provisions should likewise be declared invalid. First, no part of H.B. 85 is "susceptible of constitutional enforcement" because all of its operative provisions are dependent upon its unconstitutional nullification of federal law. *Priorities USA*, 591 S.W.3d at 456. Each subsection expressly operates only with respect to the "infringing" federal laws, which are set forth in § 1.420. Indeed, all of H.B. 85's operative provisions expressly or implicitly refer back to, and thus depend on, the nullification provision of § 1.420. Section 1.430's scope is defined using language nearly identical to § 1.420. *Compare id.*

§ 1.430 (invalidating "federal acts, laws, executive orders, administrative orders, rules, and regulations . . . that infringe on the people's right to keep and bear arms as guaranteed by the Second Amendment"), *with id.* § 1.420 (same). Section 1.430 thus necessarily relies on the validity of § 1.420, which defines what § 1.430 considers to be "invalid to this state." *Id.* § 1.430. Section 1.440 provides that it is "the duty of the courts and law enforcement agencies of this state to protect" against "the infringements *defined under section 1.420*." H.B. 85 § 1.440 (emphasis added). Similarly, § 1.450 provides that "[n]o entity or person . . . shall have the authority to enforce or attempt to enforce any federal acts . . . infringing on the right to keep and bear arms *as described under section 1.420*." *Id.* § 1.450 (emphasis added). Section 1.460 establishes civil penalties for any "political subdivision or law enforcement agency that employs a law enforcement officer who acts knowingly . . . to violate the provisions of section 1.450," which, as noted, itself refers back to § 1.420. *Id.* § 1.460. And finally, § 1.470 establishes civil liability for "[a]ny political subdivision or law enforcement agency that knowingly employs" current and former government employees who "[e]nforced or attempted to enforce" or who gave "material aid and support to the efforts of another who enforces or attempts to enforce any of the infringements *identified in section 1.420*." *Id.* § 1.470.1 (emphasis added).

Because all of H.B. 85's subsections necessarily cross-reference § 1.420, they are all inextricably intertwined and are not "in all respects complete and susceptible of constitutional enforcement" on their own. *Priorities USA*, 591 S.W.3d at 456; *see also Nat'l Educ. Ass'n v. Mo. Dep't of Labor & Indus. Rels.*, 623 S.W.3d 585, 595 (Mo. banc 2021); *Shrink Mo. Gov't PAC v. Maupin*, 71 F.3d 1422, 1427 (8th Cir. 1995) (concluding that, under Missouri law, because "[e]very subsection . . . makes some reference to the expenditure limits that we have held unconstitutional[,]" "[t]he invalid portions are inextricably intertwined with the remainder of the statute").

Nor is there any indication that the Missouri General Assembly "would have enacted [H.B. 85] if it had known that the rescinded portion was invalid." *Priorities USA*, 591 S.W.3d at 456. The General Assembly's findings do not reflect a broad desire to prevent state participation in enforcement of any and all federal laws. Instead, H.B. 85 was intended to effectuate nullification of the particular federal firearm laws laid out in § 1.420. SOF ¶¶ 17–48. Because each of H.B. 85's provisions depends on the unconstitutional nullification of federal firearm laws in § 1.420, all of H.B. 85's provisions are inextricably intertwined, and the entirety of H.B. 85 is invalid.

### C. Even Under a Section-by-Section Analysis, the Operative Provisions of H.B. 85 are Each Invalid Under the Supremacy Clause.

Because § 1.420 is unconstitutional and the remaining provisions of H.B. 85 are non-severable, this Court need not conduct a section-by-section analysis. Even were the Court to do so, however, each remaining provision also independently violates the Supremacy Clause.

#### 1. H.B. 85 §§ 1.430, 1.440, and 1.450 Are Independently Invalid As Constraints on Federal Authority and Information-Sharing.

Several of H.B. 85's provisions violate the doctrine of intergovernmental immunity by constraining federal authority and restricting information-sharing with the Federal Government. Under the doctrine of intergovernmental immunity, a state law is invalid when it "regulates the United States directly or discriminates against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435.

