IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| THE UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 2:22-cv-4022-BCW |
| ) | |
| ) | |
| THE STATE OF MISSOURI, *et al.* ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DECLARATION OF FREDERIC D. WINSTON

I, Frederic D. Winston, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the Special Agent in Charge of the Kansas City Field Division of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). I have served in my current capacity since January 3, 2021. As Special Agent in Charge, I am responsible for overseeing the criminal and regulatory enforcement operations of the Kansas City Field Division and for ensuring that such operations are consistent with federal law and the policies of ATF and the Department of Justice.

2.  I have been a law enforcement officer since July 15, 1991 and employed by ATF since August 27, 2001. Before serving in my current capacity, I worked as a local police officer and street-level federal agent. I have served in several law enforcement capacities and worked in different judicial districts and states. Most of my law enforcement work stems from information sharing, whether it was done face-to-face or through review of databases and records systems. Like my law enforcement colleagues, my job in general relies upon communication and cooperation at all levels. Previously as a local officer, I served as a federally deputized task force

1

officer and learned the value of teamwork in law enforcement. As a Resident Agent in Charge of an ATF Field Office, I led a multi-agency gang investigation unit. The unit was comprised of federal and state law enforcement personnel who worked in collaboration to successfully serve and protect the citizens within our area of responsibility. Later, as an Assistant Special Agent in Charge, I created a multi-agency strike force in the St. Louis area built upon the premise of federal agents and local officers working as a team, sharing information and resources, and all working together in an effort to decrease violent gun crimes.

3. The purpose of this declaration is to explain ATF Kansas City Field Division's role in protecting Missouri citizens from violent crime and to identify ways in which Missouri House Bill 85, also called the Second Amendment Preservation Act, impedes ATF's ability to carry out that role. This declaration is based on my personal knowledge as well as knowledge made available to me in the course of my duties as the Special Agent in Charge.

**ATF's Mission, Organization, and Administration of Federal Firearms Laws**

4. ATF's mission is to fight violent crime and to protect the public by interdicting and preventing illegal firearms trafficking and the criminal possession and use of firearms, and by ensuring compliance with federal laws and regulations by firearms industry members. ATF has twenty-five field divisions throughout the country. The Kansas City Field Division is located in Kansas City, Missouri and encompasses all of Missouri, with additional offices in St. Louis, Cape Girardeau, Springfield, and Jefferson City, Missouri. This Division also covers the States of Nebraska, Kansas, Illinois, and Iowa. Along with our high volume of criminal enforcement responsibilities, this Division is also tasked with regulating the over 4,100 federal firearms licensees with a business premises in Missouri.

5.  ATF is responsible for administering and enforcing laws related to firearms and ammunition, specifically the Gun Control Act of 1968 (GCA), 18 U.S.C. §§ 921 et seq. and the National Firearms Act of 1934 (NFA), 26 U.S.C. §§ 5801 et seq. See 28 U.S.C. § 599A; 28 C.F.R. § 0.130.  Some of the key purposes of these laws are to effectively regulate firearms that travel in or affect interstate commerce to reduce the likelihood that they are used by those involved in criminal activities.

6.  ATF is the only federal agency authorized to license and inspect firearms dealers to ensure they comply with laws governing the sale, transfer, possession, and transport of firearms. See 28 U.S.C. § 599A; 28 C.F.R. § 0.131.

## Violent Crime Within Missouri

7.  Violent crime is a significant problem in Missouri.  In 2020, the Missouri State Highway Patrol (MSHP), which is responsible for reporting state-wide crime statistics, reported 33,267 violent crime offenses state-wide, an increase of 8.38% from the previous year.[1]  That same year, MSHP reported 731 homicide offenses state-wide, an increase of 26.47% from 577 such offenses reported in 2019.

