**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-4022-BCW |
| | ) | |
| THE STATE OF MISSOURI; MICHAEL | ) | |
| L. PARSON, Governor of the State of Missouri, | ) | |
| in his official capacity; ERIC SCHMITT, | ) | |
| Attorney General of the State of Missouri, in | ) | |
| his official capacity; and SANDY KARSTEN, | ) | |
| Director of the Missouri Department of Public | ) | |
| Safety, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**DECLARATION OF FEDERAL SECURITY DIRECTOR ANGELA BROOKS**

I, Angela Brooks, declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 as

follows:

1.      I am the Federal Security Director ("FSD") for the Transportation Security

Administration's ("TSA") operations at federalized airports in the state of Missouri. The TSA is

a component agency of the United States Department of Homeland Security ("DHS"). As the

FSD, my responsibilities include overseeing all TSA screening operations at Missouri airports,

and ensuring that such operations are consistent with federal law and the policies of TSA and

DHS.

2.      I have extensive experience in law enforcement and in the federal aviation sector,

having started my career with the Federal Aviation Administration ("FAA") as a Civil Aviation

Security Specialist with the FAA's Civil Aviation Security Field Office in Kansas City,

1

Missouri. While at the FAA, I was trained as a Federal Air Marshal and flew several missions to high threat international destinations.

3.      In 2002, after the terrorist attacks on 9/11, I joined the TSA as the Assistant FSD for Regulatory Inspections at the Kansas City International Airport (MCI). I was selected to be the Assistant FSD for Operations in 2003, and then selected to be the Deputy FSD for the State of Missouri in September of 2013. In May of 2018, I was selected to serve as the FSD for the State of Wyoming, and returned to my home state in my current position as the FSD for Missouri in September of 2020.

4.      The purpose of this declaration is to explain the TSA's role in securing the national aviation system and to identify ways in which Missouri House Bill 85 ("H.B. 85"), also known as the Second Amendment Preservation Act, may impede TSA's ability to carry out its role. This declaration is based on my personal knowledge, as well as knowledge made available to me in the course of my duties as the FSD for the State of Missouri.

**TSA's Mission and Congressional Mandate**

5.      Following the events of 9/11, it was clear that the security screening at airports was not sufficient to protect the traveling public, and Congress therefore created the TSA to better secure all modes of transportation, including aviation. It is TSA's mission to prevent terrorist attacks and reduce the vulnerability of the United States to terrorism within the nation's transportation networks. In furtherance of this mission at airports across the country, including those in Missouri, TSA screens all individuals and accessible property entering the sterile area of the airport—i.e., the physical portion of an airport that provides passengers access to boarding aircraft—in order to deter, detect, and prevent the carriage of prohibited items such as any explosive, incendiary, firearm, or weapon into that sterile area or onboard an aircraft.

2

6.       In accordance with the Aviation and Transportation Security Act ("ATSA"), TSA is charged with screening airport passengers at TSA checkpoints across the nation to ensure that airline passengers do not bring unauthorized explosives, firearms, and incendiary devices or other prohibited items, either on their person or in accessible property, into the security screening checkpoint and/or the sterile area of the airport. *See* 49 U.S.C. §§ 44901, 44903; 49 C.F.R. § 1540.111. It is a federal crime to knowingly and willfully enter an airport area where TSA conducts or regulates screening activities in violation of TSA security requirements, *see* 49 U.S.C. § 46314, which generally prohibit the carrying of weapons during TSA inspection (even before a person is otherwise permitted to enter the sterile area of an airport). *See* 49 C.F.R. § 1540.111(a)(1); *see also, e.g.*, 49 U.S.C. § 46505 (prohibiting carrying a weapon when on, or attempting to get on, an aircraft); 49 C.F.R. § 1503.401 (allowing TSA to impose civil penalties on individuals who bring prohibited items to the checkpoint or onboard aircraft).

7.       TSA checkpoints serve as the screening location where the agency ensures that passengers are not carrying prohibited items into the sterile area of an airport. Congress contemplated that, in general, airports would rely on "the services of qualified State, local, and private law enforcement personnel" to "provide[] a law enforcement presence and capability . . . that is adequate to ensure the safety of passengers." 49 U.S.C. § 44903(c)(1). Thus, when a passenger's prohibited firearm is discovered at a TSA checkpoint, TSA generally refers the passenger to state or local law enforcement to pursue any potential criminal violations and ensure that the firearm is not allowed into the sterile area of the airport.

8.       TSA also has a comprehensive civil enforcement program to impose civil penalties on passengers who bring prohibited items, including firearms, whether loaded or unloaded, to the TSA checkpoint. 49 C.F.R. § 1503.401 (TSA may impose civil penalties

3

against individuals who bring prohibited items to the checkpoint or onboard aircraft). Transportation Security Inspectors (TSIs) coordinate with local law enforcement to collect the initial evidence necessary to pursue the investigation of a regulatory violation and potential civil penalty.

