REF
KF
4548
.E53
2000
v.4

# Encyclopedia of the American Constitution

## SECOND EDITION

Edited by
LEONARD W. LEVY
and
KENNETH L. KARST



ADAM WINKLER, Associate Editor for the Second Edition

DENNIS J. MAHONEY, Assistant Editor for the First Edition
JOHN G. WEST, JR., Assistant Editor for Supplement I

MACMILLAN REFERENCE USA
*An imprint of the Gale Group*
New York

Case 2:22-cv-04022-BCW   Document 8-6   Filed 02/28/22   Page 1 of 5

Copyright © 2000 by Macmillan Reference USA

All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the Publisher.

Macmillan Library Reference USA
1633 Broadway
New York, NY 10019

Printed in the United States of America

Printing Number
10 9 8 7 6 5 4 3 2

**Library of Congress Cataloging-in-Publication Data**
Encyclopedia of the American Constitution / edited by Leonard W. Levy and Kenneth L. Karst.—2nd ed. / Adam Winkler, associate editor for the second edition.
    p. cm.
  Includes bibliographical references and indexes.
  ISBN 0-02-864880-3 (hard cover : alk. paper)
    1. Constitutional law—United States—Encyclopedias.   I. Levy, Leonard Williams, 1923–   II. Karst, Kenneth L.   III. Winkler, Adam.
KF4548 .E53   2000
342.73—dc21                                                        00-029203

This paper meets the requirements of ANSI-NISO Z39.48-1992 (Permanence of Paper).

that nude dancing is entitled to "a degree of First Amendment protection" and that the appropriate level of protection is provided by the four-part *O'Brien* analysis. Unlike the plurality and Scalia, however, Souter did not invoke the state's interest in morality. Rather, he relied exclusively on the state's interest in combating the pernicious "secondary effects" said to be caused by this type of nude dancing, including prostitution and sexual assaults. In RENTON (CITY OF) V. PLAYTIME THEATRES, INC. (1986), the Court found that a city's interest in avoiding similar "secondary effects" provided a legitimate, speech-neutral justification for imposing onerous ZONING requirements on movie theaters showing sexually oriented films. In concluding that this "secondary effects" rationale supported a total ban on activity protected by the First Amendment, however, Souter significantly increased the speech restrictive impact of this rationale.

The four dissenting Justices, in an opinion by White, agreed with the plurality and Souter that the nude dancing at issue was expressive conduct protected by the First Amendment. The DISSENTING OPINION, however, took issue with the plurality's basic premise, shared by Scalia, that Indiana's regulation was a general prohibition of conduct. White pointed out that the ban on nudity did not apply in the home. This observation seems wide of the mark. As Scalia notes, the rationale for the ban was not that nudity was immoral but that *public* nudity was immoral. The dissent offered a stronger argument that the nudity ban was not truly general, claiming that the ban did not apply to nudity in theatrical productions such as "Hair" or to nudity in ballets or operas such as "Salome." The dissent also disagreed with the conclusion that the purpose of the ban was unrelated to the expressive aspect of nude dancing. In the dissent's view it was the "emotions and feelings of eroticism and sensuality" generated by nude dancing that the state sought to regulate, "apparently on the assumption that creating or emphasizing such thoughts and ideas in the minds of spectators may lead to increased prostitution and degradation of women." Consequently, the dissent found Indiana's ban on nude dancing to be an unconstitutional content-based regulation of protected expression.

To the extent that *Barnes* allows the state to ban totally nude dancing in bars and adult book stores, it represents a relatively constrained view of the scope of free speech protection. There are, nonetheless, several speech-protective aspects to this decision. Eight members of the Court found that nude dancing was "expressive conduct" entitled to some degree of First Amendment protection. A clear majority of the Court appeared to reject the plurality's view that the state's interest in promoting morality was sufficient justification for even incidental bans on constitutionally protected expression. Finally, *Barnes* strongly suggests that the state may not constitutionally ban nudity in theatrical productions. Souter, whose vote was necessary to uphold the ban, noted that it would be difficult to see how nudity in productions such as "Hair" and "Equus" could possibly cause harmful "secondary effects." On the other hand, this result can also be read as unjustifiably discriminating between "high brow" entertainment that appeals to the Justices and the "low brow" entertainment of the masses.

JAMES WEINSTEIN
(2000)

Bibliography

BLASI, VINCENT 1992 Six Conservatives in Search of the First Amendment: The Revealing Case of Nude Dancing. *William and Mary Law Review* 33:611–663.

