# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

UNITED STATES OF AMERICA,     )
                                   )
      Plaintiff,                )
                                   )
v.                                 )      Case No. 2:22-cv-04022-BCW
                                 )
THE STATE OF MISSOURI, *et al.*,  )
                                 )
      Defendants.            )

## DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

The case should be dismissed. Assuming the Court has subject-matter jurisdiction—and Defendants do not believe it does, for the reasons stated in their Motion to Dismiss under Fed. R. Civ. P. 12(b)(1)—the Complaint should nevertheless be dismissed for failure to state a claim for relief. All of the federal government's claims are premised on the same misunderstanding of the Second Amendment Preservation Act, Mo. Rev. Stat. §§ §§ 1.410-.485 (Truly Agreed and Finally Passed bill attached as Exhibit A). Properly understood, the substantive provisions of SAPA provide only that Missouri state officials and state resources may not be used to enforce certain narrow classes of disapproved *federal* firearms laws and regulations. Nothing in SAPA prevents the federal government from using federal officials and federal resources to enforce federal law in Missouri. The law is a perfectly valid exercise of Missouri's sovereign authority to direct how its own resources are used. The federal government lacks authority to "commandeer" Missouri's state officials and resources into the enforcement of federal regulatory programs—especially federal anti-gun programs. *Printz v. United States*, 521 U.S. 898, 935 (1997).

## STATUTORY BACKGROUND

During the last legislative session, the Missouri General Assembly passed House Bills 85

and 310, collectively known as the Second Amendment Preservation Act ("SAPA"), Mo. Rev. Stat. §§ 1.410-.485.  SAPA "repeal[s] section 1.320, RSMo, and … enact[s] in lieu thereof nine new sections relating to the sole purpose of adding additional protections to the right to bear arms, with penalty provisions and an emergency clause."  Ex. A, at 1.

As discussed in greater detail below, SAPA contains two major groups of provisions. First, the provisions in the first half of the bill, Sections 1.410.1, 1.420, 1.430, and 1.440, contain legislative findings and declarations of policy by the General Assembly.  Ex. A, at 1-4.  These sections include Section 1.420, which "finds and declares" that five specific kinds of federal laws and regulations targeting the ownership of firearms are unconstitutional under the Second Amendment and thus contrary to Missouri's public policy.  Ex. A, at 3-4.  These declaratory sections do not prescribe or command any specific conduct on their own, but they do define the scope of the later, substantive provisions.

The second half of the bill contains the law's major substantive provisions, in Sections 1.450, 1.460, and 1.470.  Ex. A, at 4-5.  These substantive provisions are narrow, and they are all directed at preventing *state* resources and *state* personnel from being used to enforce the *federal* laws and regulations that the General Assembly disfavored in Section 1.420.  *See id.*  Section 1.450 prohibits the State's public officers, employees, and political subdivisions from seeking to enforce the federal laws and regulations identified in Section 1.420.  Ex. A, at 4.  Section 1.460 creates civil liability for any political subdivision or law enforcement agency of the State that employs a law enforcement officer who knowingly violates Section 1.450 by seeking to enforce the disfavored federal rules and regulations against a Missouri citizen.  Ex. A, at 4.  It does not impose any civil liability on any *individual* officer, only on the political subdivision or law enforcement agency.  *Id.*  Relatedly, Section 1.470 imposes civil liability on any political

subdivision or law enforcement agency that knowingly employs an individual who, after SAPA's enactment, has enforced the disfavored federal laws and regulations identified in Section 1.420, or given material aid and support to such enforcement. Ex. A, at 4-5. Again, the section imposes no civil liability on any *individual*—only on political subdivisions and law enforcement agencies of the State. And no provision of SAPA imposes any liability on the federal government, or restricts the action of federal government officers in any way.

These provisions are discussed in greater detail below.

