**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:22-cv-04022-BCW |
| | ) | |
| THE STATE OF MISSOURI, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' SUGGESTIONS IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 7

DEFENDANTS' RESPONSE TO ............................................................................... 7

PLAINTIFF'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS ....... 7

   I.    Federal Firearm Statutes and Regulations ........................................................ 8

   II.   H.B. 85 and its Attempted Nullification of Federal Firearm Laws ............... 12

   III.   H.B. 85 Causes Significant Harm to Federal Law Enforcement and Public Safety... 18

STANDARD OF REVIEW .......................................................................................... 40

ARGUMENT ............................................................................................................... 40

   I.    The United States Lacks Standing to Bring Suit. ....................................... 40

   II.   SAPA does not nullify federal law or federal authority to enforce federal law. ........ 50

   III.   Preemption does not apply because no conflict with federal law exists. ............... 53

   IV.   SAPA is severable ................................................................................. 54

CONCLUSION ............................................................................................................ 54

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Akin v. Dir. of Revenue,*
934 S.W.2d 295 (Mo. banc 1996) ............................................................. 55

*Arizona State Legislature v. Arizona Indep. Redistricting Comm'n,*
576 U.S. 787 (2015) ............................................................................... 52

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................................... 41

*Cooper v. Aaron,*
358 U.S. 1 (1958) ........................................................................... 17, 52

*Dodson v. Ferrara,*
491 S.W.3d 542 (Mo. banc 2016) ........................................................ 55

*Eng. v. Gen. Elec. Co.,*
496 U.S. 72 (1990) ............................................................................... 54

*Faubus v. United States,*
254 F.2d 797 (8th Cir. 1958) ................................................................ 53

*Fed. Election Comm'n v. Akins,*
524 U.S. 11 (1998) ............................................................................... 45

*Gamble v. United States,*
139 S. Ct. 1960 (2019) ......................................................................... 46

*Gregory v. Ashcroft,*
501 U.S. 452 (1991) ............................................................................. 47

*Hanson v. FDIC,*
13 F.3d 1247 (8th Cir. 1994) ................................................................ 41

*Howard v. Columbia Pub. Sch. Dist.,*
363 F.3d 797 (8th Cir. 2004) ......................................................... passim

*Iverson v. Johnson Gas Appliance Co.,*
172 F.3d 524 (8th Cir. 1999) ................................................................ 41

*Jones v. United Parcel Serv., Inc.,*
461 F.3d 982 (8th Cir. 2006) ......................................................... passim

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ............................................................................. 42

*McCulloch v. Maryland,*
4 Wheat 316 (1819) ................................................................... 51, 53, 54

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ............................................................................. 43

*Montana Shooting Sports Ass'n v. Holder,*
727 F.3d 975 (9th Cir. 2013) ................................................................ 54

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ......................................................................... 7, 51

*North Dakota v. United States*,
    495 U.S. 423 (1990) ........................................................................ 54

*Printz v. United States*,
    521 U.S. 898 (1997) .................................................................... 7, 43

*Pub. Citizen v. U.S. Dep't of Just.*,
    491 U.S. 440 (1989) ........................................................................ 46

*Reno v. Condon*,
    528 U.S. 141 (2000) ........................................................................ 46

*Segal v. Metro. Council*,
    29 F.4th 399 (8th Cir. 2022) ........................................................... 41

*Spaulding v. Conopco, Inc.*,
    740 F.3d 1187 (8th Cir. 2014) ................................................... passim

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) .................................................................... 41, 43

*State ex rel. Div. of Motor Carrier & R.R. Safety v. Russell*,
    91 S.W.3d 612 (Mo. banc 2002) ..................................................... 45

*Street v. Dir. of Revenue*,
    361 S.W.3d 355 (Mo. banc 2012) ................................................... 45

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) .................................................................... 42

*United States v. Louisiana*,
    364 U.S. 500 (1960) ........................................................................ 52

*United States v. Peters*,
    5 Cranch 115 (1809) ....................................................................... 53

*United States v. Reynolds*,
    235 U.S. 133 (1914) ........................................................................ 52

*Whittington v. Tyson Foods, Inc.*,
    21 F.4th 997 (8th Cir. 2021) ........................................................... 41


**Statutes**

5 U.S.C. 3372(a)(2) .............................................................................. 44
5 U.S.C. § 3372(a) ................................................................. 28, 29, 30
18 U.S.C. 921(a)(1) .............................................................................. 44
18 U.S.C. § 241 .................................................................................... 24
18 U.S.C. § 247(d)(3) ........................................................................... 24
18 U.S.C. § 921(a)(3) ...................................................................... 9, 10
18 U.S.C. § 922(g) ........................................................................ passim
18 U.S.C. § 922(g)(1) ........................................................................... 24
18 U.S.C. § 922(g)(6) ........................................................................... 23
18 U.S.C. § 922(g)(8) ........................................................................... 23
18 U.S.C. § 922(g)(9) ........................................................................... 23
18 U.S.C. § 922(q)(2)(A) ...................................................................... 25
18 U.S.C. § 923(a) ......................................................................... 10, 21
18 U.S.C. § 923(g)(1)(A) ...................................................................... 19
18 U.S.C. § 923(i) ......................................................................... 11, 12

18 U.S.C. § 927 ........................................................................... 54

18 U.S.C. §§ 921–24 ................................................................... 8, 9

21 U.S.C. § 878 ....................................................................... 27, 44

26 U.S.C. § 5841 .......................................................................... 19

26 U.S.C. §§ 5811–22, 5841 ...................................................... 8, 9

28 U.S.C. § 599A ......................................................................... 26

28 U.S.C. §§ 561(f), 566(c) ..................................................... 27, 44

49 U.S.C. § 44903(c)(1) ............................................................... 35

49 U.S.C. § 44922(c) ................................................................... 44

49 U.S.C. § 46314 .................................................................. 25, 33

49 U.S.C. § 46505 ....................................................................... 33

49 U.S.C.§ 44922(a) .................................................................... 44

Amendment II of the Constitution of the United States ............. 13, 43

Article I, Section 23 of the Constitution of Missouri .................... 13

Kan. Stat. § 50-1207 .................................................................... 54

Mo. Rev. Stat.  §§ 1.420, 1.460 ............................................. 46, 47

Mo. Rev. Stat. § 1.140 ................................................................. 55

Mo. Rev. Stat. § 1.410.2(1) .......................................................... 51

Mo. Rev. Stat. § 1.430 ....................................................... 44, 53, 54

Mo. Rev. Stat. § 1.450 ................................................ 42, 44, 45, 46

Mo. Rev. Stat. § 1.485 ................................................................. 55

Mo. Rev. Stat. § 563.051 .............................................................. 45

Mo. Rev. Stat. § 571.070 .............................................................. 23

Mo. Rev. Stat. § 571.070.1(1) ................................................. 23, 24

Mo. Rev. Stat. § 574.035(3)(2) ..................................................... 24

Mo. Rev. Stat. § 574.050 .............................................................. 24

Mo. Rev. Stat. §§ 1.410–.485 (2021) ............................ 12, 14, 17, 55

Mo. Rev. Stat. § 1.410.2 (2), (3), (6), (7), (9) ............................... 52

U.S. CONST. ART. I ...................................................................... 52

§ 1.410(2)(5) ............................................................................... 17

§ 1.460 ................................................................................. 46, 53

Rules

Fed. R. Civ. P. 56 ........................................................................ 41

Fed. R. Civ. P. 56(a) .................................................................... 41

FED. R. CIV. P. 56(c)(4) .................................................................. 8

Fed. R. Civ. P. 701(c) .................................................................. 50

FED. R. EVID. 702(a) ...................................................................... 7

Fed. R. Evid. 801(d)(2)(A)-(D) ..................................................... 40

Regulations

27 C.F.R. § 478.121(b) ................................................................. 10

27 C.F.R. § 478.92(a)(1) ............................................................... 11

27 C.F.R. §§ 478.102, 478.124(c) ................................................. 12

27 C.F.R. §§ 478.121–.125 ....................................................................... 10
28 C.F.R. § 0.112(b) ................................................................................. 27
28 C.F.R. § 0.130 ..................................................................................... 26
28 C.F.R. §§ 0.85, 0.111 ......................................................................... 26
49 C.F.R. § 1503.401 ............................................................................... 33
49 C.F.R. § 1540.111 ............................................................................... 26
49 C.F.R. § 1540.111(a)(1) ................................................................. 25, 33
49 C.F.R. § 1540.5 ................................................................................... 25

Other Authorities

488
829
H.B. 85 ............................................................................................... passim
Pub. L. No. 73-474 .................................................................................... 8
Pub. L. No. 90-618 .................................................................................... 9
W.D.Mo. R. 56.1 ................................................................................. passim

**INTRODUCTION**

The United States cannot require Missouri to provide additional support to its law enforcement to which Missouri has not consented. There is no federal police power, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535 (2012), and "Congress cannot require state or local employees to assist with federal enforcement," Doc. 8 at 24 (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)). But that is the effect a declaratory judgment would have: Requiring Missouri to continue to fund federal law-enforcement efforts in violation of SAPA's policy.

