IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-4022 |
| V. | ) | |
| | ) | August 31, 2022 |
| THE STATE OF MISSOURI; MICHAEL | ) | |
| L. PARSO, Governor of the State of | ) | |
| Missouri, in his official capacity; | ) | |
| and ERIC SCHMITT, Attorney General | ) | |
| of the State of Missouri, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

Don Hamrick
322 Rouse Street
Kensett, AR 72082

## TWENTIETH AMICUS CURIAE BRIEF OF PRIVATE CITIZEN DON HAMRICK

### THE UNITED STATES HAS BEEN A PRISON NATION FOR YEARS:

### THE BLURRING OF THE SEPARATION-OF-POWERS THROUGH THE ABUSE OF CHEVRON DEFERENCE CONTRIBUTED TO THE UNITED STATES' GLOBAL RANKING AS THE NUMBER ONE COUNTRY WITH THE MOST PEOPLE IN PRISON AND JAIL THAN ANY COUNTRY IN THE WORLD.

Citing Aditya Bamzai, *THE ORIGINS OF JUDICIAL DEFERENCE TO EXECUTIVE INTERPRETATION*, (Date Written: August 22, 2015) 126 Yale Law Journal 908 (August 2017) (Virginia Public Law and Legal Theory Research Paper No. 2017-48)[1]

#### B. The Current Debate over Judicial Deference

In a number of recent concurrences and dissents, Justices on the Court have highlighted their interest in confronting judicial deference from a historical or **separation-of-powers perspective**, relying on an array of different sources from *Marbury* to James Madison to Montesquieu. **But none of these opinions has addressed the cases that *Chevron*[2] itself relied on to justify judicial deference as a matter of precedent.**

The first avenue through which Justices have raised these issues is **in a critique of *Chevron* itself.** The Chief Justice's dissent (joined by Justices Kennedy and Alito) in *City of Arlington v. FCC*,[50] for example, **attempted to re-evaluate *Chevron* in light of separation-of-powers first principles.** While nominally accepting the *Chevron* framework, the *City of Arlington* dissent stressed that its "disagreement" with

---

[1] Available at SSRN: https://ssrn.com/abstract=2649445 or http://dx.doi.org/10.2139/ssrn.2649445.

[2] Chevron v. Natural Resources Defense Council

1

the majority is "fundamental" and premised on the notion that the "duty to police the boundary between the Legislature and the Executive" is "firmly rooted in our constitutional structure" and is "as critical as [the] duty to respect that [boundary] between the Judiciary and the Executive." Fixing "the boundaries of delegated authority," according to the dissent, "is not a task" that courts can "delegate to the agency" because "[w]e do not leave it to the agency to decide when it is in charge." Deference under *Chevron* is appropriate only if the court decides "whether Congress . . . has in fact delegated to the agency lawmaking power over the ambiguity at issue." Accordingly, a congressional delegation of interpretive authority can support *Chevron* deference only when the delegation "extend[s] to the specific statutory ambiguity at issue," because the question *Chevron* requires a court to ask "is whether the delegation covers the 'specific provision' and 'particular question' before the court." More recently, the Chief Justice revisited the proper application and scope of judicial deference in his majority opinion in *King v. Burwell*, which casually dismissed the government's argument that the Internal Revenue Service should receive deference for its construction of the Affordable Care Act's tax-credit provisions. As the majority put it, the Court "often" applies *Chevron* in assessing statutory issues of this nature, but not in "extraordinary cases" of "deep 'economic and political significance' . . . central to th[e] statutory scheme." Accordingly, it was the Court's—not the agency's— "task to determine the [statute's] correct reading." The second avenue through which the Justices have questioned judicial deference to the executive is through a critique of *Chevron*'s sister doctrine—commonly attributed to the Supreme Court's opinions in *Bowles v. Seminole Rock & Sand Co.* and *Auer v. Robbins*—under which courts "defer to an agency's interpretation of its own regulations." In his partial dissent in *Decker v. Northwest Environmental Defense Center*, Justice Scalia relied on **separation-of-powers first principles to argue that this doctrine should be abandoned and replaced with the rule that courts must give regulations their most "natural" and "fairest" construction, "using the familiar tools of textual interpretation," notwithstanding the agency's advocacy of a plausible but "unnatural reading."**

More recently, in a separate concurrence in *Perez v. Mortgage Bankers Ass'n*, Justice Scalia observed that the APA "contemplates that courts, not agencies, will authoritatively resolve ambiguities in statutes and regulations" and that the Court's "elaborate law of deference to agencies' interpretations of statutes and regulations" was "[h]eedless of the original design of" section 706. Despite this observation, however, Justice Scalia did not call for *Chevron*'s abandonment because interpretive deference on statutory questions "was in conformity with the long history of judicial review of executive action" under a **writ of mandamus**. *Seminole Rock* and *Auer* should be rejected, he argued, because there was no "such history justifying deference to agency interpretations of its own regulations." Justice Thomas likewise questioned the "legitimacy" of *Seminole Rock*, which (according to him) **"effect[ed] a transfer of the judicial power to an executive agency" and "raise[d] constitutional concerns" by "undermin[ing]" the Court's "obligation to provide a judicial check on the other branches."** That was so because, according to Justice Thomas, **"the judicial power, as originally understood, requires a court to exercise its independent judgment in interpreting and expounding upon the laws."** In language that could apply just as easily to

2

*Chevron* as to *Seminole Rock*, he claimed that "[w]hen courts refuse to decide what the best interpretation is under the law, they abandon the judicial check."

What is notable about these recent opinions, taken together, is not merely the anti-deference position that they advocate, but also their failure to engage with the nineteenth-century cases on which *Chevron* relied. To be sure, the Justices have cited Chief Justice Marshall's directive in *Marbury* that courts must "say what the law is";[69] the text of the Vesting Clauses of Articles I and III; James Madison's and Alexander Hamilton's statements on the importance of the **separation of powers in *The Federalist***; similar general statements by Montesquieu, William Blackstone, and other pre-Founding authors; and the text of section 706 of the APA. But *Chevron*'s reliance on early nineteenth-century cases raises the possibility that each of these sources can, at the end of the day, be reconciled with the **broad principle of judicial deference** that the Court believed that it was rearticulating.