First, H.B. 85 unconstitutionally regulates the United States by denying federal authority to enforce federal law. *See Tennessee v. Davis*, 100 U.S. 257, 263 (1880) ("No state government can exclude [the federal government] from the exercise of any authority conferred upon it by the Constitution [or] obstruct its authorized officers against its will[.]"); *see also, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents

and employees, the ordinances seek to regulate the government directly."). Section 1.450 facially purports to constrain federal officials in such a way. SOF ¶¶ 22, 48. The section provides that "[n]o entity or person, including any public officer or employee of this state or any political subdivision of this state, shall have the authority to enforce or attempt to enforce any federal acts . . . described under section 1.420." H.B. 85 § 1.450. In prohibiting *any* "entity or person" from enforcing certain federal laws, § 1.450 purports to prohibit federal officials from enforcing federal law.

Additionally, §§ 1.430 through 1.450—by declaring federal firearm laws "invalid" and imposing a "duty" on state law enforcement to "protect" against "the infringements defined under section 1.420"—unconstitutionally constrain the conduct of state and local law enforcement officers who are federally deputized Task Force Officers (TFOs). SOF ¶¶ 17–57. TFOs enforce federal laws in their federal capacity based on federal authority—not state authority—and Missouri has no ability to limit that authority. *See* 28 U.S.C. §§ 561(f), 566(c) (providing that once state and local officials are properly deputized, they are bestowed with federal authority); *see also, e.g.*, *Colorado v. Nord*, 377 F. Supp. 2d 945, 949 (D. Colo. 2005) (collecting cases for the proposition that "[c]ourts have consistently treated local law enforcement agents deputized as federal agents and acting as part of a federal task force as federal agents"). While a state may withdraw certain assistance from federal enforcement efforts, it cannot reject the very existence of federal authority.

Second, H.B. 85 unconstitutionally discriminates against the Federal Government by restricting law enforcement officers from sharing information with the Federal Government. SOF ¶¶ 17–48, 58–62. A state cannot "treat[] someone else better than it treats" the Federal Government. *Washington v. United States*, 460 U.S. 536, 544–45 (1983); *see also Reno v. Condon*, 528 U.S. 141, 151 (2000) (explaining that the Tenth Amendment does not protect states' decisions to refuse to provide information to the Federal Government). But H.B. 85 prohibits Missouri officials

27

from sharing information *only* with the Federal Government—not with any other states' law enforcement agencies, even if those states have firearm laws identical to (or even stricter) than those of the United States. The constitutional defects are heightened further to the extent H.B. 85 is construed as prohibiting state and local officials from testifying in federal court or providing information regarding federal offenses to the Federal Government, all of which are activities protected under federal law. SOF ¶ 60; *see* 18 U.S.C. §§ 1512(d), 1513(e); *see also In re Quarles*, 158 U.S. 532, 535 (1895); *Williams v. Allen*, 439 F.2d 1398, 1400 (5th Cir. 1971).

### 2. H.B. 85's Penalty Provisions—§ 1.460 and § 1.470—Are Independently Invalid As Discriminatory Against Federal Authority.

H.B. 85 further carries out its unconstitutional nullification effort by imposing penalties based on the lawful enforcement of federal firearm laws. SOF ¶¶ 23–26. But, as previously discussed, the doctrine of intergovernmental immunity prohibits states from "regulat[ing] the United States directly or discriminat[ing] against the Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435; *M'Culloch*, 17 U.S. at 317 ("States have no power . . . to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted . . . by Congress to carry into effect the powers vested in the national government."). States thus cannot "control the conduct of" individuals "acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56–57 (1920).

H.B. 85 penalizes the lawful exercise of federal authority twice over. First, § 1.460 imposes a $50,000 penalty on "[a]ny political subdivision or law enforcement agency that employs a law enforcement officer who acts knowingly . . . to violate the provisions of section 1.450[.]" H.B. 85 § 1.460. Second, § 1.470 imposes an additional $50,000 penalty on "[a]ny political subdivision or law enforcement agency that knowingly employs an individual" who *previously* served as a federal official (or acted under color of federal law) and enforced the relevant federal firearm laws, or who

provided "material aid and support" to someone who enforced the relevant federal firearm laws. *See id.* §§ 1.470, 1.480. "By constraining the conduct of federal agents and employees, [H.B. 85] seek[s] to regulate the government directly." *City of Arcata*, 629 F.3d at 991.