8.  Firearms are used in a significant number of violent crimes in Missouri.  MSHP reports a total of 13,964 firearm-related offenses in 2020, an increase of 109.20% from 2019.  MSHP also reports that, of the 731 homicides in the state in 2020, 506 involved a firearm.  Further, of Kansas City's 176 homicides in 2020, 148 (84.1%) were committed by firearms.  The St. Louis Metropolitan area, for its part, experienced 264 homicides in 2020, 92.1% of which were committed by firearms.

---

[1] The MSHP data referenced in this declaration are available at https://showmecrime.mo.gov/CrimeReporting/CrimeReportingTOPS.html (last visited 2/28/22).

9. Gun violence in the State has continued through 2021, with MSHP reporting 20,690 firearm-related crimes, an increase of 48.17% from 2020, and 571 homicides, 77.5% of which involved a firearm. Further, Kansas City suffered 137 homicides in 2021, while the St. Louis Metropolitan Area reported 189 homicides, the vast majority of which involved a firearm.

10. ATF's role in limiting unlawful access to firearms is thus key to preventing additional violent crimes in the State. Additionally, ATF's ability to solve and assist in the prosecution of violent crime frequently depends on data associated with firearms, *e.g.*, ballistics information, or records maintained by federal firearms licensees, as discussed further below.

11. Federal firearms investigations and prosecutions are key components of combating violent crime, and promoting public safety, within Missouri. The arrest and conviction of those violating the Federal firearms laws are frequently one of the most effective tools for taking violent criminals off the street.

**Missouri Second Amendment Preservation Act**

12. On June 12, 2021, the Governor of Missouri signed Missouri House Bill Number 85 (HB85), also called the "Second Amendment Preservation Act" or the "SAPA" into law. As enacted, the SAPA purports to create significant new limits on the ability and authority of state and local law enforcement to enforce federal firearms laws and imposes sanctions on those who violate these limits or enable their violation. Additionally, the SAPA declares certain federal firearms laws unlawful. Based upon the passage of this law, ATF has seen impacts that I believe hinder the collaborative partnerships and investigative information sharing that protect the people of Missouri, as well as other states. As discussed further below, the SAPA has negatively impacted law enforcement and public safety within Missouri by: (1) prompting the withdrawal of state and local officers from joint task forces; (2) limiting the amount of information that ATF receives from

state and local entities; and (3) purporting to nullify, and consequently creating confusion about the validity of, federal firearms laws.

**Effects of the SAPA: Withdrawal from Task Forces and other Partnerships**

13. The SAPA has already had a significant impact on ATF's partnerships with state and local law enforcement offices. Those partnerships, which include task forces designed to address crimes in the locations specific to a partner department, are critical to ATF's law enforcement mission of protecting Missouri communities from violent crimes.

14. Before the passage of the SAPA, there were approximately 69 ATF Special Agents, 22 ATF Industry Operations Investigators, 44 full-time Task Force Officers, and 9 Special Deputies, with a post of duty in Missouri.

15. As of this declaration, 13—and soon to be 14—of the 53 state and local officers with federal deputizations (the Task Force Officers and Special Deputies referenced in the preceding paragraph), have withdrawn from participation in ATF task forces in some capacity based on the SAPA, specifically:

   a. The MSHP withdrew three troopers from participation in any ATF Task Forces;
   
   b. The Columbia Police Department (PD) withdrew four officers from participation in an ATF Task Force;
   
   c. The Johnson County Sheriff withdrew one deputy from participation in an ATF Task Force;
   
   d. The O'Fallon PD withdrew two officers with K-9s from participation in an ATF Task Force;

5

e. The Sedalia PD withdrew two officers from participation in an ATF Task Force;

f. The Hazelwood PD has advised that it will withdraw from participation in an ATF Task Force; and

g. The Cape Girardeau PD has allowed its TFO to continue to participate in an ATF Task Force, but that TFO has been instructed to limit his activities and not participate in certain federal firearms matters.