<b>Firearms at TSA Checkpoints Nationwide and in Missouri</b>

9.        TSA screeners frequently and consistently discover firearms in carry-on luggage at checkpoints around the nation.  This problem is recurrent and increasing.  In the first nine months of 2021, TSA firearm catches at checkpoints set a 20-year record.  See TSA firearm catches at checkpoints sets 20-year record in first nine months of 2021 | Transportation Security Administration, *available at* https://www.tsa.gov/news/press/releases/2021/10/13/tsa-firearm-catches-checkpoints-sets-20-year-record-first-nine.

10.        The discovery of firearms at the checkpoint is particularly problematic in Missouri.  From 2018 through 2021, TSA discovered a total of 526 firearms at screening checkpoints in Missouri, with 183 firearm discoveries in 2021.  The incidence rate for Missouri is substantially higher than the nationwide average – in 2021, the nationwide average was one firearm discovery for every 97,999 passengers, but in Missouri, it was one firearm discovery for every 51,184 passengers.  *See* Rate of TSA firearm discoveries at Missouri airports trends upward in 2021 | Transportation Security Administration, *available at* https://www.tsa.gov/news/press/releases/2022/01/19/tsa-firearm-discoveries-missouri-airports-trends-upward-2021.

<b>The Impact of H.B. 85 on TSA Operations</b>

11.        On June 12, 2021, the Governor of Missouri signed H.B. 85 into law.  H.B. 85 purports to nullify federal firearms laws that Missouri considers an infringement on the Second

4

Amendment rights of Missourians. In doing so, H.B. 85 purports to limit the ability and authority of state and local law enforcement to enforce federal firearms laws. H.B. 85 ensures this limitation by allowing civil lawsuits against state and local law enforcement agencies that would impose hefty fines – up to $50,000 – on those entities that are found to violate H.B. 85.

12. Because H.B. 85 appears to nullify all federal acts "forbidding the possession . . . of a firearm . . . by law-abiding citizens," H.B. 85 appears to nullify all federal laws that prohibit firearm possession by *all* citizens in certain places, such as airports. However, even if H.B. 85 were construed to incorporate Missouri state law's place-based restrictions on firearm possession, H.B. 85 would still purport to nullify important federal restrictions on firearms in airports.

13. More specifically, it is my understanding that Missouri state law does not affirmatively prohibit concealed carry permit-holders from carrying firearms into airports or prohibit members of the public from carrying unloaded firearms into airports when ammunition is not readily accessible.

14. In contrast to Missouri state law, federal law explicitly prohibits individuals from possessing firearms (including unloaded firearms) at airports at the beginning of TSA inspection. *See* 49 C.F.R. § 1540.111(a)(1). Thus, TSA's statutory and regulatory provisions that prevent firearms from being carried into the sterile area of an airport or onto an aircraft go beyond Missouri's place-based possession restrictions.

15. As indicated above, Congress contemplated that TSA's screening operations and efforts will work in concert with local law enforcement personnel. When passengers bring firearms in their carry-on luggage, the very presence of that firearm necessarily creates a potentially dangerous and attention-grabbing situation at the checkpoint. In order to ensure that

a firearm discovered during screening is secured and prevented from entering the sterile area, TSA relies on local law enforcement officers to respond to the checkpoint. TSA standard operating protocols require TSA screeners to call local law enforcement if they believe that a carry-on bag contains a firearm. For every airport in Missouri at which TSA conducts screening, the responding airport police are provided by state and/or local jurisdictions.

16.     Given the federal prohibition on carrying a firearm into the sterile area of an airport or onto an aircraft, and the broad nullifying provisions of H.B. 85, the law poses a risk to the federal aviation system because it may discourage state and local law enforcement personnel at airports from assisting promptly in responding to TSA when firearms are discovered at the checkpoint.

17.     Additionally, it cannot be guaranteed that state and local law enforcement personnel at airports will continue to provide TSA with information necessary for TSA to carry out its civil enforcement actions against persons who bring firearms to the screening checkpoint.

18.     Thus, H.B. 85 increases the dangers associated with firearms at airports by creating confusion over whether state and local law enforcement personnel will continue to fulfill their passenger safety functions when a firearm is discovered. Any delay or hesitation in fulfilling this critical duty represents a substantial public safety threat, given the importance of acting swiftly to neutralize potential dangers in sensitive environments such as airports.

19.     Finally, given the ever-increasing discovery of firearms at TSA checkpoints nationwide and in Missouri, TSA may need to be more proactive in deterring and dissuading the public from bringing firearms to the checkpoint, such as by asking law enforcement to retain a firearm discovered during screening pending federal enforcement efforts, whether civil or criminal. H.B. 85 would hinder these efforts in Missouri by creating confusion over whether

6

local law enforcement entities in Missouri would cooperate with any such enhanced federal mandates.

**Conclusion**

20.     In sum, based upon my knowledge, and aviation and law enforcement experience in working with state and local airport law enforcement officers, H.B.85 diminishes the certainty that Missouri law enforcement officers will continue to work cooperatively and effectively with TSA in fulfilling its mission.  This potential weakness could be exploited by persons seeking to do significant harm to the United States through its aviation system.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: _____

Angela Brooks
Federal Security Director, State of Missouri
Transportation Security Administration
Department of Homeland Security

7