# NULLIFICATION

THOMAS JEFFERSON first suggested the doctrine of nullification in the second Kentucky Resolutions (1799), where he asserted that the sovereign states are the only proper judges of whether the federal government has violated the Constitution and "that a nullification . . . [by] those sovereignties, of all unauthorized acts . . . is the rightful remedy." (See VIRGINIA AND KENTUCKY RESOLUTIONS.) In the 1820s, South Carolinians Robert J. Turnbull and Whitemarsh Seabrook laid the doctrinal foundations of an expanded nullification argument by denouncing the expansion of federal authority. In *Consolidation* (1824), THOMAS COOPER argued that the states remained independent sovereigns, having given only limited and express powers to Congress.

JOHN C. CALHOUN systematized and refined the Carolinians' constitutional arguments. He maintained that the people of the separate states never relinquished their SOVEREIGNTY, and that sovereignty was indivisible. In ratifying the Constitution, the states created a government of limited, specified, and delegated authority. Calhoun used the legal doctrine of agency to explain the federal relationship: "The States . . . formed the compact, acting as sovereign and independent communities. The General Government is but [their] creature . . . a government emanating from a compact between sovereigns . . . of the character of a joint commission . . . having, beyond its proper sphere, no more power than if it did not exist." ("Address on the Relation of the States and the Federal Government," 1831.) When the federal government (the agent) exceeded its authority, the states (the principals), in the exercise of their sovereign power, could "interpose" their authority by nullifying the federal statute or action, which would be void in the nullifying states. If three-fourths of the other

Case 2:22-cv-04022-BCW   Document 8-6   Filed 02/28/22   Page 3 of 5

states adopted a constitutional amendment empowering the federal government to perform the nullified act, the state then had the choice of acquiescing or of withdrawing from the compact (the federal Constitution) by SECESSION. But Calhoun emphasized that nullification was a peaceable alternative, not a preliminary step, to secession.

Calhoun's theory found application in a dispute, ostensibly over protective tariffs, that produced the Nullification Crisis of 1832. For a decade, Carolinians had declared that their objections to specific federal programs such as INTERNAL IMPROVEMENTS or the national bank were merely specific parts of a larger objection to federal intrusion into the states' internal autonomy. The antitariff struggle was, in James Henry Hammond's metaphor, a "battle at the outposts" to prevent an assault on the real "citadel," slavery. When the Tariff of 1832 failed to meet Carolinian demands for an abrogation of the 1828 Tariff of Abominations, a South Carolina convention adopted an ordinance nullifying it and prohibiting its enforcement in the state.

President ANDREW JACKSON reacted forcefully. In his "Proclamation to the People of South Carolina" (1832), he denounced the theory of secession, insisting that the federal government was a true government to which the states had surrendered a part of their sovereignty. (See JACKSON'S PROCLAMATION.) "Disunion by armed force is treason," he warned. Congress enacted the FORCE ACT (1833), which provided for alternative means of collecting the tariff in South Carolina and enhanced the president's power to use militia and regular forces to suppress resistance to federal authority. Congress also began a downward revision of the tariff. With the crisis over the tariff assuaged, the South Carolina legislature denounced Jackson's "Proclamation" and a subsequent convention made the empty gesture of nullifying the Force Act.

In 1837, Calhoun offered six congressional resolutions that would have opened all federal TERRITORIES to slavery. Congress adopted four of these, including one declaring that the federal government was only a "common agent" of the states and possessed only "delegated" powers. But antislavery agitation in the North increased, and many Northerners endorsed the WILMOT PROVISO (1846), which would have excluded slavery from the territories acquired as a result of the Mexican War. To meet this threat, other southern radicals, including Robert Barnwell Rhett, Edmund Ruffin, and William Lowndes Yancey, turned to secession, which subsumed nullification.

Though the Union victory in the CIVIL WAR left the doctrines of state sovereignty, INTERPOSITION, nullification, and secession all defunct, southern political leaders briefly and ineffectually exhumed interposition theories during efforts in the late 1950s to thwart desegregation in southern universities and schools.

WILLIAM M. WIECEK
(1986)

Bibliography

CURRNET, RICHARD W. N. 1963 *John C. Calhoun.* New York: Washington Square Press.
FREEHLING, WILLIAM W. 1965 *Prelude to Civil War: The Nullification Controversy in South Carolina, 1816–1836.* New York: Harper & Row.

# NULLIFICATION CONTROVERSY

See: Constitutional History, 1829–1848