First, Section 1.410.2 provides ten legislative findings related to the importance of the fundamental right to keep and bear arms, and the importance of the States in our federal system. Ex. A, at 1-3. These declaratory sections explain the importance of the bill and illuminate its scope, but they do not create any substantive rights, duties, or obligations on any party. *See id.*

Section 1.420 then lists "federal acts, laws, executive orders, administrative orders, rules, and regulations" that are "considered infringements on the people's right to keep and bear arms[.]" Ex. A, at 3-4. It identifies five categories of laws and regulations that are deemed to violate the fundamental right to keep and bear arms. *Id.* These include (1) discriminatory taxes, levies, and fees imposed on firearms and accessories "that might reasonably be expected to create a chilling effect on the purchase or ownership of those items by law-abiding citizens," (2) "[a]ny registration or tracking of firearms, firearm accessories, or ammunition;" (3) "[a]ny registration or tracking of firearms of the ownership of firearms, firearm accessories, or ammunition;" (4) "[a]ny act forbidding the possession, ownership, use, or transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens;" and (5) "[a]ny act ordering the confiscation of firearms, firearm accessories, or ammunition from law-abiding citizens." *Id.* Section 1.480.1 defines "law-abiding citizen" as "a person who is not otherwise precluded under state law from possessing a

firearm" and the term "shall not be construed to include anyone who is not legally present in the United States or the state of Missouri." *Id.*

Section 1.430 then expresses Missouri's disfavor of the laws described in Section 1.420 and declares them to be contrary to the public policy of the State. It declares that "[a]ll federal acts, laws, executive orders, administrative orders, rules, and regulations … that infringe on the people's right to keep and bear arms as guaranteed by the Second Amendment to the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri shall be invalid in this State," "shall not be recognized by this state," and "shall not be enforced by this state." *Id.* And Section 1.440 provides that Missouri's "courts and law enforcement agencies" have a "duty … to protect the rights of law-abiding citizens to keep and bear arms … and to protect these rights from the infringements defined under section 1.420." *Id.* Section 1.430 declares this as general policy only; it does not create any liability, dictate any particular course of conduct, or impose any penalties on any state official or other person or agency.

The principal substantive sections begin with Section 1.450. First, Section 1.450 provides that "[n]o entity or person … shall have the authority to enforce or attempt to enforce any federal acts, laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances infringing on the right to keep and bear arms as described under section 1.420." Ex. A, at 4. However, "[n]othing in sections 1.410 to 1.480 shall be construed to prohibit Missouri officials from accepting aid from federal officials in an effort to enforce Missouri laws." *Id.* Further, § 1.480.3 permits "provid[ing] material aid to federal officials who are in pursuit of a suspect when there is a demonstrable criminal nexus with another state or country and such suspect is either not a citizen of this state or is not present in this state." *Id.* Moreover, Section 1.480.4 permits "provid[ing] material aid to federal prosecution for:"

(1) Felony crimes against a person when such prosecution includes weapons violations substantially similar to those found in chapter 570 or chapter 571 so long as such weapons violations are merely ancillary to such prosecution; or (2) Class A or class B felony violations substantially similar to those found in chapter 579 when such prosecution includes weapons violations substantially similar to those found in chapter 570 or chapter 571 so long as such weapons violations are merely ancillary to such prosecution.

*Id.*

Next, Sections 1.460 and 1.470 impose civil liability on state political subdivisions and law enforcement agencies that employ individuals who have either (1) knowingly violated Section 1.450 by enforcing the disfavored federal laws and regulations against Missourians; or (2) knowingly enforced those disfavored federal laws and regulations against Missourians, after SAPA's enactment, while acting as agents of the federal government. Section 1.460.1 provides that "[a]ny political subdivision or law enforcement agency that employs a law enforcement officer who acts knowingly … to violate the provisions of section 1.450 or otherwise knowingly deprives a citizen of Missouri of the rights or privileges ensured by Amendment II of the Constitution of the United States or Article I, Section 23 of the Constitution of Missouri" shall be subject to civil liability. Ex. A, at 4. Similarly, Section 1.470.1 provides that "[a]ny political subdivision or law enforcement agency that knowingly employs an individual acting or who previously acted as an official, agent, employee, or deputy of the government of the United States, or otherwise acted under color of law within the borders of this state, who has knowingly" either "(1) [e]nforced or attempted to enforce any of the infringements identified in section 1.420," or "(2) [g]iven material aid and support to the efforts of another" to do so, shall be subject to civil liability. Ex. A, at 4-5.

Notably, the only *enforcement* role for SAPA in these substantive sections is by lawsuits brought by private parties against state political subdivisions and law enforcement agencies that violate Sections 1.460 and 1.470 by hiring or employing officers who have knowingly violated

SAPA by enforcing the disapproved federal-law provisions in Section 1.420. SAPA does not authorize *enforcement* by any other means. The Governor, the Attorney General, and all other state officials play no direct role in the enforcement of any provision of SAPA.