**DEFENDANTS' RESPONSE TO**
**PLAINTIFF'S STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

Defendants object that Plaintiff's statement of undisputed facts improperly rely on specific factual allegations outside of the record and citing information that is inaccessible to Defendants, such as the capacity of federal law enforcement efforts, the significance of such efforts, and alleged incidents of confusion, non-enforcement, and failed cooperation by state or local law enforcement that are too vague to verify. Because no discovery has been conducted, Defendants have not had the opportunity to test the accuracy of such statements, and Plaintiff's lay fact declarants often make sweeping statements that go to the unproven ultimate question of whether SAPA (as opposed to a change in Administrations and enforcement priorities) caused alleged decreases in cooperation or harms to federal law enforcement. The declarants also rely on unknown hearsay about "confusion" or the risks of future harms. Such testimony requires expert testimony, as Plaintiff appears to concede by stating that the declarations are based off the specialized experience of the declarants. *E.g.*, Brooks Decl. ¶ 20 ("In sum, based upon my knowledge, and aviation and law enforcement experience . . ."); *see also* FED. R. EVID. 702(a). But Defendants have had no

opportunity to examine them or their methods to see if such testimony is admissible. Plaintiff cannot rely on such declarations. *See* FED. R. CIV. P. 56(c)(4).

Additionally, Defendants note that they repeat the headings of the SUMF for ease of reference only, and deny them to the extent they represent a material fact.

### I. Federal Firearm Statutes and Regulations

1. Congress has long regulated the sale, manufacture, and possession of firearms and ammunition through a comprehensive regulatory scheme established by the National Firearms Act (NFA) and the Gun Control Act (GCA). *See* 26 U.S.C. §§ 5811–22, 5841; 18 U.S.C. §§ 921–24.

**Response:** This statement asserts a legal conclusion to which no response is required. The National Firearms Act ("NFA") and the Gun Control Act ("GCA") speak for themselves. Defendants deny any characterization of them.

2. Congress first enacted the NFA in 1934. *See* Act of June 26, 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at 26 U.S.C. §§ 5811–22, 5841).

**Response:** Admitted.

3. The NFA imposes registration and taxation requirements on parties manufacturing or transferring certain "firearms." *See* 26 U.S.C. §§ 5811–22, 5841.

**Response:** This statement asserts a legal conclusion to which no response is required. The NFA speaks for itself. Defendants deny any characterization of it.

4. The NFA defines "firearms" to include machineguns, certain types of rifles and shotguns, silencers, and "destructive devices" such as grenades. *See id.* § 5845.

**Response:** This statement asserts a legal conclusion to which no response is required. The NFA speaks for itself. Defendants deny any characterization of it.

5. The NFA does not regulate most handguns, nor does it prohibit ownership of regulated firearms. *See id.*

**Response:** This statement asserts a legal conclusion to which no response is required. The NFA speaks for itself. Defendants deny any characterization of it.

6. Thirty years later, in 1968, Congress enacted the GCA. *See* Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (codified as amended at 18 U.S.C. §§ 921–24).

**Response:** Admitted that the GCA was enacted in 1968; denied that the GCA was enacted "[t]hirty years later[.]"

7. The GCA defines "firearms" more broadly than the NFA, to include "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA and NFA speak for themselves. Defendants deny any characterization of them.

8. The GCA imposes licensing requirements on any party "engaged in the business of importing, manufacturing, or dealing firearms, or importing or manufacturing ammunition." *Id.* § 923(a).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA speaks for itself. Defendants deny any characterization of it.

9. Any party "engaged in the business of importing, manufacturing, or dealing in firearms, or importing or manufacturing ammunition," *id.* § 923(a), must receive a license from the Attorney General and pay regular fees, *see id.* (detailing annual fee required based on type of firearm and whether licensing applicant is an importer, manufacturer, or dealer).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA speaks for itself. Defendants deny any characterization of it.

10. These 18 U.S.C. § 923(a) license holders (called "Federal Firearms Licensees") must maintain "records of importation, production, shipment, receipt, sale, or other disposition of firearms" and may not transfer a firearm to an unlicensed person unless they complete a Firearms Transaction Record. *Id.* § 923(g)(1)(A); *see also* 27 C.F.R. §§ 478.121–.125.

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA and accompanying regulations speak for themselves. Defendants deny any characterization of them.

11. All records must be available at the Licensees' business premises for compliance inspections by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). *See* 27 C.F.R. § 478.121(b).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA and accompanying regulations speak for themselves. Defendants deny any characterization of them.

12. Licensees must ensure that every manufactured or imported firearm is identified by a serial number and a mark indicating the model of the firearm, the Licensee's name or abbreviation, and the Licensee's location. 18 U.S.C. § 923(i); 27 C.F.R. § 478.92(a)(1).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA and accompanying regulations speak for themselves. Defendants deny any characterization of them.

13. The GCA prohibits the possession of firearms by certain categories of individuals. Included among these categories are individuals who have been convicted of a felony, individuals who have been convicted of a misdemeanor crime of domestic violence, individuals who have been dishonorably discharged from the military, noncitizens who are not lawfully in the United States, unlawful users of controlled substances, and others. 18 U.S.C. § 922(g).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA speaks for itself. Defendants deny any characterization of it.

14. The GCA also bans the transfer or possession of machineguns not already lawfully possessed prior to 1986, *id.* § 922(o), as well as the manufacture, import, sale, shipping, delivery, possession, transfer, or receipt of any firearm that is either not detectable "by walk-through metal detectors" as an exemplar to be developed by the Attorney General, or which, "when subjected to

inspection by the type of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of" any major component thereof, *id.* § 922(p)(1).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA speaks for itself. Defendants deny any characterization of it.

15. Licensees must report the theft or loss of any firearm to ATF and local law enforcement authorities, *id.* § 923(g)(6), and must respond to requests by the Attorney General made in the course of a criminal investigation for information concerning the disposition of a firearm, *id.* § 923(g)(7).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA speaks for itself. Defendants deny any characterization of it.

16. Before making any over-the-counter firearm transaction, Licensees must verify the purchaser's identity and must conduct a background check through the National Instant Criminal Background Check System (NICS), which is administered by the FBI. *Id.* § 922(t); 27 C.F.R. §§ 478.102, 478.124(c).

**Response:** This statement asserts a legal conclusion to which no response is required. The GCA and accompanying regulations speak for themselves. Defendants deny any characterization of them.

## II.     H.B. 85 and its Attempted Nullification of Federal Firearm Laws

17. Governor Parson signed H.B. 85—the "Second Amendment Preservation Act"—into law on June 12, 2021. *See* Mo. Rev. Stat. §§ 1.410–.485 (2021) (codifying H.B. 85).

**Response:** Admitted.

18. H.B. 85 declares that "federal acts, laws, executive orders, administrative orders, rules, and regulations" falling into five categories "shall be considered infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States and Article I, Section 23 of the Constitution of Missouri." H.B. 85 § 1.420.

**Response:** This statement asserts a legal conclusion to which no response is required. The Second Amendment Preservation Act ("SAPA") speaks for itself. Defendants deny any characterization of it.

19. The five categories of allegedly unconstitutional "infringements" include "but [are] not limited to":

(1) "[a]ny tax, levy, fee, or stamp imposed on firearms, firearm accessories, or ammunition not common to all other goods and services and that might reasonably be expected to create a chilling effect on the purchase or ownership of those items by law-abiding citizens";

(2) "[a]ny registration or tracking of firearms, firearm accessories, or ammunition";

(3) "[a]ny registration or tracking of the ownership of firearms, firearm accessories, or ammunition";

(4) "[a]ny act forbidding the possession, ownership, use, or transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens"; and

(5) "[a]ny act ordering the confiscation of firearms, firearm accessories, or ammunition from law-abiding citizens."*Id.*

**Response:** This statement asserts a legal conclusion to which no response is required. SAPA speaks for itself. Defendants deny any characterization of it.

20. Section 1.430 asserts that these five categories of federal laws "shall be invalid to this state, shall not be recognized by this state, shall be specifically rejected by this state, and shall not be enforced by this state." *Id.* § 1.430.

**Response:** This statement asserts a legal conclusion to which no response is required. SAPA speaks for itself. Defendants deny any characterization of it.

21. Section 1.440 further provides that "[i]t shall be the duty of the courts and law enforcement agencies of this state to protect the rights of law-abiding citizens to keep and bear arms within the borders of this state and to protect these rights from the infringements defined under section 1.420." *Id.* § 1.440.

**Response:** This statement asserts a legal conclusion to which no response is required. SAPA speaks for itself. Defendants deny any characterization of it.

22. Section 1.450 purports to divest *all* persons and entities—including federal, state, and local officers and employees—of authority to enforce the allegedly infringing federal firearm laws: "No entity or person, including any public officer or employee of this state or any political subdivision of this state, shall have the authority to enforce or attempt to enforce any federal acts,

laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances infringing on the right to keep and bear arms as described under section 1.420." *Id.* § 1.450.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, like the "facts" asserted above, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding v. Conopco, Inc.*, 740 F.3d 1187, 1196 (8th Cir. 2014) (disregarding evidence purporting to state legal conclusions as fact for purposes of summary judgment); *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 991 (8th Cir. 2006) (affirming district court's decision to disregard plaintiffs' "purported statements of controverted fact" that "instead consist[ed] of impermissible conclusions or legal argument," in violation of W.D.Mo. R. 56.1).