Cases like *Edward's Lessee*, on which *Chevron* itself relied, are completely missing from the recent opinions questioning judicial deference. In other words, though *Chevron* was premised on a jurisprudential tradition, that tradition plays no part in the current debate. That omission is a serious one, because (assuming *Chevron* properly understood the cases) their age suggests that separation of powers poses no barrier to judicial deference to executive interpretation. The import of those cases is thus key to assessing the recent ju[3]dicial critiques of the *Chevron* opinion.

---

## CHEVRON DEFERENCE IS TREASON TO THE SEPERATION OF POWER

YOUTUBE VIDEOS:

ATF Agents Going Door To Door Looking For Your Guns!
Jul 20, 2022  ATF
https://www.youtube.com/watch?v=kN6jZKrzOmo

Rogue ATF Thugs Going Door-to-Door Harassing & Endangering Gun Owners!!!
Jul 20, 2022
https://www.youtube.com/watch?v=XWNkhsFAIKo

Armed ATF Agents Going Door To Door To Seize Your Legally Obtained Items
August 27, 2022
https://www.youtube.com/watch?v=wq5_P1iYgrw

---

[3]

3

Citing *United States* v. *Matthew Raymond Hoover*, D. C. M. D. Fla, Jacksonville Division, Case №: 3:21-Cr22(S2)-MMH-MCR, filed July 1, 2022; Supplement To Motion To Dismiss & To Declare Unconstitutional The National Firearms Act of 1934:

Defendant Matthew Raymond Hoover ("Defendant"), in light of the Supreme Court's recent decision in **New York State Rifle & Pistol Assn., et al. Bruen**, 597 U.S. __ (slip op., 2022), respectfully supplements his Motion to Dismiss Counts 1 – 7 of the Indictment (ECF 57) against him. This Motion is based on the aforementioned Motion and its attachments; the Supreme Court's recent decision; and the text of the Constitution, as informed by the **history and tradition of the United States**. In support of this Motion, Defendant hereby states:

I.    THE SUPREME COURT'S LANDMARK *BRUEN* DECISION
      FUNDAMENTALLY CHANGES THE INSTANT MATTER

   a.  THE *BRUEN* DECISION AND ITS LEGAL STANDARD

***Bruen* held as unconstitutional New York's 1911 Sullivan Act**, requiring a license and demonstration of **"proper cause"** for the possession and carrying of a concealed firearm. *Bruen*, 597 U.S. at *2. **What makes *Bruen* particularly germane to the instant matter is the announcement of a clear legal standard for the evaluation of acts regulating the peaceable keeping and bearing of arms. *Bruen* identified the Court of Appeals "coalesce[ing] around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-ends scrutiny", the Court correctly identified this as** "one step too many[.]" *Id.* *9-10. Those previous decisions at the various Courts of Appeal **manifested deference to the Government in a manner unlike any other fundamental right, and the inexplicable consideration of regulations    clearly contemplating the keeping and bearing of arms as beyond the scope of the Second Amendment. *Id.* *14** (reading case law to **"necessarily reject[]" intermediate scrutiny in the Second Amendment context, further positing that    a "constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."**) (quoting *Heller v. District of Colombia*, 554 U.S. 570 at 634 (2008)).

Finally, though, we have a standard which clearly articulates the burdens in a case involving restrictions on the right to keep and bear arms. It is, as artfully penned by the Court, "when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively protects** that conduct. The Government **must *then*** justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation. Only then may a court conclude that the individual's conduct falls    outside    the    Second    Amendment's    'unqualified command.'" (cleaned up) (emphasis added).

**To summarize: any law, regulation, or government policy affecting the "right of the people to keep and bear arms," U.S. CONST., Amend. II, can only be constitutional if the Government demonstrates analogous restrictions deeply rooted in American history evinced by historical materials contemporaneous with the adoption of the Bill of Rights in 1791**. *Bruen*, 597 U.S. at *29.

4

**b.** THE STATUTES HERE AT ISSUE AFFECT CONDUCT COVERED BY THE SECOND AMENDMENT'S "UNQUALIFIED COMMAND"

Defendant is charged under 18 U.S.C. 5861 and 5871, as well as conspiracy to commit those offenses. The charged statutes deal with the taxation and transfer of machineguns, and other weapons. The Government alleges the tchotchkes at issue— the **"auto key cards"—to be machineguns**. **What's more, actions subsequent to the passage of the charged firearm statutes render it impossible to comply with the taxing provisions, thus leaving the statutes a bizarre, vestigial area of law passed pursuant to the taxing power which—in dubious constitutionality—is used by the Government as an independent effective prohibition on the sale, transfer, or possession of any controlled devices not registered by 1986.**

The Government may attempt to argue that machineguns are beyond the scope of the Second Amendment by attempting to characterize them as "dangerous and unusual," as it has in other cases, but this is not the test. The court's invocation of "dangerous and unusual" weapons in *Heller* and subsequently *Bruen* was for the purpose of discussion of what *might be* a constitutionally acceptable law, rather than the endorsement of any particular extant policy. *Bruen*, 597 U.S. at *12 (Clarifying that the Court was not undertaking "an exhaustive historical analysis…of the full scope of the Second Amendment") (quoting *Heller*, 554 U.S. at 627). Rather, the only way a court may conclude Defendant's conduct falls outside the scope of the Second Amendment's unqualified command remains clear: the Government must prove the particular regime in question is consistent with the **history and tradition of the United States**. *Id* at *15. Furthermore, the question of whether a weapon is **"in common use at the time,"** necessarily pins the analysis to the time ***before the prohibition***. **To consider otherwise would incentivize the Government to legislate wantonly and aggressively, seizing arms, then later evade constitutional scrutiny by suggesting that the arms cannot be in common use, because the Government prohibited them. Such circular logic would be inconsistent with any fundamental rights jurisprudence. Thus, the Government has the burden to prove that the regime in question is consistent with the history and tradition of firearms regulation in this country around the founding era.**