These penalty schemes also discriminate against the federal government by attaching liability only to the exercise of federal authority and not to the exercise of comparable state authority. *See id.* ("The cities' differential treatment of identical conduct based on the actor's status as a federal agent or employee fits squarely within this [discrimination] framework."). The penalty schemes impose a unique disadvantage on former federal officials and task force officers by precluding them from seeking employment with local government or law enforcement in Missouri, even though other states' law enforcement officers are free to do so regardless of their prior law enforcement activities. *Cf. Timlin v. Myers*, 980 F. Supp. 1100, 1108 (C.D. Cal. 1997) (applying intergovernmental immunity doctrine to invalidate state law that "unduly burden[ed]" federal employees relative to state employees). These penalties on the lawful exercise of federal authority are therefore invalid and independently violate the Supremacy Clause.

## II.   Entry of A Permanent Injunction Against H.B. 85's Enforcement is Warranted

Unless this Court enjoins enforcement of H.B. 85, the United States will continue to be irreparably harmed in its ability to enforce federal firearm laws, reduce violent crime, and apprehend wanted fugitives. Those injuries demonstrate the propriety of, and need for, an injunction. *See Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008) (identifying the factors). An injunction is necessary to redress the United States' irreparable harm, and to further the public interest in enforcing federal law and protecting public safety.

As the attached submissions establish, H.B. 85 severely harms public safety within Mis-

souri. SOF ¶¶ 50–72. By purporting to nullify certain federal firearm laws, H.B. 85 directly undermines federal law enforcement within Missouri. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (noting that the United States has compelling interests in preventing crime and promoting public safety). Despite the critical nature of joint task forces, many state and local law enforcement agencies have instructed their personnel not to enforce particular federal laws even when acting in a federal capacity as TFOs. SOF ¶¶ 52, 54, 56–57. This instruction has already adversely affected the ability of task forces to fight violent crime. SOF ¶¶ 55–57. Additionally, H.B. 85 has caused a breakdown in the United States' information-sharing and investigatory-support networks, undermining important crime-solving tools like NIBIN. SOF ¶ 58–62. H.B. 85 has particularly dangerous implications for sensitive areas such as airports, where any delay or even outright refusal on the part of the on-site police to enforce federal firearm laws could be disastrous. SOF ¶¶ 63–68. And H.B. 85's vague, broad, and plainly unconstitutional nature has generated confusion and inconsistent enforcement. SOF ¶¶ 69–72. Meanwhile, H.B. 85 limits the job prospects of federal employees and others who engage in the lawful exercise of federal authority by facially discriminating against such individuals. H.B. 85 §§ 1.460, 1.470; SOF ¶¶ 73–74.

The United States has a strong interest in promoting public safety, fulfilling its responsibilities under federal law, and upholding the mandates of the Constitution. If Missouri's nullification attempt prevails, it may become a model for states in countless substantive areas. An injunction is necessary to redress the above harms, promote public safety, and advance the rule of law.

## CONCLUSION

For these reasons, the Court should permanently enjoin enforcement of H.B. 85 and issue a declaratory judgment that H.B. 85 violates the Supremacy Clause, is preempted by federal law, and violates the doctrine of intergovernmental immunity.

Dated: February 28, 2022

Respectfully submitted,

SAYLER A. FLEMING
United States Attorney
Eastern District of Missouri

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

TERESA A. MOORE
United States Attorney
Western District of Missouri

BRIAN D. NETTER
Deputy Assistant Attorney General

/s/ Alan T. Simpson
ALAN T. SIMPSON (Mo. Bar 65183)
Assistant United States Attorney
Western District of Missouri
400 East 9th Street, Room 5510
Assistant United States Attorney
Kansas City, MO 64106
Telephone: (816) 426-3130
Fax: (816) 426-3165
Email: alan.simpson@usdoj.gov

CRISTEN C. HANDLEY
Counsel, Civil Division

ALEXANDER K. HAAS
Director

DANIEL SCHWEI
Special Counsel

/s/ Cassandra Snyder
DANIEL RIESS
CASSANDRA M. SNYDER
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 451-7729
Fax: (202) 616-8460
Email: cassandra.m.snyder@usdoj.gov

31