16. These task forces are primarily dedicated to investigating and enforcing the laws relevant to the illegal use, possession, and trafficking of firearms. Such task forces, as well as ATF's overall partnerships with state and local departments and agencies, are key to holding violent persons and those illegally using firearms accountable under the law. For example, from its creation in January 2020 through August 2021, the Columbia Violent Crimes Task Force has recovered 55 firearms from prohibited persons; made 30 arrests for violation of federal law and 35 arrests for violation of state law. Without exception, these arrests stem from collaborative investigations involving violent crime offenses, firearm possession, or association with violent gang organizations. However, since the passage of the SAPA, state and local law enforcement no longer work with the Violent Crimes Task Force at all. Indeed, state and local law enforcement partners have limited their cross-jurisdictional cooperation with ATF all across the state.

17. There are numerous instances in which Federal partnership via the National Integrated Ballistic Information Network (NIBIN) has assisted in resolving violent crime investigations, such as in Columbia and the greater Boone County area. An example of the combined effectiveness of a strong local and Federal partnership is the arrest of those responsible for the tragic murder of Shamya Brimmage in March of 2017 in Columbia, Missouri. Brimmage

was celebrating her birthday inside a house when a drive-by shooting occurred, resulting in her death and another injured victim. A confidential source provided a local TFO with suspect information. Working in combination with an ATF agent partner, the team was able to detain the suspect in a vehicle matching other information relayed. Spent casings were recovered from that vehicle and NIBIN confirmed they were a match to those recovered from the homicide scene. Second Degree Murder charges remain pending against one defendant while another suspect pled guilty to Voluntary Manslaughter, among other charges, and is currently serving a 20-year sentence.

18. Because of the withdrawal of state and local officials from ATF task forces, ATF is no longer able to fulfill its duties as effectively, including preventing, investigating, and assisting in the prosecution of violent offenders. These state and local officials are critical members of ATF's law enforcement efforts. As a result of the withdrawals identified above, the SAPA has harmed law enforcement and public safety in Missouri.

19. For example, with respect to federal prosecutions initiated in Missouri federal court from ATF investigations, from June 12 through December 15 of 2019, 318 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 364, and the number of criminal charges was 679. Of that same time-period in 2020, 285 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 380, and the number of charges was 788. Of that same time-period in 2021, 177 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 230, and the number of charges was 365. The 2021 numbers represent a forty-four percent (44%), thirty-seven percent (37%), and forty-six (46%) percent drop, respectively from the 2019 numbers. While it is likely

that other factors such as COVID-19 also played a role in the decline of prosecutions, the SAPA was undoubtedly a factor.

20. Moreover, ATF has had planned enforcement operations, such as search warrants, where we normally would have collaborated with our local partners, but these departments now feel they cannot participate due to the SAPA. This has caused ATF to pull resources from other areas of responsibility to ensure agent and public safety.

**Effects of the SAPA: Limits on Information from State and Local Officials**

21. The SAPA has also impacted ATF's ability to rely on state and local partners for information related to ATF's own investigations, including those related to the criminal use, possession, and trafficking of firearms.

22. For example, citing the SAPA, the Director of the MSHP Missouri Information Analysis Center (MIAC) informed ATF that the Center will no longer provide any investigative support to ATF, to include assisting in providing background information on investigative targets. The MIAC also indicated it will no longer submit firearms trace requests directly to ATF, a process used to help identify firearms used in crimes and link persons to unlawful activities. Additionally, MIAC will not assist in Federal Bureau of Investigation National Instant Criminal Background Check System (NICS) referral investigations that are assigned to ATF, *e.g.*, after a purchaser receives a firearm from a licensee but is then determined to be prohibited from possessing the firearm. Prior to the implementation of the SAPA, the MIAC has been a great partner and resource for ATF investigations associated with firearms investigations and violent criminals.