In addition, SAPA contains a robust severability clause. Section 1.485 provides: "If any provision of sections 1.410 to 1.485 or the application thereof to any person or circumstance is held invalid, such determination shall not affect the provisions or applications of sections 1.410 to 1.485 that may be given effect without the invalid provision or application, and the provisions of sections 1.410 to 1.485 are severable." *Id.* This clause reinforces the general severability provision in Missouri law that applies to all Missouri statutes. Mo. Rev. Stat. § 1.140.

## LEGAL STANDARD

Assuming the Court has jurisdiction—and it does not—Missouri moves to dismiss for failure to state a claim for relief. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The Court is not "bound to accept as true a legal conclusion couched as a factual allegation." *Id.*

## ARGUMENT

The Court should dismiss this case because the federal government fails to state a valid claim for relief. As noted in Part II of Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(1), the Complaint's three claims—Supremacy Clause, preemption, and "intergovernmental immunity"—are really three ways of asserting the same legal theory, because preemption and intergovernmental immunity merely assert a violation of the Supremacy Clause. Whether they are conceptualized as a three distinct claims or a single claim,

all three of these claims fail to state a claim for relief for the same reason: SAPA merely restricts *state* officials and *state* resources from being used to administer and enforce federal gun laws. This falls squarely within Missouri's valid constitutional authority under *Printz v. United States*, 521 U.S. 898 (1997).

The Supreme Court has held that the Supremacy Clause is not the "source of any federal rights," and certainly does not create a cause of action. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-27 (2015). The federal government's Supremacy Clause-related claims, therefore, must rely on other specific federal laws that supposedly preempt SAPA. But the federal government does not, and cannot, identify any such provision. Nothing in SAPA precludes federal officials from using federal resources to enforce federal law. Rather, SAPA says what the Supreme Court approved in *Printz*: state officials (using state resources) cannot be required to enforce federal law. 521 U.S. at 912, 928-29 (holding that the Supremacy Clause "says nothing about whether state executive officers must administer federal law"); *id.* at 912 ("[S]tate legislatures are not subject to federal direction."); *id.* at 925 ("[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs.").

The federal government's Supremacy Clause-related claims fail on the merits because the government fundamentally misapprehends the provisions of SAPA that it challenges. As discussed above, SAPA contains two sets of provisions: The first half of the statute has declaratory provisions, expressing the sense of the General Assembly that certain provisions of federal law violate the fundamental rights guaranteed in the Second Amendment to the United States Constitution and Article I, § 23 of the Missouri Constitution. Thus, Section 1.410.2 provides detailed legislative findings expressing the sense of the legislature ("The general

assembly finds and declares…"), but it does not on its own proscribe or command any conduct. Ex. A, at 1-3. Likewise, Section 1.420 declares the General Assembly's determination that five categories of federal laws and regulations infringe "on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri." Ex. A, at 3. Missouri states its view that such laws and regulations infringe on the right to keep and bear arms and are thus already invalid under the Second Amendment. It is the Second Amendment which, according to SAPA, invalidates infringements on the fundamental right to keep and bear arms—not the Missouri General Assembly—and thus the bill's title is the "*Second Amendment* Preservation Act." Ex. A, 1 (emphasis added). The federal government may have a different (and much narrower) view of the scope of Second Amendment rights than Missouri's view, but Missouri is not bound to accept that narrow interpretation.

Further, the federal government's arguments overlook the fundamental structure of SAPA, as discussed further above. After the declaratory provisions in Sections 1.410 to 1.440, SAPA then provides substantive provisions in Sections 1.450 to 1.470. These provisions have a single, unified effect: They prohibit *state* personnel and *state* resources from being used to enforce the federal laws and regulations that the General Assembly has deemed to be infringe on the Second Amendment, and are thus contrary to the public policy of this State. Section 1.450 provides that "[n]o entity or person, including any public officer or employee of this state or any political subdivision of this state, shall have the authority to enforce or attempt to enforce any federal acts, laws … infringing on the right to keep and bear arms as described under section 1.420." Ex. A, at 4. Section 1.460 provides that a "political subdivision or law enforcement agency" of the State that employs an officer who "knowingly" infringes Missourians' right to

keep and bear arms "while acting under the color of any state or federal law," shall be liable to the injured party for civil damages. *Id.* Section 1.470 provides that, if "[a]ny political subdivision … knowingly employs an individual acting or who previously acted" as a federal agent and who "knowingly" enforced any federal laws or rules disapproved in Section 1.420 or gave "material aid and support" to such enforcement, the political subdivision shall be subject to civil penalties. *Id.* There are no civil penalties for any such individual officer—only for the political subdivision or law enforcement agency that "knowingly" hires such an officer. *Id.*