23. H.B. 85 also creates a civil penalty scheme discriminating against those who have enforced federal firearm laws since H.B. 85 came into effect, or who will do so in the future. *Id.* §§ 1.460–.470.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

24. Specifically, § 1.460 provides for an injunction against, and a $50,000 fine "per occurrence" on, state or local law enforcement agencies that employ an officer who knowingly participates in the enforcement of any of the purportedly infringing federal firearm laws. *Id.* § 1.460.

**Response:** SAPA speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

25. Similarly, § 1.470 effectively bans public officers who have enforced any of the purportedly infringing federal firearm laws in Missouri since H.B. 85 came into effect, or who will do so in the future, from state employment for life. It does so by authorizing an injunction and a $50,000 penalty "per employee" upon agencies who hire them. *Id.* § 1.470 (contemplating such relief when an employee either (1) enforces or attempts to enforce "any of the infringements identified in section 1.420" or (2) "[g]ive[s] material aid and support to the efforts of another who enforces or attempts to enforce" them); *see also id.* § 1.480.2 (defining "material aid" as including "voluntarily giving or allowing others to make use of . . . communications equipment or services . . . ; facilities; weapons; personnel; . . . or other physical assets").

**Response:** SAPA speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

26. Section 1.470 authorizes "[a]ny person residing or conducting business in a jurisdiction" to pursue these monetary penalties and injunctive relief. *Id.* § 1.470.2.

**Response:** SAPA speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

27. H.B. 85's core purpose of nullifying federal firearm laws is made plain by its introductory findings, which purport to justify this nullification attempt by relying on a discredited, pre-Civil War nullification doctrine. *Id.* § 1.410.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

28. The introductory provision of H.B. 85 asserts that "each party [to the compact of the Constitution, *i.e.*, each State] has an equal right to judge for itself as to whether infractions of the compact have occurred." *Id.* § 1.410(2)(5).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

29. The language in § 1.410(2)(5) parrots that of the nullification doctrine first found in the Virginia and Kentucky Resolutions of 1798, which in turn inspired the nullification principle championed by Senator John C. Calhoun in 1832 and was later again revived by southern State legislatures attempting to nullify *Brown v. Board of Education. See* 4 *Encyclopedia of the American Constitution* 1832–33 (Levy & Karst eds., 2d ed. 2000) (attached hereto as Ex. 5); *see also Cooper*, 358 U.S. at 17 (rejecting this nullification doctrine).

**Response:** SAPA, Exhibit 5, and *Cooper v. Aaron*, 358 U.S. 1 (1958), speak for themselves. Defendants deny any characterization of them. Further, this is not a fact but rather

an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

Footnote 1. H.B. 85 also contains several non-operative provisions, such as § 1.480, which sets forth an August 28, 2021 effective date and defines certain terms; § 1.485, which consists of a severability clause; and Section B, which states that H.B. 85 takes immediate effect upon becoming law.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Even assuming this is a fact—and it is not—it violates W.D.Mo. R. 56.1(a) because "[e]ach fact must be set forth in a separately numbered paragraph[.]"

### III.    H.B. 85 Causes Significant Harm to Federal Law Enforcement and Public Safety

30. H.B. 85 does not specifically enumerate the federal laws it purports to invalidate. But at a minimum, H.B. 85 purports to nullify several broad categories of federal firearm laws. H.B. 85 § 1.420.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

31. H.B. 85 purports to invalidate "[a]ny registration or tracking of firearms" and "[a]ny registration or tracking of the ownership of firearms." *Id.* §§ 1.420(2), 1.420(3).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

32. H.B. 85's purported invalidation of "[a]ny registration or tracking of firearms" and "[a]ny registration or tracking of the ownership of firearms," *id.*, conflicts with the NFA's registration requirements for certain firearms. *See* 26 U.S.C. § 5841; *see also* Ex. 1 (Decl. of Frederic D. Winston) ¶¶ 35–38 (discussing the importance of federal firearm licensees' recordkeeping responsibilities with respect to the enforcement of federal law).

**Response:** SAPA and the NFA speak for themselves. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The Winston Declaration is not based on facts or personal knowledge but conjecture and inappropriate opinion testimony that cannot support summary judgment and is therefore denied. Rule 56(c)(4); *see Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 801 (8th Cir. 2004). In the cited paragraphs above, the declarant states what SAPA "purports" or "appears" to accomplish, but he is not qualified to speak on the effect of state and federal law. Additionally, he does not swear that any federal firearm licensee is or has failed to comply with the NFA's registration requirements.

33. H.B. 85's purported invalidation of "[a]ny registration or tracking of firearms" and "[a]ny registration or tracking of the ownership of firearms," H.B. 85 §§ 1.420(2), 1.420(3), also conflicts with the GCA's recordkeeping requirements. *See* 18 U.S.C. § 923(g)(1)(A) ("Each licensed importer, licensed manufacturer, and licensed dealer shall maintain such records of importation, production, shipment, receipt, sale, or other disposition of firearms at his place of

business."); *see also* Ex. 1 (Decl. of Frederic D. Winston) ¶¶ 35–38 (discussing the importance of federal firearms licensees' recordkeeping responsibilities with respect to the enforcement of federal law).

**Response:** SAPA and the GCA speak for themselves. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The Winston Declaration is not based on facts or personal knowledge but conjecture and inappropriate opinion testimony that cannot support summary judgment and is therefore denied. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. In the cited paragraphs above, the declarant states what SAPA "purports" or "appears" to accomplish, but he is not qualified to speak on the effect of state and federal law. Additionally, he does not swear that any federal firearm licensee is or has failed to comply with the GCA's registration requirements.

34. H.B. 85 purports to invalidate "[a]ny act forbidding the . . . transfer of a firearm, firearm accessory, or ammunition by law-abiding citizens." H.B. 85 § 1.420(4).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

35. The term "law-abiding citizens" is defined (for H.B. 85 only) to mean any individual who "is not otherwise precluded under state law from possessing a firearm," without reference to federal firearm eligibility, so long as the individual is "legally present in the United States [and] the state of Missouri." *Id.* § 1.480(1).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

36. By authorizing any "law-abiding citizen" to transfer firearms, § 1.420 conflicts with the GCA's requirement that anyone regularly "engage[d] in the business of . . . dealing in firearms" must comply with federal licensing requirements. 18 U.S.C. § 923(a).

**Response:** SAPA and the GCA speak for themselves. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

37. By authorizing any "law-abiding citizen" to transfer firearms, § 1.420 conflicts with federal limitations on the circumstances under which unlicensed individuals may transfer firearms. *See, e.g.*, *id*. § 922(a)(5) (prohibiting unlicensed individuals from transferring firearms to residents of other states).

**Response:** SAPA and federal law provisions speak for themselves. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

38. H.B. 85 purports to invalidate "[a]ny act forbidding the possession, ownership, [or] use . . . of a firearm, firearm accessory, or ammunition by law-abiding citizens." H.B. 85 § 1.420(4).

**Response:** SAPA speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1.  *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

39. Because H.B. 85 defines the term "law-abiding citizen" solely with reference to state law, *see id.* § 1.480(1), § 1.420(4) purports to invalidate many federal prohibitions on firearm possession for which no analogous state law exists. *See* 18 U.S.C. § 922(g).

**Response:** SAPA speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1.  *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

40. Federal law prohibits possession of a firearm by a person who has committed a domestic-violence misdemeanor. *Id.* § 922(g)(9).

**Response:** Federal law, including 18 U.S.C. § 922(g), speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1.  *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

41. Federal law prohibits possession of a firearm by a person subject to a certain type of restraining order preventing the stalking or harassment of an intimate partner. *Id.* § 922(g)(8).

**Response:** Federal law, including 18 U.S.C. § 922(g), speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1.  *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

42. Federal law prohibits possession of a firearm by a person dishonorably discharged from the military. *Id.* § 922(g)(6).

**Response:** Federal law, including 18 U.S.C. § 922(g), speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

43. None of these provisions—18 U.S.C. § 922(g)(9), 18 U.S.C. § 922(g)(8), or 18 U.S.C. § 922(g)(6) —has an analogous Missouri state law prohibition.

**Response:** Missouri law, including Mo. Rev. Stat. § 571.070 and related provisions, speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

44. Additionally, Missouri law does not prohibit all persons convicted of a felony from possessing firearms. Mo. Rev. Stat. § 571.070.1(1).

**Response:** Missouri law speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

45. Rather, Missouri law prohibits firearm possession only by those persons convicted either of felonies under Missouri state law "or of a crime under the laws of any state or of the United States which, if committed within this state, would be a felony" under Missouri law. Mo. Rev. Stat. § 571.070.1(1).