**c.** THE LAWS HERE AT ISSUE ARE FACIALLY UNCONSTITUTIONAL UNDER *BRUEN*

**It is no great secret that no federal regulation of firearms existed before the enactment of the laws here at issue. In addition to the previously raised Constitutional questions, nothing in the applicable history and tradition of the United States supports the categorical ban of machineguns, much less the item here at issue—a tchotchke the Government alleges might possibly, with transformative labor, one day become a machinegun.** Further, the ATF's decision that the tchotchke at issue— **a stainless steel card with some lines lightly thereupon engraved—was a machinegun came completely by administrative fiat, absent even notice and comment. Our Nation's history and tradition does not, and cannot, support a finding that an alleged drawing of a part is that part**

5

**merely because an unelected bureaucrat unilaterally willed it to be. To hold otherwise would be to grant the Bureau more power than Congress could have ever granted it, and make innumerable items potentially illegal.** *See Bruen,* 597 U.S. at *19-20 ("Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearms regulation requires a determination of whether the two regulations are "relatively similar." . . . **"Even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense**.") (cleaned up) (internal citations removed).

As *Bruen* explained, historical analogues to a regulation can be helpful, **but Defendant here proffers more modern evidence that a categorical ban on machineguns, as the Government here seeks to enforce against a bespoke trinket, would be unconstitutional.** We present the testimony of then-Attorney General Cummings at a 1934 hearing on the National Firearms Act.

> MR. LEWIS: I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

> ATTORNEY GENERAL CUMMINGS: Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. **You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved**. *But* when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated", you are easily within the law.

> MR. LEWIS: In other words, it does not amount to prohibition, but allows of regulation.

> ATTORNEY GENERAL CUMMINGS: That is the idea. We have studied that very carefully.

National Firearms Act: Hearings before the Committee on Ways and Means, House of Representatives on H.R. 9066, 73 Cong. 2d Sess. (1934). **Defendant posits that the then-Attorney General, advancing the very law whose constitutionality was even then dubious, admitting that a categorical ban on machineguns would present constitutional problems, is instructive that there is no historical basis for the current regime—essentially reflecting what Mr. Cummings describes as problematic—consistent with the Second Amendment**.

**d.** THE LAWS HERE AT ISSUE ARE UNCONSTITUTIONAL AS APPLIED TO DEFENDANT UNDER *BRUEN*

In the alternative to that advanced above, the application of §5861 and §5871 is unconstitutional as it applies to Defendant. Even if the Government could somehow prove to the Court that the wholesale felonization of the peaceable possession of an entire category of arms to be consistent, **this case presents something far**

6

more peculiar: an administrative agency's unilateral declaration that an alleged drawing of a component—a component the possession of which subjects the holder to lengthy prison terms—is the component itself. There can be no historical justification, consistent with the "unqualified command" of the Second Amendment, plus the clear metes of the First, that could justify such a prosecution. Should any exist, the Government bears the burden to prove it. *Bruen* at \*15 ("Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'"); *id.* at \*20 ("whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry.) (cleaned up) (quoting *McDonald v. Chicago*,561 U.S. 742 at 767 (2010)).

## II. CONCLUSION

**The command of the Second Amendment is clear.** Under *Bruen*, consistent with the text of the Constitution and the **history and tradition** of our Great Nation, it stands to reason that any regulation affecting the peaceable possession of arms—or in this case, something from which the Government alleges an arm may one day be made from—warrants meaningful review. **The underlying laws have evaded meaningful scrutiny despite being unprecedented in their severity,** and the application thereof to Defendant Hoover—a patriotic American and father who stands accused of talking about a piece of metal with lines drawn on it and **faces the complete destruction of his life and livelihood therefrom—demonstrates the severity with which this matter warrants meaningful constitutional review. The standard announced in *Bruen* gives this Court the tools it needs to do so.**

WHEREFORE Defendant Matthew Raymond Hoover respectfully moves this Honorable Court to **dismiss the Indictment (ECF 57) against him in its entity with prejudice, to declare the National Firearms Act facially unconstitutional**, or, in the alternative, unconstitutional as applied to Defendant, and for any further relief that this Court deems just and proper.

7

Cinting Anders Hagstrom, *SEN. JONI ERNST QUESTIONS MERRICK GARLAND'S 'KNOCK AND TALK' GUN ENFORCEMENT PUSH: FEDERAL AGENTS ARE VISITING THE HOMES OF GUNOWNERS, SOMETIMES WITHOUT A WARRANT*, Fox News, published August 23, 2022:

> Joni Ernst, R-Iowa, says Attorney General Merrick Garland's recent crackdown on firearm straw purchases may be infringing on Americans' rights.

> Ernst sent a letter to Garland on Tuesday stating that while enforcing laws against straw purchasing firearms is important, the Department of Justice must be clear on its methods. "Straw purchase" refers to the practice of an individual purchasing a firearm on behalf of someone else, which is illegal.

> The Bureau of Alcohol, Firearms and Tobacco (ATF) started cracking down on the purchases in July.

> "Several reports and videos have surfaced detailing ATF agents engaging in 'knock and talk' investigations of straw purchases," Ernst wrote in the letter obtained by Fox News Digital. "During the course of these 'knock and talk' investigations, ATF agents knock on the front door of a private residence and ask the resident to display a recently purchased firearm as proof that the resident did not conduct a straw purchase. In all of the 'knock and talk' incidents brought to my attention, none involved the presentation of a warrant."

> Ernst says ATF agents often arrive at the house in full gear, wearing bulletproof vests and do not inform residents at the homes that producing the firearm was optional.

> "The combination of these factors calls into question whether the ATF's actions are meant to harass or coerce firearm purchasers into, at best, legally questionable 'investigations,'" she stated.