23. In the United States District for the Western District of Missouri, local and state collaboration varies, with many departments still hesitant of fully cooperating with ATF because of the uncertain ramifications of the SAPA. Agents are required to get subpoenas for information

that pre-SAPA was readily available.  In parts of the Western District, local law enforcement will only provide assistance in emergency situations.  In the Eastern District of Missouri, most departments are similarly hesitant to assist ATF based on the SAPA.

24. Perhaps most concerning, several state and local law enforcement entities have indicated that they will no longer input data into NIBIN.  NIBIN is the only interstate automated ballistic imaging network in operation in the United States and seeks to automate ballistics evaluations and provide actionable investigative leads in a timely manner.  This technology is vital to any violent crime reduction strategy because it enables investigators to match ballistics evidence with other cases across the nation.  This process also helps reveal previously hidden connections between violent crimes in different states and jurisdictions.

25. Some jurisdictions previously stopped inputting data into NIBIN but have now resumed doing so.  However, most of those jurisdictions will only input data after complying with additional procedures, which delays the entry of information into NIBIN and likewise harms its efficacy.

26. NIBIN is a critical tool in efforts to combat violent crime nationwide and in Missouri.  NIBIN, however, is only as good as the information put into the system.  If state and local law enforcement do not timely input data into NIBIN, our collective efforts in fighting violent crime are diminished.  A key component of the NIBIN process is information sharing and the timeliness of inputting data which generates potential leads.  Potential leads increase the likelihood of linking, solving or preventing additional firearm violence.  The stoppage or hesitancy to use NIBIN caused by the SAPA, has placed an avoidable risk upon the public.

27. The following statistics demonstrate the utility and importance of NIBIN within Missouri.  Over the three years preceding the SAPA's enactment, NIBIN was used to generate

over 6,000 leads, including 3,149 cross-jurisdictional leads. From October 2019 to June 2021, approximately 200 suspects were identified in NIBIN-related incidents in the State.

28. In the absence of state and local law enforcement officials voluntarily providing the information and assistance described above, particularly with respect to NIBIN, ATF's law enforcement responsibilities are harder to execute. Thus, the SAPA has deprived ATF of cooperative information-sharing relationships which harm law enforcement and public safety in Missouri.

### Effects of the SAPA: Nullifying Federal Law and Creating Confusion

29. The SAPA purports to nullify certain federal firearms laws that are important for maintaining public safety. For example, since there is no corresponding Missouri state violation, the SAPA would appear to allow certain federally prohibited persons to possess firearms, such as those under a restraining order and those convicted of misdemeanor crimes of domestic violence, 18 U.S.C. §§ 922(g)(8), (g)(9).

30. For reference, from October 2017 through July 2021, ATF referred approximately eight cases for prosecution to the respective Missouri Offices of the U.S. Attorney for violations of 18 U.S.C. § 922(g)(8), as well as approximately 20 cases for prosecution to those Offices for violations of 18 U.S.C. § 922(g)(9). During that same timeframe, ATF received approximately 81 FBI referrals for violations of § 922(g)(8), and approximately 744 FBI referrals for violations of § 922(g)(9).

31. From August 2021 through the present, no further cases have been referred for prosecution and ATF received an additional 11 FBI referrals for violations of § 922(g)(8) and an additional 148 FBI referrals for violations of § 922(g)(9).

32. All of these referrals involved people located in Missouri and identified by the Federal Bureau of Investigation's NICS System as prohibited persons who attempted to purchase, or actually did purchase firearms. State and local partners, and more specifically task force officers, often assist in investigating these referrals. Without this assistance, ATF will not be able to investigate these referrals as quickly, which in turn allows prohibited persons who were able to purchase firearms to retain them longer at greater risk to the public.

33. Prosecuting those who possess firearms after being convicted of a disqualifying misdemeanor crime of domestic violence and/or are in violation of qualifying restraining orders, is an important part of ATF's public safety mission, especially as to those offenders who have threatened violence or committed violent acts against family members.