In sum, the substantive provisions of SAPA—Sections 1.450 to 1.470—merely prohibit state personnel and resources from being used to enforce the federal laws and rules identified and disapproved in Section 1.420, as well as any other infringements of the right to keep and bear arms. These provisions lie squarely within Missouri's constitutional authority—even if courts may ultimately disagree with the General Assembly's interpretation of the right to keep and bear arms in applying it to the federal laws identified in Section 1.420. Even if some of those federal laws and rules are later held to be constitutional, the General Assembly is still free to disapprove of them and to provide that state resources may not be used to enforce them. *Printz*, 521 U.S. at 933. In *Printz*, the Supreme Court "conclude[d] categorically" that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *Id.* This conclusion holds true whether or not the federal regulatory program is unconstitutional; indeed, in *Printz*, there was no claim that the federal program at issue was unconstitutional. *See id.* Missouri cannot be forced by the federal government to commit its state personnel and resources to administer federal programs of which it disapproves. *Id.* This does not "nullify" federal law, because it does not prevent the federal government from implementing and enforcing its own federal regulatory programs through its own copious resources. *See id.*

9

The Complaint itself makes this point very clear. The federal government's concern with SAPA is that it has allegedly prevented state law-enforcement officers and agencies from assisting it in enforcing federal laws. Every objection that the United States raises about the practical impact of SAPA is an example of state officers and agencies declining to assist the federal government in the enforcement of federal gun laws. Thus, the United States wants this Court to invalidate SAPA so that *state* resources may be used to assist the federal government in the enforcement of *federal* gun regulations and restrictions. But that is exactly what *Printz* held that the Constitution does not require the States to do. 521 U.S. at 932. Missouri has the authority to decline to employ its resources in the enforcement of federal laws. The federal government may disagree with this decision as a matter of policy, but those concerns should be addressed to the Missouri General Assembly, not to this Court.[1]

## CONCLUSION

Assuming the Court has jurisdiction, it should grant this motion and dismiss the case.

---

[1] Even if the Court were to find any of SAPA's provisions unconstitutional—which it should not—those provisions should be severed from the valid ones. Federal courts are to apply severability clauses in state laws. *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996) (per curiam) ("Severability is of course a matter of state law."). Where the legislature "has explicitly provided for severance by including a severability clause in the statute," the Court must presume that the legislature "did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987); *see also Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (plurality opinion). As the Supreme Court has explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, or … sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328-29 (2006) (citation omitted).

SAPA contains an express severability clause clearly stating the Legislature's intention that all provisions and applications of the bill should be severable: "If any provision of sections 1.410 to 1.485 or the application thereof to any person or circumstance is held invalid, such determination shall not affect the provisions or applications of sections 1.410 to 1.485 that may be given effect without the invalid provision or application, and the provisions of sections 1.410 to 1.485 are severable." Mo. Rev. Stat. § 1.485. Thus, the Court should enforce SAPA's severability clause as written.

Respectfully Submitted,

**ERIC S. SCHMITT**
Attorney General of Missouri

/s/ *Jesus A. Osete*
D. JOHN SAUER, #58721
  *Solicitor General*
JESUS A. OSETE, #69267
  *Deputy Attorney General*

Office of the Attorney General
Supreme Court Building
P.O. Box 899
207 W. High St.
Jefferson City, MO 65102
Tel: (573) 751-1800
Facsimile: (573) 751-0774
E-mail: Jesus.Osete@ago.mo.gov

*Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 14th day of March 2022, I electronically filed the foregoing with the Clerk of Court using the Court's electronic filing system, to be served on all counsel of record.

/s/ *Jesus A. Osete*
Deputy Attorney General

*Counsel for Defendants*