**Response:** Missouri law speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

46. H.B. 85 thus purports to invalidate the federal prohibition on felons possessing firearms, *see* 18 U.S.C. § 922(g)(1), with respect to those individuals convicted of felonies but whose crimes are not considered felonies under Missouri state law. *Compare, e.g.*, *id.* § 2101 (federal felony charges pertaining to rioting), *with* Mo. Rev. Stat. § 574.050 (rioting only a misdemeanor); 18 U.S.C. § 247(d)(3) (federal felony charges for individuals who injure others in the free exercise of religious beliefs), *with* Mo. Rev. Stat. § 574.035(3)(2) (injury to persons exercising religious freedom in a house of worship only a misdemeanor); *see also, e.g.*, 18 U.S.C. § 241 (federal felony charges for conspiracies to deprive individuals of federal rights, with no clear analogue under Missouri law).

**Response:** SAPA and other provisions of Missouri and federal laws speak for themselves. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

47. Moreover, because H.B. 85 defines the term "law-abiding citizen" to mean "a *person* who is not otherwise precluded under state law from possessing a firearm," H.B. 85 § 1.480.1 (emphasis added), H.B. 85 thus operates to nullify federal laws that prohibit firearm possession in certain *places*, such as the sterile area of airports and other sensitive locations, because those laws generally forbid possession of firearms by everyone (including persons "not otherwise precluded under state law from possessing a firearm"). *See, e.g.*, 49 U.S.C. § 46314 (prohibiting entering an

aircraft or airport area in violation of security requirements); 49 C.F.R. § 1540.111(a)(1) (prohibiting the carrying of weapons at airport inspection area); 18 U.S.C. § 922(q)(2)(A) (prohibiting carrying certain firearms in school zones); *id.* § 930 (prohibiting possession of firearms in federal facilities).

**Response:** SAPA and other provisions of Missouri and federal laws speak for themselves. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

Footnote 2. The "sterile area" of an airport refers the physical portion of an airport "that provides passengers access to boarding aircraft and to which the access generally is controlled by TSA." 49 C.F.R. § 1540.5; *see also* Ex. 4 ¶ 5 (Decl. of Angela Brooks).

**Response:** Federal regulations speak for themselves. Defendants deny any characterization of them. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Even assuming this is a fact—and it is not—it violates W.D.Mo. R. 56.1(a) because "[e]ach fact must be set forth in a separately numbered paragraph[.]" The cited portion of the Brooks Declaration contains many propositions that are not based on personal knowledge and are inappropriate opinion testimony; these cannot support summary judgment and are denied. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

48. By purporting to nullify the federal laws described above—including by declaring them invalid, by imposing a "duty" on state officials to protect against such laws, and by directing that

"[n]o entity or person" shall have authority to enforce such laws—H.B. 85 expressly attempts to directly regulate the Federal Government and constrain its operations. *See* H.B. 85 §§ 1.420–.450.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

49. The federal firearm laws declared invalid—including the NFA, the GCA, and implementing regulations—are routinely enforced by federal agencies such as the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), *see* 28 U.S.C. § 599A; *see also* 28 C.F.R. § 0.130, as well as the Federal Bureau of Investigation (FBI), the United States Marshals Service (USMS), and the Transportation Security Administration (TSA), *see generally* 28 C.F.R. §§ 0.85, 0.111; 49 C.F.R. § 1540.111. Moreover, violations of these laws are routinely investigated and prosecuted by the United States Attorney's Offices for the Eastern and Western Districts of Missouri.

**Response:** Federal firearms laws and regulations and SAPA speak for themselves. Defendants deny any characterization of them. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

50. H.B. 85 has adversely affected public safety by undermining federal law enforcement partnerships with state and local law enforcement, increasing the danger arising from unlawful firearm possession, discriminating against federal law and federal employees, and causing confusion among law enforcement officers, Federal Firearms Licensees, and the general public.

*See* Ex. 1 (Winston Decl.) ¶¶ 14–16, 18, 21–28, 32, 37–38; Ex. 2 (Jordan Decl.) ¶¶ 8–10, 12; *See* Ex. 3 (Decl. of Micheal Vernon Stokes) ¶¶ 10–11, 13–15, 17–18.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Moreover, these declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

51. First, H.B. 85 undermines federal joint task forces. These task forces involve state and local law enforcement officers who are deputized as federal law enforcement officers and voluntarily serve alongside federal officials to enforce federal law. *See* Ex. 1 (Winston Decl.) ¶ 16. Once federally deputized, these state and local officers exercise federal authority when enforcing federal law. *See, e.g.*, 28 U.S.C. §§ 561(f), 566(c); 28 C.F.R. § 0.112(b); *see also* 21 U.S.C. § 878.

**Response:** SAPA and federal laws speak for themselves. Defendants deny any characterization of them. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Moreover, these declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Additionally, Defendants note that deputizing state and local law enforcement requires consent by the State. *See* 5 U.S.C. § 3372(a).

52. For example, ATF relies on joint task forces to investigate and enforce laws relevant to the illegal use, possession, and trafficking of firearms. *See* Ex. 1 (Winston Decl.) ¶ 16 (explaining

that joint "task forces, as well as ATF's overall partnerships with state and local departments and agencies, are key to holding violent persons and those illegally using firearms accountable under the law").

**Response:** Defendants admit the statement "ATF relies on joint task forces to investigate and enforce laws relevant to the illegal use, possession, and trafficking of firearms." Defendants deny characterizations and other facts alleged in the cited declaration, and to the extent further response is required, Defendants deny.

53. Similarly, the USMS has three task forces across the State of Missouri primarily devoted to the apprehension of fugitives. *See* Ex. 2 (Decl. of Jonathan D. Jordan) ¶ 7 (explaining that USMS has two fugitive task force in the Eastern District of Missouri); Ex. 3 (Stokes Decl.) ¶ 7 (explaining that USMS has one fugitive task force in the Western District of Missouri).

**Response:** Defendants note that deputizing state and local law enforcement requires consent by the State. *See* 5 U.S.C. § 3372(a).

54. Because of H.B. 85, many state and local law enforcement agencies have instructed their personnel either to withdraw from participation in joint task forces or to abstain from enforcing particular federal laws even when acting in a federal capacity. *See* Ex. 1 (Winston Decl.) ¶¶ 14–16; Ex. 2 (Jordan Decl.) ¶¶ 9, 12; *See* Ex. 3 (Stokes Decl.) ¶¶ 14, 17.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Moreover, these declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment.

Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Additionally, Defendants note that deputizing state and local law enforcement requires consent by the State. *See* 5 U.S.C. § 3372(a).

55. H.B. 85 has thereby harmed the ability of task forces to pursue violent criminals and enforce federal law against them. *See, e.g.*, Ex. 1 (Winston Decl.) ¶ 18; *see also id.* ¶ 19 (showing significant drop in firearms-related prosecutions initiated based on ATF investigations); ¶ 32 (explaining that H.B. 85 has also harmed joint task forces' ability to investigate referrals from the FBI regarding illegal possession of firearms, which "allows prohibited persons who were able to purchase firearms to retain them longer").

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portions of the Winston Declaration rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Additionally, Defendants note that deputizing state and local law enforcement requires consent by the State. *See* 5 U.S.C. § 3372(a).

56. The Columbia Violent Crimes Task Force, which previously achieved significant results in fighting violent crime, has disbanded as a result of H.B. 85 after state and local law enforcement withdrew their federally deputized officers. *See* Ex. 1 (Winston Decl.) ¶ 16.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. The cited portion of the Winston Declaration relies on inadmissible hearsay and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

Additionally, the cited paragraph does not confirm that the Columbia Violent Crimes Task force has disbanded.  Further, Defendants note that deputizing state and local law enforcement requires consent by the State.  *See* 5 U.S.C. § 3372(a).

57. Some state and local task force officers now disengage in the middle of actively executing arrest warrants if a gun is found. *See* Ex. 2 (Jordan Decl.) ¶ 12 ("This hesitancy initially impacted fugitive operations in such areas as . . . walking away from an operation when other task force members were actively involved in executing an arrest warrant."); Ex. 3 (Stokes Decl.) ¶ 17 ("[Task Force Officers ("TFOs")] may initially participate in the fugitive operation, but depending on the developments at the scene, including the discovery of a firearm, TFOs have disengaged while execution of the arrest warrant is in process."). This creates "grave security issues" for other task force members during the operation. Ex. 3 (Stokes Decl.) ¶ 17.

**Response:**  These declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment.  Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

58. Second, H.B. 85 has caused a breakdown in the United States' information-sharing networks. Following H.B. 85, many state and local law enforcement agencies no longer voluntarily offer critical investigative assistance to the Federal Government. *See* Ex. 1 (Winston Decl.) ¶¶ 21–28 (describing breakdown of information networks); *see, e.g.*, *id.* ¶ 32 (explaining that without this communication, ATF is not "able to investigate [FBI] referrals as quickly, which in turn allows prohibited persons who were able to purchase firearms to retain them longer at greater risk to the public"); Ex. 3 (Stokes Decl.) ¶ 13 (noting that "the filing of federal firearms offenses by local law enforcement agencies" with USMS "has slowed dramatically"); *see id.* ¶ 16 (describing incident on September 5, 2021, when a Missouri State Highway Patrol Trooper allowed a driver to continue

on despite determining that the driver was wanted on an arrest warrant for a federal weapons violation).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Moreover, these declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

59. The Missouri Information and Analysis Center (MIAC)—an entity operated by the Missouri State Highway Patrol to facilitate information-sharing between federal, state, and local law enforcement agencies—now refuses to cooperate with federal agencies pursuing federal firearm offenses. *See* Ex. 1 (Winston Decl.) ¶ 22 (regarding MIAC).