King James Bible Jeremiah. 5:21 *"Hear now this, O foolish people, and without understanding; which have eyes, and see not; which have ears, and hear not."*

## "There are none so blind as those who will not see."

8

| 2018 | 2021 |
|---|---|
| Peter Wagner & Wendy Sawyer, ***STATES OF INCARCERATION: THE GLOBAL CONTEXT 2018***, Prison Policy Initiative, June 2018. https://www.prisonpolicy.org/global/2018.html | Emily Widra and Tiana Herring, ***STATES OF INCARCERATION: THE GLOBAL CONTEXT 2021***, Prison Policy Initiative, September 2021. https://www.prisonpolicy.org/global/2021.html |
| Oklahoma now has the highest incarceration rate in the U.S., unseating Louisiana from its long-held position as "the world's prison capital." By comparison, states like New York and Massachusetts appear progressive, but even these states lock people up at higher rates than nearly every other country on earth. Compared to the rest of the world, *every* **U.S. state relies too heavily on prisons and jails to respond to crime.** | Not only does the U.S. have the highest incarceration rate in the world; every single U.S. state incarcerates more people per capita than virtually any independent democracy on earth. To be sure, states like New York and Massachusetts appear progressive in their incarceration rates compared to states like Louisiana, but **compared to the rest of the world, every U.S. state relies too heavily on prisons and jails to respond to crime.** |

2018         2021

**Figure. 1. World Incarceration Rates If Every U.S. State Were A Country 2018**





| 2018 | 2021 |
|---|---|
| **Figure 1.** This graph shows the number of people in state prisons, local jails, federal prisons, and other systems of confinement from each U.S. state per 100,000 people in that state and the incarceration rate per 100,000 in all countries with a total population of at least 500,000.<br><br>The graphic above charts the incarceration rates of every U.S. state alongside those of the other nations of the world. And looking at each state in the global context reveals that, in every region of the country, incarceration is out of step with the rest of the world.<br><br>If we imagine every state as an independent nation, as in the graph above, every state appears extreme. 23 states would have the highest incarceration rate in the world — higher even than the United States. Massachusetts, the state with the lowest incarceration rate in the nation, would rank 9th in the world, just below Brazil and followed closely by countries like Belarus, Turkey, Iran, and South Africa.<br><br>In fact, many of the countries that rank alongside the *least* punitive U.S. states, such as Turkmenistan, Thailand, Rwanda, and Russia, have authoritarian governments or have recently experienced large-scale internal armed conflicts. Others struggle with violent crime on a scale far beyond that in the U.S.: El Salvador, Russia, Panama, Costa Rica, and Brazil all have murder rates more than double that of the U.S. Yet the U.S., "land of the free," tops them all.<br><br>States like Arkansas, with incarceration rates even higher than the U.S. average, compare even worse. Next to other stable democracies, Arkansas is off the charts: | If we imagine every state as an independent nation, as in the graph above, every state appears extreme. 24 states would have the highest incarceration rate in the world — higher even than the United States. Massachusetts, the state with the lowest incarceration rate in the nation, would rank 17th in the world with an incarceration rate higher than Iran, Colombia, and all the founding NATO nations.<br><br>In fact, many of the countries that rank alongside the *least* punitive U.S. states, such as Turkey, Thailand, Rwanda, and Russia, have authoritarian governments or have recently experienced large-scale internal armed conflicts. Others struggle with "violent crime"<br><br>on a scale far beyond that in the U.S.: South Africa, Panama, Costa Rica, and Brazil all have murder rates<br><br>*more than double* that of the U.S. Yet the U.S., "the land of the free," tops them all.<br><br>States like Arkansas, with incarceration rates even higher than the U.S. average, compare even worse. Next to other stable democracies, Arkansas is off the charts: |

10

## CONCLUSION **2018**

For four decades, the U.S. has been engaged in a globally unprecedented experiment to make every part of its criminal justice system more expansive and more punitive. As a result, incarceration has become the nation's default response to crime, with, for example, 70 percent of convictions resulting in confinement — far more than other developed nations with comparable crime rates.

Today, there is finally serious talk of change, but little action that would bring the United States to an incarceration rate on par with other stable democracies. The incremental changes made in recent years aren't enough to counteract the bad policy choices built up in every state over decades. For that, all states will have to aim higher, striving to be not just better than the worst U.S. states, but among the most fair and just in the world.



Figure 2. Compare another state: Arkansas
or compare just the U.S. with its peers.

11

The crime rates seen in the U.S. do not require high incarceration rates.

The incarceration rates in every U.S. state are out of line with the entire world, and we found that this disparity is not explainable by differences in crime or "violent crime."

In fact, there is little correlation between high rates of "violent crime" and the rate at which the U.S. states lock people up in prisons and jails.

When we compare U.S. states and other nations in terms of both "violent crime" and incarceration, we find ourselves more closely aligned with nations with authoritarian governments or recently large-scale internal armed conflicts. Rather than any of the founding NATO member countries traditionally compared to the United States, the only countries that approach the incarceration rate and "violent crime" rates of the 50 states are El Salvador, Panama, Peru, and Turkey. Every U.S. state, and the United States as a nation, is an outlier in the global context. No other country incarcerates as many people, including countries with similar rates of "violent crime:"



**The United States incarcerates more of its population than any other nation – including nations that have similar or higher rates of crime**

A comparison of violent crime and incarceration rates presented per 100,000 residents in the 50 U.S. states and 98 other countries.

*Figure 3. We compared the incarceration rates of countries and U.S. states against "violent crime," which we calculated based on four categories of offense types—murder and nonnegligent manslaughter, rape and sexual violence, robbery, and aggravated and serious assault — that have available data across 98 countries with populations over 500,000 and the U.S. states. (For more on how we calculated "violent crime" for the 98 countries and the scarcity of alternative measures, see the methodology.)*

Case 2:22-cv-04022-BCW   Document 71   Filed 09/06/22   Page 12 of 27

## CONCLUSION 2021

For four decades, the U.S. has been engaged in a globally unprecedented experiment to make every part of its criminal justice system more expansive and more punitive. As a result, incarceration has become the nation's default response to crime, with, for example, 70 percent of convictions resulting in confinement — far more than other developed nations with comparable crime rates.

Our new analysis of incarceration rates and crime rates across the world reveals that the U.S.'s high incarceration rates are **not** a rational response to high crime rate, but rather a politically expedient response to public fears and perceptions about crime and violence.