34. By way of further example, local officers have indicated to ATF that even State court protective orders, on which State judges issue the orders with the advisement that possession of firearms would violate Federal law, could not be enforced by local officers due to the SAPA and that ATF—instead of local officers—are now responsible for retrieving those firearms.

35. Along with those noted GCA violations, the SAPA also appears to prohibit the imposition of federal taxes and registration requirements on any firearm covered by the NFA. The NFA defines "firearm" to include shotguns with a barrel length of less than 18 inches or weapons made from shotguns with an overall length of less than 26 inches; rifles with a barrel length of less than 16 inches or weapons made from rifles with an overall length of less than 26 inches; machineguns; silencers; and destructive devices. 26 U.S.C. § 5845. The NFA also requires the registration of such firearms in the National Firearms Registration and Transfer Record maintained by ATF. See 26 U.S.C. § 5841. Like with GCA violations, ATF conducts substantial enforcement efforts on these NFA-type weapons, and often work with our local partners in these investigations.

Enforcing these requirements of federal law are important aspects of ATF's mission to ensure lawful, safe ownership of firearms.

36. Federal firearms licensees also play a significant role in helping to protect the public, and their compliance with the federal laws and regulations is critical to this important goal. I specifically note the requirements of licensees to accurately and timely maintain acquisition and disposition records and to ensure that the ATF Form 4473 and multiple handgun sales forms are correctly completed and maintained when applicable. These records are key components to assisting in trace requests for recovered crime guns. Licensees also carry an important responsibility of ensuring a person acquiring any firearms is correctly identified and a background check is done to prevent prohibited persons from receiving firearms. The SAPA purports to declare these responsibilities of federal firearms licensees invalid.

37. Since the enactment of the SAPA, federal firearms licensees have indicated confusion about the current status of the law. In an attempt to affirm that these legal responsibilities continue regardless of the SAPA, and to address questions and confusion the Kansas City Field Division has received related to the SAPA, on July 26, 2021, ATF issued an informational letter addressed to all federal firearms licensees in Missouri. <u>See</u> www.atf.gov/firearms/docs/open-letter/missouri-open-letter-all-ffls-house-bill-number-85-second-amendment/download.

38. Federal firearms licensees' compliance with federal laws and regulations are critical in the fight against gun violence. For example, when ATF recovers a firearm, tracing the ownership of that firearm is crucial to the resulting investigation and frequently depends upon the records kept by federal firearms licensees. Without those records, a successful trace becomes much more difficult to achieve.

39. The SAPA's attempt to nullify federal law could also create confusion amongst private citizens about whether federal firearms laws remain valid and enforceable. If a private citizen were to erroneously believe that federal firearms laws were invalid, and sought to oppose ATF's lawful authority on that basis, that would pose an unacceptable and unnecessary risk of violent confrontation, use of force, and serious injury.

## Conclusion

40. In sum, based upon my knowledge and law enforcement experience in working with state and local partners, the SAPA has caused and will continue to cause a strain on law enforcement relationships due to the inability to communicate as effectively and to efficiently share information and investigative resources. This, in turn, will prevent law enforcement at all levels from effectively serving and protecting the citizens of Missouri and other states.

41. As discussed above, the SAPA (1) prevents federal, state, and local law-enforcement partners from cooperating effectively to investigate and enforce the law; (2) constrains information-sharing with the Federal Government, which deprives law enforcement of information needed to successfully investigate crimes, including violent crimes; and (3) creates confusion about the current status of federal firearms laws, which could harm the Federal Government's ability to effectively enforce federal law and potentially even lead to unnecessary, dangerous situations. For all of these reasons, the SAPA has an extremely negative effect on successful law enforcement and public safety within the State of Missouri.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:

_____
Frederic D. Winston
Special Agent in Charge
ATF Kansas City Field Division
U.S. Department of Justice