**Response:** The declaration relies on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

60. In some localities, federal agents are now required to issue subpoenas for information that is ordinarily available upon informal request. *See* Ex. 1 (Winston Decl.) ¶ 23 (explaining that confusion about the "uncertain ramifications" of H.B. 85 has caused some state and local law enforcement agencies to stop voluntarily cooperating without a subpoena).

**Response:** The declaration relies on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

61. Several state and local law enforcement agencies are no longer entering data into the ATF's National Integrated Ballistic Information Network (NIBIN), the sole inter-jurisdictional automated ballistic imaging network in the country. *See id.* ¶ 24–28.

**Response:** Plaintiff's declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

62. NIBIN allows investigators to match ballistics evidence in a particular case with other cases, both within the state and across states, and its efficacy declines when law enforcement does not routinely enter new data into it. *See id.* These disruptions to the free flow of vital information between previously cooperative agencies impair the work of federal, state, and local law enforcement alike. *See id.*

**Response:** The declaration relies on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801.

63. Third, H.B. 85 has particularly dangerous implications for sensitive areas such as airports. Federal law generally prohibits the carrying of weapons when entering or in a sterile area at an airport or during TSA inspections prior to entering such an area. *See* 49 U.S.C. § 46314; 49 C.F.R. § 1540.111(a)(1); *see also, e.g.*, 49 U.S.C. § 46505; 49 C.F.R. § 1503.401.

**Response:** SAPA and the federal law provisions speak for themselves. Defendants deny any characterization of them. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

64. H.B. 85 purports to nullify all such place-based restrictions on firearm possession. Statement of Undisputed Material Facts (SOF) ¶ 47. This increases the risk that an individual might bring a firearm into an airport security checkpoint, which "creates a potentially dangerous and attention-grabbing situation" and makes it harder for TSA to protect the public from terrorism. Ex. 4 (Decl. of Angela Brooks) ¶¶ 5, 15.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portions of the Brooks Declaration rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Notably, the declaration does not state that any of these alleged risks have materialized or that TSA has implemented changes to airport operations, therefore it does not support the allegation that SAPA has made it harder for TSA to do its job.

65. H.B. 85's purported nullification of all place-based restrictions on firearm possession, including in airports, is especially problematic in Missouri, where the incidence rate for firearm discovery in airport security checkpoints is almost double the national average. *See id.* ¶ 10.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portions of the Brooks Declaration rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Notably, the declaration does not state that any of these alleged risks have materialized or that TSA has implemented changes to

airport operations, therefore it does not support the allegation that SAPA has made it harder for TSA to do its job.

66. H.B. 85's implications with respect to airports are especially troubling because TSA must refer firearms violations at airports to on-site state and local police to pursue potential criminal charges and to confiscate the firearm or otherwise ensure that the firearm is not allowed into the sterile area. *See id.* ¶¶ 8, 15; *see also* 49 U.S.C. § 44903(c)(1) (contemplating that airports would rely on "the services of qualified State, local, and private law enforcement personnel" to "provide[] a law enforcement presence and capability . . . that is adequate to ensure the safety of passengers"); *id.* § 44922(a) (providing TSA with deputation authority for state and local law enforcement officers).

**Response:**  SAPA speaks for itself.  Defendants deny any characterization of it.  Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.  The cited portions of the Brooks Declaration rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment.  Rule 56(c)(4); *see Howard*, 363 F.3d at 801.  Notably, the declaration does not state that any of these alleged risks have materialized or that TSA has implemented changes to airport operations, therefore it does not support the allegation that SAPA has made it harder for TSA to do its job.

67. H.B. 85's nullification proclamation may discourage state and local law enforcement personnel at airports from promptly assisting when firearms are discovered and from providing TSA with information necessary for TSA to carry out subsequent civil enforcement actions. *See* Ex. 4 (Brooks Decl.) ¶¶ 16–17.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portions of the Brooks Declaration rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Notably, the declaration does not state that any of these alleged risks have materialized or that TSA has implemented changes to airport operations, therefore it does not support the allegation that SAPA has made it harder for TSA to do its job.

68. Any confusion-related delay or even outright refusal on the part of the on-site police with respect to firearms could be disastrous. *See id.* ¶ 18.

**Response:** This is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portion of the Brooks Declaration relies on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Notably, the declaration does not state that any of these alleged risks have materialized or that TSA has implemented changes to airport operations, therefore it does not support the allegation that SAPA has made it harder for TSA to do its job.

69. Fourth, the confusion that H.B. 85 generates has far-reaching consequences. Numerous aspects of H.B. 85 are so vague as to make it difficult for state and local law enforcement officials to interpret the law's precise parameters. Many state and local officials are still uncertain about the exact ramifications of H.B. 85. *See* Ex. 1 (Winston Decl.) ¶ 23. And this confusion leads to inconsistent enforcement of H.B. 85 and federal firearm laws. *See* Ex. 3 (Stokes Decl.) ¶ 16

(describing aforementioned incident in which Missouri State Highway Patrol Trooper released driver who was wanted on a USMS warrant for a federal weapons violation because the Trooper believed H.B. 85 prevented him from making the arrest); *see id.* ¶ 17 (noting that local law enforcement engages in "varying levels of participation" in joint task forces as cases develop).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. These declarations rely on conjecture, hearsay, and inappropriate opinion testimony that cannot support summary judgment. Rule 56(c)(4); *see Howard*, 363 F.3d at 801. Moreover, Defendants are not charged with enforcement of SAPA and SAPA does not have an enforcement provision against federal officers or agencies.

70. Over sixty local law enforcement officials in Missouri have confirmed that H.B. 85 has caused confusion and hindered law enforcement's ability to defend and protect Missouri citizens. *See* Exhibits to *Amicus Curiae* St. Louis Area Police Chiefs Association, *City of Arnold v. State of Missouri*, No. 22JE-cc00010 (Jeff. Co. Cir. Ct. filed Jan. 7, 2022); Exhibits to *Amicus Curiae* Missouri Police Chiefs Association, *City of Arnold v. State of Missouri*, No. 22JE-cc00010 (Jeff. Co. Cir. Ct. filed Jan. 7, 2022).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. Moreover, argument and exhibits contained in *amicus* briefs filed in other cases is not admissible evidence and cannot support summary judgment. Rule 56(c).

71. H.B. 85 also creates confusion among private citizens in Missouri. *See* Ex. 1 (Winston Decl.) ¶ 39 (describing confusion among private citizens).

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portion of the Winston Declaration is conjecture and inappropriate opinion testimony that cannot support summary judgment. *See Howard*, 363 F.3d at 801. Moreover, it only states that SAPA "could also create," not that SAPA actually creates, confusion.

72. ATF in particular has recognized confusion among private citizens in Missouri and has issued an informational letter to all FFLs in Missouri reiterating that H.B. 85 does not alter their legal obligations under federal law. *See* ATF, Open Letter to All Missouri Federal Firearms Licensees, https://www.atf.gov/firearms/docs/open-letter/missouri-open-letter-all-ffls-house-billnumber-85-second-amendment/download (July 26, 2021); *see also* Ex. 1 (Winston Decl.) ¶ 37 (describing federal firearms licensees' "confusion about the current status of the law").

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991. The cited portion of the Winston Declaration is conjecture and inappropriate opinion testimony that cannot support summary judgment. *See Howard*, 363 F.3d at 801. Moreover, the cited ATF letter only addresses federal firearm licensees—not the general public, and to the extent there was any confusion, the letter is guidance that "confirms the continuing applicability of existing federal obligations."

73. Fifth, H.B. 85 facially discriminates against the United States and federal employees. H.B. 85's penalty provisions bar individuals who have "[e]nforce[d] or attempt[ed] to enforce any of the" relevant federal firearm laws from employment with "[a]ny political subdivision or law enforcement agency" within Missouri by imposing a civil monetary penalty of $50,000 and injunctive relief upon the employing agency. *See* H.B. 85 §§ 1.460, 1.470.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

74. H.B. 85 punishes federal employees and those acting under color of federal law— including state and local law enforcement officers deputized to enforce federal law—whose responsibilities involve enforcing federal firearm laws. *See id*.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

75. In sum, H.B. 85 discriminates against the United States and federal employees, sows confusion across law enforcement and the general public, creates particular danger in sensitive areas such as airports, injures the United States' information-sharing networks, and undermines federal joint task forces.

**Response:** SAPA speaks for itself. Defendants deny any characterization of it. Further, this is not a fact but rather an impermissible legal argument or conclusion under W.D.Mo. R. 56.1. *Cf. Spaulding*, 740 F.3d at 1196; *Jones*, 461 F.3d at 991.