Today, there is finally serious talk of change, but little action that would bring the United States to an incarceration rate on par with other stable democracies. The incremental changes made in recent years aren't enough to counteract the bad policy choices built up in every state over decades. For that, all states will have to aim higher, striving to be not just better than the worst U.S. states, but among the most fair and just in the world.

13

# Right of Revolution

## Excerpt From John Locke, Second Treatise, (1689), §§ 149

149. Though in a Constituted Commonwealth, standing upon its own Basis, and acting according to its own Nature, that is, acting for the preservation of the Community, there can be but one Supream Power, which is the Legislative, to which all the rest are and must be subordinate, yet the Legislative being only a Fiduciary Power to act for certain ends, there remains still in the People a Supream Power to remove or alter the Legislative, when they find the Legislative act contrary to the trust reposed in them. **For all Power given with trust for the attaining an end, being limited by that end, whenever that end is manifestly neglected, or opposed, the trust must necessarily be forfeited, and the Power devolve into the hands of those that gave it, who may place it anew where they shall think best for their safety and security. And thus the Community perpetually retains a Supream Power of saving themselves from the attempts and designs of any Body, even of their Legislators, whenever they shall be so foolish, or so wicked, as to lay and carry on designs against the Liberties and Properties of the Subject. For no Man, or Society of Men, having a Power to deliver up their Preservation, or consequently the means of it, to the Absolute Will and arbitrary Dominion of another; whenever any one shall go about to bring them into such a Slavish Condition, they will always have a right to preserve what they have not a Power to part with; and to rid themselves of those who invade this Fundamental, Sacred, and unalterable Law of Self-Preservation, for which they enter'd into Society. And thus the Community may be said in this respect to be always the Supream Power, but not as considered under any Form of Government, because this Power of the People can never take place till the Government be dissolved.**

## EXCERPT FROM THE DECLARATION OF INDEPENDENCE JULY 4, 1776

**"That whenever any Form of Government becomes destructive of these ends, it is the Right of the People to alter or to abolish it, and to institute new Government, laying its foundation on such principles and organizing its powers in such form, as to them shall seem most likely to effect their Safety and Happiness. Prudence, indeed, will dictate that Governments long established should not be changed for light and transient causes; and accordingly all experience hath shewn, that mankind are more disposed to suffer, while evils are sufferable, than to right themselves by abolishing the forms to which they are accustomed. But when a long train of abuses and usurpations, pursuing invariably the same Object evinces a design to reduce them under absolute Despotism, it is their right, it is their duty, to throw off such Government, and to provide new Guards for their future security."**

**EXCERPT FROM ABRAHAM LINCOLN'S
FIRST INAUGURAL SPEECH
MARCH 4, 1861**

All profess to be content in the Union if all constitutional rights can be maintained. Is it true, then, that any right plainly written in the Constitution has been denied? I think not. Happily, the human mind is so constituted that no party can reach to the audacity of doing this**. Think, if you can, of a single instance in which a plainly written provision of the Constitution has ever been denied. If by the mere force of numbers a majority should deprive a minority of any clearly written constitutional right, it might in a moral point of view justify revolution; certainly would if such right were a vital one**. But such is not our case. All the vital rights of minorities and of individuals are so plainly assured to them by affirmations and negations, guaranties and prohibitions, in the Constitution that controversies never arise concerning them. But no organic law can ever be framed with a provision specifically applicable to every question which may occur in practical administration. No foresight can anticipate nor any document of reasonable length contain express provisions for all possible questions.

**The JANUARY 6 COMMISSION is an Act of Treason
Against the United States Constitution
As Declared by John Locke, The Declaration of Independence,
And Abraham Lincoln all Said the Same Thing.**

**A Revolution is the Right, Power, and Duty of We, The People
When the Government Becomes a Treasonous Belligerent
Against the People like President Joe Biden has Become.**

15

Alex Madajian, *THE LATEST ATF ATTEMPT TO HARASS AND DISCOURAGE GUN OWNERS: REPORTING BACKGROUND-CHECK RESULTS TO LOCAL LAW ENFORCEMENT IS A DISTRACTION*, The Washington Times, August 16, 2022.[4]

Alex Madajian is a member of the Federal affairs team at **Gun Owners of America**, an organization with over 2 million active members dedicated to **preserving and restoring Americans' Second Amendment rights**.

**OPINION:**

**Gun owners and constitutionalists at large are growing increasingly concerned by an invasive new policy to be enforced by the Bureau of Alcohol, Tobacco, Firearms and Explosives, which will mandate the reporting of background-check delays and denials to local law enforcement when someone tries to purchase a firearm.** We can already predict the negative consequences of this poorly designed policy, with innocent individuals trying to buy a gun **being inadvertently flagged by the National Instant Criminal Background Check System and, shortly after, angrily greeting law enforcement at their front door**.

Under existing law, all commercial firearm transactions require the buyer to undergo a background check through the NICS system. At times, delays or denials are returned to the seller by the FBI, **allegedly because the agency claims to have conviction records or other evidence that would disqualify someone from firearm purchasing**. While the current system will prevent the transfer of firearms if a denial comes up, **there is no local law enforcement notification policy. THIS IS BECAUSE DATA CONCRETELY SUPPORTS THE NOTION THAT THESE DELAYS OR DENIALS ARE NEARLY ALWAYS FALSE POSITIVES AND CAN BE RACIALLY TIED.**

**Justice Department data shows that over 9 out of 10 NICS denials are false positives!** Equally compelling, the independent Government Accountability Office has highlighted the near zero prosecution level of those denied. On top of that, economist and gun rights advocate John Lott's research suggests that members of a minority group are disproportionately denied by the NICS system, compelling bipartisan House Members to insert a required DOJ demographic study on NICS denials into a large gun package they passed in June.

So, why is Congress doubling down, and how did we get to the current point?

First, this required notification policy, also known as the NICS Denial Notification Act, was foolishly embedded in the Violence Against Women Reauthorization Act of 2019 (VAWA). This compelled Gun Owners of America to successfully oppose the bill's passage for three years. However, this past March, the VAWA bill was inserted into the massive omnibus government spending package, which was rammed through Congress with a mere 48-hour notice.