Footnote 3. H.B. 85 is the subject of two ongoing state-court lawsuits filed by various cities and counties against the state of Missouri: one lawsuit filed by the City of St. Louis, St. Louis County, and Jackson County, *see City of St. Louis v. State of Missouri*, No. 21AC-CC00237 (Cole Co. Cir. Ct.); and one lawsuit filed by the City of Arnold, *see City of Arnold v. State of Missouri*, No. 22JE-cc00010 (Jeff. Co. Cir. Ct.).  The Federal Government participated as amicus curiae in *City of St. Louis*, *see City of St. Louis v. State of Missouri*, No. SC99290 (Mo.), in which the Supreme Court of Missouri heard argument on February 7, 2022.

**Response:** Admitted, even though this fact is not "set forth in a separately numbered paragraph[,]" in violation of W.D.Mo. R. 56.1(a).  Further responding that on August 18, 2021, the United States filed an almost thirty-page Statement of Interest (along with the Declaration of Frederic D. Winston) in *City of St. Louis v. State of Missouri*, No. 21AC-CC00237 (Mo. Cir. Ct.). Fed. R. Evid. 801(d)(2)(A)-(D).

**STANDARD OF REVIEW**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1000 (8th Cir. 2021). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion … which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "If the moving party has no evidence negating an element of the case, it must nevertheless affirmatively show the absence of evidence in the record." *Hanson v. FDIC*, 13 F.3d 1247, 1253 (8th Cir. 1994). The court must "view[] the evidence in the light most favorable to the non-moving party and resolv[e] all reasonable inferences in its favor." *Segal v. Metro. Council*, 29 F.4th 399 (8th Cir. 2022).

"As a general rule, summary judgment is proper only after the nonmovant has had adequate time for discovery." *Iverson v. Johnson Gas Appliance Co.*, 172 F.3d 524, 530 (8th Cir. 1999). "If the failure to allow discovery deprives the nonmovant of a fair chance to respond to the motion, however, summary judgment is not proper and will be reversed." *Id.*; *see also* Fed. R. Civ. P. 56 advisory committee's note (2010 amendments) (noting that "in many cases [a summary judgment] motion will be premature until the nonmovant has had time to file a responsive pleading *or other pretrial proceedings have been had*") (emphasis added).

**ARGUMENT**

**I.      The United States Lacks Standing to Bring Suit.**

The United States has not shown that it "suffered an injury in fact" that is traceable to the defendants that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Limiting federal jurisdiction to cases or controversies ensures that

"federal courts exercise "their proper function in a limited and separated government," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021), as "[f]ederal courts do not exercise general legal oversight of the Legislative and Executive Branches, or of private entities," *id.*, or of the public policy of States. But that is what the United States seeks to do here, claiming that it is harmed by the Missouri General Assembly's declaration that Missouri's subdivisions and agents do not "have the authority to enforce or attempt to enforce any federal acts, laws, executive orders, administrative orders, rules, regulations, statutes, or ordinances infringing on the right to keep and bear arms," Mo. Rev. Stat. § 1.450. This kind of advisory opinion is prohibited by Article III. *TransUnion*, 141 S. Ct. at 2203.

No such injury exists (or can exist) on a plain reading of SAPA. Similarly, because SAPA cannot be enforced against the United States or its agencies and the named defendants do not enforce SAPA, SAPA does not cause any injury to the United States and any judgment against the Defendants would not redress such injury.

The United States cannot succeed by merely stating "general factual allegations of injury resulting from the defendant's conduct" at summary judgment. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). On "a summary judgment motion, however, the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Id.* As made clear by the Winston, Jordan, Stokes, and Brooks declarations, Docs. 8-2 to 8-5, federal law enforcement continues to investigate and prosecute federal firearms violations in Missouri. These declarations do not show that federal agencies or officers are fearful of or have been subjected to a SAPA suit, that the named Defendants have enforced SAPA, or that federal law enforcement has been unlawfully impeded rather than the federal government not receiving the benefit of state assistance. Moreover, the declarations show that state law enforcement assists

federal law enforcement to the extent permitted by law. The United States has failed to carry its burden. *Spokeo*, 578 U.S. at 339.

## A.  The United States has not suffered an injury in fact.

The United States has failed to show that SAPA regulates or interferes with federal agencies enforcing federal law—because it does not. SAPA simply requires Missouri's law enforcement to, as the complaint agrees is lawful, "lawfully decline to assist with federal enforcement[.]" Doc. 1, at 3 (citing *Printz v. United States*, 521 U.S. 898, 935 (1997)). The United States' asserted injuries are based on misconstruing SAPA, speculating on risks that have not manifested, and insisting that SAPA favors other states over the federal government.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S.at 560).

The United States' chief "injury" (at 20) appears to be that § 1.420 deems certain categories of federal acts "infringements on the people's right to keep and bear arms, as guaranteed by Amendment II of the Constitution of the United States" and the Missouri Constitution. Missouri does not injure the United States by declaring what the Second Amendment requires of its officials and political subdivisions. *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010). The United States alleges (at 1) that SAPA "purports to divest all persons and entities of the authority to enforce those federal firearm laws." It also claims that § 1.430 of SAPA attempts to "nullify federal law" because it declares and allegedly revives a "long-defunct nullification doctrine by independently declaring federal law to be un-constitutional and 'invalid.'" The United States further claims (at 21) that SAPA purports to declare invalid certain federal firearms statutes that have been upheld by federal courts under federal law.

The federal government misconstrues SAPA's plain text. SAPA does not invalidate federal law as applied to third parties. The text of the invalidity provision states that certain federal acts "shall be invalid **to this state**, shall not be recognized **by this state**, shall be specifically rejected **by this state**, and shall not be enforced **by this state**." Mo. Rev. Stat. § 1.430 (emphasis added). Despite the United States' lengthy briefing, it has cited no contested provision of the National Firearms Act or the Gun Control Act that applies to states. *E.g.*, 18 U.S.C. 922(g) ("It shall be unlawful for any person") & 18 U.S.C. 921(a)(1) ("The term 'person' and the term 'whoever' include any individual, corporation, company, association, firm, partnership, society, or joint stock company."). Nor has it cited any provision requiring the State to take any action and even concedes (at 22) that the federal government "cannot require state or local employees to assist with federal [law] enforcement." It is not an injury to declare that certain acts violate the right to keep and bear arms and acts that do not apply to the State are inapplicable and invalid as to the State (when they are) and will not be enforced by the State.

The United States also claims (at 27) that SAPA "unconstitutionally constrain[s] the conduct of state and local law enforcement officers who are federally deputized Task Force Officers." Not so. The various cited "deputizing" provisions, 49 U.S.C.§ 44922(a), 21 U.S.C. § 878, 28 U.S.C. §§ 561(f), all rely on consent by the State. 5 U.S.C. 3372(a)(2) ("On request from or with the concurrence of a State or local government, and with the consent of the employee concerned, the head of a Federal agency may arrange for the assignment of an employee of a State or local government to his agency"); 49 U.S.C. § 44922(c) ("To deputize a State or local law enforcement officer under this section, the Administrator of the Transportation Security Administration shall enter into a voluntary agreement with the appropriate State or local law enforcement agency"). Section 1.450 of SAPA revokes any consent (including that previously

given) for state and local entities and personnel to "enforce or attempt to enforce" any of the infringements. It also revokes the authority of a private citizen, granted under Mo. Rev. Stat. § 563.051, to arrest a law-abiding citizen for an infringement. Contrary to the United States' view (at 27), it does not "purport[] to prohibit federal officials from enforcing federal law."[1]

Similarly, section 1.460 grants damages to persons injured by employees of political subdivisions or law enforcement of Missouri. The United States misreads this provision to claim that it applies to federal law enforcement. Yet, the statute must be read as a whole and related sections should be read harmoniously. *Street v. Dir. of Revenue*, 361 S.W.3d 355, 358 (Mo. banc 2012). This provision clearly applies to Missouri political subdivisions and law enforcement as applied to a "citizen of Missouri." It provides for venue in a state circuit court, requires that court to hear temporary equitable requests expeditiously, and waives sovereign immunity. Obviously only each sovereign may waive its own immunity. *State ex rel. Div. of Motor Carrier & R.R. Safety v. Russell*, 91 S.W.3d 612, 615 (Mo. banc 2002). Similarly, SAPA's use of "[a]ny political subdivision or law enforcement agency" in § 1.470 where it distinguishes officials of the "government of the United States" shows that the General Assembly did not include federal law enforcement within any "law enforcement agency."

The United States also asserts (at 27) that SAPA injures it "by restricting law enforcement officers from sharing information with the Federal Government." But the United States has not cited any provision showing that it has a right to such information. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (injury-in-fact satisfied when plaintiff could not obtain information "the

---

[1] SAPA focuses on Missouri's citizens, Missouri's political subdivisions and law enforcement, and Missouri's borders. The United States wrongly interprets § 1.450 to apply to federal law enforcement when that same provision envisions that federal officials will operate in Missouri and permits Missouri officials to accept federal aid in enforcing Missouri law. Mo. Rev. Stat. § 1.450.

statute requires that AIPAC make public."); *see also Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 449 (1989) (injury-in-fact when statute permits requesting information). Indeed, the one case cited for this proposition, *Reno v. Condon*, 528 U.S. 141, 143-45 (2000), involved the constitutionality of a statute that required, permitted, and prohibited certain transfers of driver information from DMV databases in interstate commerce. No statute exists here, and the only "fact" offered to support this claim (at 28) is that the federal government must issue subpoenas for testimony. But the United States does not claim that state law enforcement are failing to obey federal subpoenas or that SAPA prohibits such testimony. Nor could they, as testifying is not enforcing federal law. SAPA does not prohibit obedience to judicial orders, like subpoenas. Mo. Rev. Stat. § 1.450.