---

[4]    https://www.washingtontimes.com/news/2022/aug/16/the-latest-atf-attempt-to-harass-and-discourage-gu/

Second, our two data-reinforced points, coupled with the overwhelming disposition of criminals to illegally acquire a firearm to begin with, again make one wonder what the real end game is with this new denial notification policy. Gun Owners of America maintains that this is just another policy from the anti-gun crowd aimed at harassing and discouraging individuals from exercising their Second Amendment rights. As previously demonstrated, a denial is overwhelmingly likely to be false and an unjust denial of the purchaser's constitutional right. Just as insidious, those in minority communities are likely to be disproportionately targeted for denial by the system.

With passage of this legislation, many customers buying a firearm may soon discover that occasional delays or denials in NICS checks will automatically result in local law enforcement being notified of a potential attempt to illegally acquire a firearm, forcing them to investigate. Some may argue that this is a good thing, that this is well-intentioned and should help cut down on dangerous illegal activity. GOA would fully disagree, both due to the overwhelming lack of criminals attempting to acquire a gun through legal means and, more importantly, because we knew that since the inception of the NICS system, it was ripe for abuse and would lead us down the slippery slope we now find ourselves facing.

American law enforcement is already spread too thin and facing a recruiting crisis, and sending it on wild-goose chases that yield virtually zero prosecutions and fan flames of outrage in the process is not a wise policy decision. And yet, here we are, facing unnecessary frustrations and outrage that our own policymakers created in a bipartisan manner. The American public deserves better policymaking, and it can start with repealing this nonsolution to a nonproblem.

17



Will the Real RifleRemedy2000 Please Stand Up?

Tracking ATF's Fake Gun Broker Accounts

Aug 29, 2022

https://www.youtube.com/watch?v=myhJIf07kPs

HUGE UPDATE: We asked RifleRemedy2000 to speak with us privately if that account, was in fact, owned by a private individual. It turns out it was. We spoke directly to who we are calling "Carl" and yes, he's a real person, who might be in real trouble with the ATF. So we kindly ask that you instead watch this video, https://youtu.be/MqQBgEFl6YU which is a more accurate depiction of RifleRemedy2000. We at Washington Gun Law stand corrected.



**FOLLOWS**



The Real RifleRemedy2000 Has Come Forward...
And He Has Lots of Interesting Things to Say

Aug 29, 2022

https://www.youtube.com/watch?v=MqQBgEFI6YU

Washington Gun Law President, William Kirk, provides an urgent update to a video that aired yesterday where I accused the RifleRemedy2000 Gun Broker account of being an ATF account. This was based on the inordinate amount of suspicious ATF purchases that had originated from that account. However, when we published that video, we added a disclaimer that IF RifleRemedy2000 was a real person, contact us privately and we would set the record straight. Well, today, August 29, 2022 he did just that. So in this video, we set the record straight and ask a favor of you the lawful and responsible gun owners of America. Learn more and arm yourself with education today.



### § 645. Entrapment—Elements

**Entrapment is a complete defense to a criminal charge, on the theory that "Government agents may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute."** *Jacobson v. United States*, 503 U.S. 540, 548 (1992). A valid entrapment defense has two related elements:

> **(1) government inducement of the crime, and**

> **(2) the defendant's lack of predisposition to engage in the criminal conduct.**

*Mathews v. United States*, 485 U.S. 58, 63 (1988). Of the two elements, predisposition is by far the more important.

**Inducement is the threshold issue in the entrapment defense. Mere solicitation to commit a crime is not inducement.** *Sorrells v. United States*, 287 U.S. 435, 451 (1932). **Nor does the government's use of artifice, stratagem, pretense, or deceit establish inducement.** *Id.* at 441. **Rather, inducement requires a showing of at least persuasion or mild coercion,** *United States v. Nations*, 764 F.2d 1073, 1080 (5th Cir. 1985); pleas based on need, sympathy, or friendship, *ibid.*; or extraordinary promises of the sort "that would blind the ordinary person to his legal duties," *United States v. Evans*, 924 F.2d 714, 717 (7th Cir. 1991). *See also United States v. Kelly*, 748 F.2d 691, 698 (D.C. Cir. 1984) (**inducement shown only if government's behavior was such that "a law-abiding citizen's will to obey the law could have been overborne"**); *United States v. Johnson*, 872 F.2d 612, 620 (5th Cir. 1989) (**inducement shown if government created "a substantial risk that an offense would be committed by a person other than one ready to commit it"**).

Even if inducement has been shown, a finding of predisposition is fatal to an entrapment defense. **The predisposition inquiry focuses upon whether the defendant "was an unwary innocent** or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime." *Mathews*, 485 U.S. at 63. Thus, predisposition should not be confused with intent or mens rea: a person may have the requisite intent to commit the crime, yet be entrapped. Also,

20

predisposition may exist even in the absence of prior criminal involvement: "the ready commission of the criminal act," such as where a defendant promptly accepts an undercover agent's offer of an opportunity to buy or sell drugs, may itself establish predisposition. *Jacobson*, 503 U.S. at 550.

[cited in JM 9-18.000]



THE UNITED STATES
DEPARTMENT *of* JUSTICE

**JUSTICE MANUAL**

Title 9 Criminal

## § 9-90.010 - National Security

### A. Introduction and Scope.

Protecting our national security is the Department's top priority. National security encompasses the national defense, foreign intelligence and counterintelligence, international and **INTERNAL SECURITY**, and foreign relations. This includes countering terrorism; combating espionage and economic espionage conducted for the benefit of any foreign government, foreign instrumentality, or foreign agent; enforcing export controls and sanctions; and disrupting cyber threats that are perpetrated by nation states, terrorists, or their agents or proxies.