The United States further claims that this non-sharing is discriminatory because it treats the federal government differently from other states. Yet SAPA governs the conduct of Missouri political subdivisions and law enforcement as to citizens of Missouri, "within the borders of this state," and under the Federal and Missouri constitutions. Mo. Rev. Stat. §§ 1.420, 1.460. The only sovereigns that may act within Missouri's borders are Missouri and the United States, and SAPA recognizes that other sovereigns may act on Missouri citizens in other jurisdictions. Thus, SAPA does not discriminate against the United States; it precludes using Missouri resources against Missouri citizens within Missouri's borders for certain infringements. In our system of dual sovereigns, it is "not at all uncommon for the Federal Government to permit activities that a State chooses to forbid or heavily restrict," and "a State may choose to legalize an activity that federal law prohibits." *Gamble v. United States*, 139 S. Ct. 1960, 1968 (2019).

Finally, the United States claims (at 28-29) that SAPA "penalizes the lawful exercise of federal authority" because § 1.460 imposes a penalty on *state* law enforcement agencies that

enforce an infringement under § 1.420 and it imposes a penalty on any *state* law enforcement agency that hires a former federal official who enforced an infringement under § 1.420. SAPA only imposes liability on Missouri's political subdivisions and law enforcement agencies—not federal officers or agencies. Indeed, SAPA does not impose liability on any individual. The United States does not cite any interest it has in the *future* employment of its *former* employees. Nor can the federal government prohibit Missouri from ordering its subdivisions or determining the qualifications of its government officials. *Gregory v. Ashcroft*, 501 U.S. 452, 463 (1991).

**B.      The declarations show that United States continues to enforce its laws.**

The declarations fall far short of showing that SAPA blocks or impedes the United States from enforcing federal law. Despite concluding that SAPA "impedes ATF's ability to carry out" its operations, Winston Decl. ¶ 3, has "had several negative impacts on USMS operations in E/MO," Jordan Decl. ¶ 8, has "had several negative impacts on USMS operations in W/MO," Stokes Decl. ¶ 12, or "may impede TSA's ability to carry out its role," Brooks Decl. ¶ 4, none has facts showing that SAPA stops *federal* officers from enforcing federal law. The declarations all rest on the false legal conclusion that SAPA "purports to nullify several categories of federal firearm laws." Jordan Decl. ¶ 8, Stokes Decl. ¶ 12, Brooks ¶ 11, Winston Decl. ¶ 12. These declarations show that federal officers continue to enforcing federal law without fear.

Missouri starts with what the declarations do not show. There are no claims that SAPA prevents federal officers from enforcing federal law. None claim that federal law enforcement are subject to SAPA or that any federal officer has been sued under SAPA. The Winston Declaration claims federal firearm licensees were "confused," ¶ 37, but it does not report that its letter failed to fix the alleged confusion or that any federal firearm licensee disobeyed federal law, *id.* ¶¶ 36-39. The declarations also do not claim that state and local officials are blocking enforcement of federal

46

law or breaking federal law.  Despite the United States' claim (at 28) that SAPA could prevent these officials from testifying and potentially violating the prohibitions on witness tampering and retaliation, none of the four declarants made any statements supporting that allegation. Additionally, no declarant expressed concern that federal employees would be barred from state service or that the United States has an interest in the future employment of its former employees.

Indeed, the declarations allege that state and local law enforcement simply "could not help any federal agency at this time."  Jordan Decl. ¶ 13; *id.* at ¶ 12 (describing passive behavior such as walking away and failing to volunteer information); Winston Decl. ¶ 15 (noting state and local officers "have withdrawn from participation in ATF task forces"); *id.* at ¶ 16 ("state and local law enforcement partners have limited their cross-jurisdictional cooperation"); *id.* at ¶ 22 (MSHP "will no longer provide any investigative support to ATF, to include assisting in providing background information on investigative targets"); *id.* at ¶ 24 ( state and local law enforcement "will no longer input data"); *id.* at ¶ 31 (noting lack of referrals for prosecution); Stokes Decl. ¶ 17 (noting reduced participation in fugitive operations).  The declarations do not show that Missouri state and local law enforcement have failed to do something they promised to do.  The declarations also do not show that Missouri helps other states in ways that those authorities refuse to help the federal government.  And of course, no declaration claims that state and local law enforcement are refusing to give assistance when required by federal law.  *See* Doc. 8, at 22.

The declarations also show that federal officers continue to enforce federal law.  Special Agent Winston explains that in 2021, "177 prosecutions were initiated (of which the vast majority involved firearms crime), defendants numbered 230, and the number of charges was 365." Winston Decl. ¶ 19.  Local law enforcement provides assistance to ATF in emergency situations, Winston Decl. ¶ 23, and some jurisdictions continue to input data into NIBIN, *id.* ¶ 25.  Marshal

Jordan explains that his Fugitive Task Force has not lost any members due to SAPA, Jordan Decl. ¶ 12, and that in FY 2021 the Eastern District's Marshals had 421 federal related weapons warrants for new charges, 320 warrants related to supervised release and felon-in possession charges that were prosecuted federally, *id.* at ¶ 10. Additionally, the Task Force has made 1,201 arrests for state and federal weapons offenses and "arrested 470 additional persons for homicide, assault, and robbery, which all involved firearms." *Id.* at ¶ 11. Jordan describes one incident where local police could not assist with the outer perimeter, but he does not claim that it prohibited federal officers from enforcing federal law. *Id.* at ¶ 13. Marshal Supervisor Stokes similarly explained that his task force continued to apprehend "30 individuals for federal firearms related charges" and seized 51 firearms in 2021. Stokes Decl. ¶¶ 10-11. TSA Director Brooks similarly explained that TSA in Missouri had "183 firearm discoveries in 2021." Brooks Decl. ¶ 10.

The United States offers mere speculation of harm, as evidenced by TSA Director Brooks. She posits that SAPA "poses a risk to the federal aviation system because it may discourage state and local law enforcement personnel at airports from assisting promptly in responding to TSA when firearms are discovered at the checkpoint." *Id.* ¶ 16. Despite the fact that in Missouri, one firearm is discovered for every 51,184 passengers, a "substantially higher [rate] than the nationwide average," *id.* ¶ 10, she reports *no* incidents where SAPA caused local law enforcement to jeopardize TSA's functions. *Id.* ¶ 16. Similarly, she cannot report "[a]ny delay or hesitation in fulfilling" a critical duty, *id.* ¶ 18, or that any state and local law enforcement personnel at airports have failed to provide TSA with necessary information, *id.* ¶ 17. Even though 183 firearms were discovered in 2021, presumably some after SAPA was enacted, Director Brooks reports no incidents. *Id.* ¶ 10. These fears are unfounded and cannot constitute an injury.

Similarly, declarants make several statements that SAPA caused decreases in federal law enforcement statistics, but they present no credible evidence that any decreases were caused by SAPA rather than other factors. *E.g.*, Winston Decl. ¶ 19 ("The 2021 numbers represent a forty-four percent (44%), thirty-seven percent (37%), and forty-six (46%) percent drop, respectively from the 2019 numbers. While *it is likely that other factors such as COVID-19 also played a role in the decline of prosecutions*, the SAPA was undoubtedly a factor."); *see also* Stokes Decl. ¶ 11(after noting year-over-year reduction of 41 firearms seizures, "[a]lthough there are many factors involved, *including a reduction in TFOs and COVID*, H.B. 85 is the only change that caused the significant drop in the numbers.") (emphasis added). This is inappropriate opinion testimony by a lay witness because the United States has not designated them an expert witness but attempted to have them testify based on specialized experience and knowledge. Fed. R. Civ. P. 701(c); *see, e.g.*, Winston Decl. ¶ 40 ("In sum, based upon my knowledge and law enforcement experience in working with state and local partners …"). Notably absent from the declarations is any acknowledgment that the Administration has changed since 2020 and 2019, so its enforcement priorities have also changed. *E.g., Biden DOJ Reinstates an Obama-Era Memo on Charging and Sentencing Policy*, The National Law Review (Feb. 1, 2021) (requiring individualized assessment of each matter on a case-by-case basis). Instead of consulting with law enforcement, the Administration receives advice from "activist groups like the NAACP Legal Defense and Educational Fund and the Leadership Conference on Civil and Human Rights." Chelsey Cox, *President Biden's promises on policing reform: What the administration has accomplished*, USA Today (May 4, 2021).[2] COVID-19 measures and impacts should not be underestimated, either.

---

[2] *Available at* https://www.usatoday.com/story/news/politics/2021/05/04/biden-accomplishments-police-reform-promises-law-enforcement-changes/7263626002/.