## 9-90.020 - National Security Matters—Prior Approval, Consultation, and Notification Requirements

A. What Constitutes a Case Affecting, Involving, or Relating to the National Security.

    1. National Security Statutes

        Criminal provisions affecting, involving, or relating to the national security are:

- 2 U.S.C. § 192 (Contempt of Congress Related to National Security)
- 8 U.S.C. § 1185(b) (Travel Control of Citizens)
- 18 U.S.C. § 219 et seq. (Officers and Employees of the United States Acting as Foreign Agents)
- 18 U.S.C. § 791 et seq. (Espionage; Unauthorized Disclosure of Classified Information)
- 18 U.S.C. § 951 et seq. (Neutrality Laws)
- 18 U.S.C. § 1030(a)(1) (Computer Espionage)
- 18 U.S.C. § 1542 et seq. (Passport Violations Related to National Security)

21

- o 18 U.S.C. § 1924 (Unauthorized Removal and Retention of Classified Documents or Material)
- o 18 U.S.C. § 1831 (Economic Espionage)
- o 18 U.S.C. § 2151 et seq. (Sabotage)
- o **18 U.S.C. § 2381 et seq. (Treason, Sedition and Subversive Activities)** ●
- o 22 U.S.C. § 611 et seq. (Foreign Agents Registration)
- o 22 U.S.C. § 2778 (Arms Export Control Act)
- o 42 U.S.C. § 2274 to 2278, 2284, and other Atomic Energy Violations that Affect National Security (Atomic Energy Act)
- o 50 U.S.C. § 3121 (Intelligence Identities Protection Act)
- o 50 U.S.C. § 782 et seq. (Communication of Classified Information by Government Officer or Employee)
- o 50 U.S.C. § 851 et seq. (Registration of Person Who Has Knowledge Concerning Espionage Activities)
- o 50 U.S.C. § 1701 et seq. (International Emergency Economic Powers Act)
- o 50 U.S.C. § 4801 et seq. (Export Control Reform Act)
- o 50 U.S.C. § 4305(b) (Trading With the Enemy Act)

2. Other Matters that Affect the National Security

A variety of other Federal statutes may also be used to prevent, disrupt, and prosecute national security threats. ●**Thus, prosecutions pursuant to criminal statutes other than those set forth in 9-90.020(A)(1)** may also affect national security (e.g., a case involving wire fraud or hacking by or on behalf of a foreign government in which 18 U.S.C. § 1831 or 18 U.S.C.§ 1030(a)(1) are not specifically included as charges).

If a particular matter affects the national security, or if there is a reasonable question about whether a particular matter affects the national security, the USAO shall consult with CES to discuss how the matter should be treated. If the USAO is coordinating with another component of Main Justice, the USAO shall consult directly with CES unless the other component of Main Justice has agreed to facilitate this required consultation.

B. Consultation and Approval Requirements.

Prosecution of a case involving a national security statute set forth in 9-90.020(A)(1) shall not be instituted without the express approval of the **National Security Division or higher authority**. In addition, in such cases, **Counterintelligence and Export Control Section (CES) of the National Security Division**, shall be consulted before:

- o an arrest is made,
- o a search warrant is obtained,
- o a grand jury investigation is commenced,
- o immunity is offered,
- o an indictment is presented,
- o an information is filed,
- o a civil injunctive action is filed,

22

- a prosecution is declined,
- a count is dismissed,
- a plea agreement is filed,
- a sentencing commitment or other disposition is made,
- or an adverse ruling or decision is appealed.

In any other prosecution that affects the national security, regardless of the specific statute(s) implicated, or if there is a reasonable question about whether a particular matter affects the national security, the USAO shall consult with CES to discuss how the matter should be treated and whether the above prior approval or consultation requirements should apply. If the USAO is coordinating with another component of Main Justice, the USAO shall consult directly with CES unless the other component of Main Justice has agreed to facilitate this required consultation.

Consultation with CES is also required in all cases in which classified information plays a role in the prosecutive decision, and all cases that require the protections afforded by the Classified Information Procedures Act, 18 U.S.C. app. 3, i.e., cases in which classified information may be disclosed during the pretrial, trial or appellate stage of the litigation.

Finally, before initiating a prosecution under 2 U.S.C. § 441e, Campaign Contributions by Foreign Nationals, the Registration Unit of CES, (202) 233-0986, shall be consulted.

[cited in JM 9-2.111; JM 9-90.010; JM 9-90.300; JM 9-90.400; JM 9-90.500; JM 9-90.550; JM 9-90.600; JM 9-90.610; JM 9-90.620; JM 9-90.640; JM 9-90.700; JM 9-90.720]

[updated December 2020]

## 9-90.100 - General Policies Concerning Prosecutions For Crimes Directed at National Security and for Other Crimes in which National Security Issues May Arise

The Attorney General has determined that all criminal cases relating to activities directed against the national security (*See* JM 9-90.300 *et seq.*), as well as collateral offenses such as perjury that arise out of such activities, are to be supervised by the Assistant Attorney General (AAG), National Security Division. Although the AAG may assign those cases within the National Security Division, prosecution of national security cases will ordinarily be handled by the USAO in the district where venue lies. When a national security investigation is initially referred to the National Security Division, the AAG, or his/her designee, will notify the United States Attorney (USA) in that district as soon as possible following the referral. In either event, the AAG shall retain general supervisory authority over the conduct of the case from its inception until its conclusion, including appeal.

When national security issues arise in United States Attorneys' Offices in the course of prosecutions of offenses not related to the national security, that district's National/International Security Coordinator must notify the Chief of the Counterintelligence and Export Control Section (CES). That Section Chief shall be responsible for insuring that the Assistant United States Attorney (AUSA) assigned to the case is aware of and complies with Departmental policies related to national security prosecutions.