According to one survey from respondents in Illinois, Missouri, and Ohio, community policing lessened by over 80%, access to police declined, "[r]eductions in enforcement actions and in-person responses to calls for service were found to be 73% and 69% for all three states on average," and "arrests, traffic stops and investigatory stops have declined mainly nationally." Niyazi Ekici and Dean C. Alexander, *COVID-19's effects on police departments in Illinois, Missouri, and Ohio, Security Magazine* (Sept. 14, 2021).[3] State and local law enforcement have also experienced staffing shortages in the past two years. Heidi Schmidt, *Decisions will have to be made, KCPD chief warns about staffing shortages*, FOX4KC (Sept. 28, 2021).[4] These are all independent reasons and factors that contribute to the number of federal prosecutions. The United States presents no evidence to establish its *ipse dixit* on causation.

## II.     SAPA does not nullify federal law or federal authority to enforce federal law.

Contrary to the United States' allegations, SAPA reaffirms the General Assembly's duty "to support and defend the Constitution of the United States." Mo. Rev. Stat. § 1.410.2(1). It takes a more narrow view of Congress's powers and makes the unobjectionable statement that "[i]f the federal government assumes powers that *the people* did not grant it in the Constitution of the United States, its acts are unauthoritative, void, and of no force." *Id.* § 1.410.2(4) (emphasis added); *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534–33 (2012) ("the Federal Government 'can exercise only the powers granted to it.'") (opinion of Roberts, C.J.) (quoting *McCulloch v. Maryland*, 4 Wheat 316, 405 (1819)). SAPA's reliance on "the people of the several states," Mo. Rev. Stat. §§ 1.410.2 (2), (3), (6), (7), (9), echoes the Constitution's republican values

---

[3] *Available at* https://www.securitymagazine.com/articles/96082-covid-19s-effects-on-police-departments-in-illinois-missouri-and-ohio.

[4] *Available at* https://fox4kc.com/news/decisions-will-have-to-be-made-kcpd-police-chief-warns-about-staffing-shortages/.

that the House of Representatives be chosen by "the People of the several States." U.S. CONST. ART. I, § 2, CL.1. SAPA's focus on "the people" as the fount of political power expressly reinforces that "our fundamental instrument of government derives its authority from 'We the People.'" *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 820 (2015). This is a far cry from the nullification theory whereby the federal government is the agent of the states, who could "'interpose' their authority by nullifying the federal statute or action." Ex. 5, *Encyclopedia of the American Constitution*, 1832-33 (2d ed. 2000).

The cases cited by the United States confirm that nullification attempts to deny the People rights granted to them under federal law or the federal Constitution. In *United States v. Reynolds*, 235 U.S. 133 (1914), the Court held that one could be prosecuted for using Alabama law to force a convict into an involuntary labor contract in violation of the federal statute prohibiting peonage. 235 U.S. at 150. There, the Alabama laws denied the convict his rights under the Thirteenth Amendment. In *Cooper v. Aaron*,[5] the Court confronted efforts by the Arkansas Governor and legislature to prevent black students from attending Central High School, acting pursuant to an amendment to the state constitution to "oppose in every Constitutional manner the Un-constitutional desegregation decisions of" *Brown v. Board of Education*. 358 U.S. at 8 (1958). The "Arkansas National Guard acting pursuant to the Governor's order, stood shoulder to shoulder at the school grounds and thereby forcibly prevented" the federal court's desegregation order from taking effect. *Id.* at 11. Notably, the United States filed a separate action against then-Governor Faubus, where the court of appeals did not reach whether the United States had standing because the *Aaron* plaintiffs, the "real parties in interest," "joined the Government in praying for the preliminary injunction." *Faubus v. United States*, 254 F.2d 797, 805 (8th Cir. 1958). Finally, in

---

[5] *United States v. Louisiana*, 364 U.S. 500 (1960) (per curiam), relies entirely on *Cooper v. Aaron.*

*United States v. Peters*, 5 Cranch 115 (1809), Pennsylvania passed laws to prevent and overturn a federal court's judgment to pay a maritime prize to the adjudged rightful captors. The Court explained that the Pennsylvania could not "annul the judgments of the courts of the United States, and destroy the rights acquired under those judgments." *Id.* at 136. In each case, the states sought to interfere with the legal rights of third parties.

That is not the case here. SAPA only seeks to regulate Missouri's government. No provision is directed at federal officers enforcing federal law (or federal firearm licensees), and SAPA only declares that certain federal infringements will be invalid to the State and not enforced by the State. Mo. Rev. Stat. § 1.430. Indeed, it only places a duty on "the courts and law enforcement agencies of this state to protect the rights of law-abiding citizens to keep and bear arms within the borders of this state." *Id.* § 1.440. The only entities that pay penalties are Missouri political subdivisions and law enforcement agencies. *Id.* §§ 1.460, 1.470. SAPA neither creates rights against federal law nor subtracts rights from third parties.

For similar reasons, the United States' claim (at 22) that SAPA attempts to "directly regulate, discriminate against, and affirmatively penalize the lawful exercise of federal authority" fails. First, SAPA concludes that some exercises of federal authority currently presumed lawful will be found to infringe the right to keep and bear arms and requires Missouri law enforcement to avoid enforcing them. Second, SAPA requires nothing from the federal government and does not attempt to limit federal enforcement. *Contra McCulloch*, 4 Wheat at 361. No enforcement mechanism penalizes the federal government or any individual.

Third, SAPA does not discriminate against the federal government. SAPA applies to Missouri's law enforcement activities within Missouri's borders, § 1.420. No other sovereign operates within Missouri's borders, so Missouri does not provide *additional* assistance to federal

law enforcement.  In *McCulloch*, Maryland targeted the only bank with a federal charter.  4 Wheat at 320 ("An act to impose a tax on all banks or branches thereof, in the state of Maryland, not chartered by the legislature.").  And in *North Dakota v. United States*, 495 U.S. 423 (1990), the Court found that the federal government received an ancillary benefit that state liquor stores did not, even if there were some extra labeling requirements. *Id.* at 439.

### III.     Preemption does not apply because no conflict with federal law exists.

The United States seeks to widely preempt the entire statute.  That is inconsistent with conflict preemption, and Congress has made clear that its laws do not occupy the field.  18 U.S.C. § 927 (no preemption "unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.").  "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one."  *Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).  Thus, the United States must prove that a specific provision of SAPA directly conflicts with a federal statute.

First, SAPA does not conflict with a "with a broad swath of federal firearm laws concerning registration, licensing, and tracking" and who may possess a firearm.  Doc. 8, at 23.  All those laws apply to persons, but Missouri only prevents state enforcement of them.  § 1.430.  It does not purport to give anyone rights against the federal government, end federal licensing requirements, *see Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 978 (9th Cir. 2013), or attempt to prosecute federal law enforcement, *see* Kan. Stat. § 50-1207.  No conflict exists with §§ 1.410-430.

Second, the United States agrees that SAPA's restraint on Missouri law enforcement is constitutional under *Printz*.  It claims that § 1.440 and § 1.450 go further by requiring protection of those rights and applying to "any" law enforcement including federal officials.  As explained above, SAPA only applies to Missouri entities, and it revokes any state authority to enforce federal

53

laws deemed infringements. And as set forth above, the penalty provisions do not penalize federal agencies or their workers, nor can one read the statute as applying to federal entities.

## IV.  SAPA is severable.

Missouri has a strong presumption in favor of severability. *See* Mo. Rev. Stat. § 1.140. SAPA has an even stronger severability provision: if any provision or *application to any person* is held invalid, it "shall not affect the provisions or applications of sections 1.410 to 1.485 that may be given effect without the invalid provision or application." Mo. Rev. Stat. § 1.485. The courts will give effect to such clauses. "Upon a finding of invalidity as to one provision of a statute, courts are to presume that the legislature intended to give effect to the other parts of the statute that are not invalidated." *Dodson v. Ferrara*, 491 S.W.3d 542, 558 (Mo. banc 2016) (citing *Akin v. Dir. of Revenue*, 934 S.W.2d 295, 300-301 (Mo. banc 1996)). Faced with such provisions, the United States' facial challenge cannot succeed. Plaintiff concedes (at 24) that one application of the statute is constitutional—limiting Missouri's enforcement of federal laws. The statute is severable and the court should follow the intent of the General Assembly and strike only those provisions or applications of the statute—if any—that the court determines to be invalid.

## CONCLUSION

For the foregoing reasons, and those in Defendants' Motions to Dismiss, Docs. 13, 16, the Court should deny Plaintiff's Motion for Summary Judgment.

Dated: April 11, 2022

Respectfully Submitted,

**ERIC S. SCHMITT**
Attorney General of Missouri

/s/ *D. John Sauer*

D. JOHN SAUER, #58721
  *Solicitor General*
JESUS A. OSETE, #69267
  *Deputy Attorney General*
Office of the Attorney General
Supreme Court Building
P.O. Box 899
207 W. High St.
Jefferson City, MO 65102
Tel: (573) 751-1800
Facsimile: (573) 751-0774
E-mail: john.sauer@ago.mo.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th of April 2022, I electronically filed the foregoing with the

Clerk of Court using the Court's electronic filing system, to be served on all counsel of record.

/s/ *D. John Sauer*