## 9-90.500 - Internal Security

**Numerous offenses pertaining to the internal security of the United States can be prosecuted only with the approval of, and under the supervision of, the <u>ASSISTANT ATTORNEY GENERAL OF THE NATIONAL SECURITY DIVISION</u>, or higher authority. Authorization and supervision requirements are found at JM 9-90.020. The Counterintelligence and Export Control Section of the National Security Division supervises prosecutions involving internal security.**

[updated January 2020]

---

## "Suspension of Disbelief "[5]
### Defined in A DICTIONARY OF MEDIA AND COMMUNICATION

"The concept that to become emotionally involved in a narrative, audiences must react as if the characters are real and the events are happening now, even though they know it is 'only a story'. 'The willing suspension of disbelief for the moment' was how the British poet Coleridge phrased it in 1817, with reference to the audiences for literary works. Schramm argues that this is a general expectation for all entertainment (*see also* entertainment function): we are 'prepared to go along with a story or a spoof or a good joke, to identify and agonize with a character who never lived…to have a certain empathy with fictional characters, to go along with the conventions of films or broadcasts."

# The Big Lie

**"<u>If you tell a lie big enough and keep repeating it, people will eventually come to believe it.</u>** The lie can be maintained only for such time as the State can shield the people from the political, economic and/or military consequences of the lie. <u>It thus becomes vitally important for the State to use all of its powers to repress dissent, for the truth is the mortal enemy of the lie, and thus by extension, the truth is the greatest enemy of the State</u>."

---

[5] Oxford Reference. **https://www.oxfordreference.com/view/10.1093/oi/authority.20110803100544310**

**This is an excellent definition of the "Big lie,"** however, there seems to be no evidence that it was used by Nazi propaganda chief Joseph Goebbels, though it is often attributed to him.

The original description of the big lie appeared in ***Mein Kampf***. Adolf Hitler applied it to the behavior of Jews rather than as a tactic he advocated. Specifically, he accused Viennese Jews of trying to discredit the Germans' activities during World War I. Hitler wrote of the Jews' "unqualified capacity for falsehood" and "**that in the big lie there is always a certain force of credibility; because the broad masses of a nation are always more easily corrupted in the deeper strata of their emotional nature than consciously or voluntarily; and thus in the primitive simplicity of their minds they more readily fall victims to the big lie than the small lie, since they themselves often tell small lies in little matters but would be ashamed to resort to large-scale falsehoods. It would never come into their heads to fabricate colossal untruths, and they would not believe that others could have the impudence to distort the truth so infamously. Even though the facts which prove this to be so may be brought clearly to their minds, they will still doubt and waver and will continue to think that there may be some other explanation…. From time immemorial, however, the Jews have known better than any others how falsehood and calumny can be exploited.**"

The OSS psychological profile of Hitler described his use of the big lie:

**His primary rules were: never allow the public to cool off; never admit a fault or wrong; never concede that there may be some good in your enemy; never leave room for alternatives; never accept blame; concentrate on one enemy at a time and blame him for everything that goes wrong; people will believe a big lie sooner than a little one; and if you repeat it frequently enough people will sooner or later believe it**.

Goebbels did describe the big lie in different language in an article he wrote in 1941, "Churchill's Lie Factory," but he was accusing the British of the ploy:

**The English follow the principle that when one lies, one should lie big, and stick to it. They keep up their lies, even at the risk of looking ridiculous**.

Randall Bytwerk argues that neither Hitler nor Goebbels would admit to lying. Goebbels, "always maintained that propaganda had to be truthful. That doesn't

mean he didn't lie, but it would be a pretty poor propagandist who publicly proclaimed that he was going to lie."

---

## Do you now recognize THE BIG LIE in President Joe Biden's and his ATF's ABUSE OF POWER under the CHEVRON DOCTRINE?

*New York State Rifle & Pistol Association, Inc., et al.* v. *Bruen, Superintendent of New York State Police, et al*, AND *United States* v. *Mathew Raymond Hoover* AND *Machine Gun USA v Matthew Hoover SUPPLEMENT TO MOTION TO DISMISS & TO DECLARE UNCONSTITUTIONAL THE NATIONAL FIREARMS ACT OF 1934 (NFA)* have the extreme potential to prove all **Federal and State Gun Control Laws** are a **'Fraud Ab Initio,'** a **'Fraud in the Factum,'** a **'Fraud in the Inducement,'** a **'Fraud in the Making,'** a **'Fraud on We, The People,'** a **'Fraud on the Courts'** and **Treason against the United States Constitution!**

### The Pendulum is swinging back to Originalism.

### The Doctrine of Original Public Meaning.

Back to THE STATE OF NATURE under GOD'S LAW OF ACTUAL FREEDOM in our AMERICAN SOCIETY under THE UNIVERSAL ETHIC OF RECIPROCITY, also known as THE GOLDEN RULE.

Diverse Tech Geek, *WHAT DOES IT TAKE FOR THE FCC TO REVOKE A TV STATION'S LICENSE?* September 10, 2018, Updated on December 10, 2021.[6]

### Failure to serve the public [interest]

**The FCC requires radio and television station licensees to serve the public interest in some way; failure to do so can result in a station losing its license. However, this is extremely rare, as it requires something particularly egregious and ongoing on the station's part**.

A famous example of this is Jackson, Mississippi's WLBT. An NBC affiliate, the station's owner in the 1950s and 60s was pro-segregation. As such, they'd pre-empt any network programming that mentioned or depicted African-Americans in a positive light; the owners claimed "technical difficulties" were the reason. Civil rights protesters filed formal complaints and lawsuits over WLBT's actions.

The protests and lawsuits against WLBT dragged out for some years, including several initial rulings in favor of the station's owner. However, in 1969, the

---

[6] https://www.diversetechgeek.com/fcc-revoke-tv-station-license

26

FCC finally revoked the owner's license, awarding a new one (though under the same call letters) to a more diverse group of owners.

**To date, this is apparently the only time a television station owner permanently lost their license due to failing to serve the public [interest].**

---

The evidence is clear, even in the Fog of this Civil War of Words spawned by the Democrats' Nihilistic Tactics of Identity Politics to win at all cost even if they to resort to The Big Lie to deceive the American People with a theatrical performance to put the American People into a state of Suspension of Disbelief with another Big Lie, bigger than the last.

# EXPOSE THE BIG LIE!
## THE UNITED STATES IS NOT THE LAND OF THE FREE ANYMORE!
# WE, THE PEOPLE, ARE IN THE LAND OF SLAVES TO THE GOVERNMENT!

DON HAMRICK

27