1          IN THE UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF MISSOURI
2                      WESTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )
4            Plaintiff,               ) No.  2:22-cv-04022
                                      )      July 6, 2022
5            v.                       )      Kansas City, Missouri
                                      )      CIVIL
6    STATE OF MISSOURI,               )
                                      )
7            Defendant.               )

8

9           TRANSCRIPT OF ORAL ARGUMENT
        BEFORE THE HONORABLE BRIAN C. WIMES
10           UNITED STATES DISTRICT JUDGE

11    Proceedings recorded by electronic voice writing
            Transcript produced by computer
12

13

14                      APPEARANCES

15   For Plaintiff:      MS. CASSIE SNYDER
                         MR. DANIEL SCHWEI
16                       DOJ-Civ
                         Department of Justice
17                       1100 L Street NW
                         Washington, DC  20005
18

19                       MR. ALAN SIMPSON
                         United States Attorney's Office-KCMO
20                       400 E. 9th Street
                         Suite 5510
21                       Kansas City, MO  64106

22

23   For Defendant:      MR. MICHAEL E. TALENT
                         Missouri Attorney General's Office
24                       815 Olive Street
                         Suite 200
25                       St. Louis, MO  63101
           Denise Carroll Halasey CCR, CVR-CM, RVR
                United States Court Reporter

1                    July 6th, 2022

2          THE COURT:  Good afternoon.  Let the Court call the

3    case.  This is United States versus state of Missouri, Case

4    No.  22-cv-04022.  Can I have parties enter their appearance

5    for the record, please.  I'll start with the government.

6          MS. SNYDER:  Good afternoon, Your Honor.  Cassie

7    Snyder with the Department of Justice on behalf of the United

8    States.  And with me I have Daniel Schwei.

9          THE COURT:  Daniel, can you spell the last name?

10         MS. SNYDER:  Sure.  S-C-H-W-E-I.

11         And I also have Alan Simpson with the US attorney's

12    office.

13         THE COURT:  Okay.  Thank you.

14         And the lone attorney for the state of Missouri.

15    Can I have your name?

16         MR. TALENT:  Good afternoon, Your Honor.

17         Michael Talent for the state of Missouri, the

18    governor, and the Attorney General's estate as well.

19         THE COURT:  Good afternoon, Mr. Talent.

20         Let me tell you how the Court plans on proceeding.

21    What I want to do is five the parties the opportunity to make

22    the argument to the Court.  Obviously, there will be some

23    questions throughout.  My intent is to give each side 30

24    minutes -- well, 20 minutes, and then I will give you the

25    opportunity for any rebuttal.  Then I will probably step off

 1    the bench, after both arguments to gather my thoughts.  If I

 2    have any additional questions in the final ten minutes or if

 3    you want to address any of the arguments made by the other

 4    side that you think are most relevant to the Court in making

 5    this determination.

 6              With that said, why don't the United States as the

 7    movant, Ms. Snyder.

 8              MS. SNYDER:  Good afternoon, Your Honor.

 9              THE COURT:  Good afternoon.

10              MS. SNYDER:  Cassie Snyder with the Department of

11    Justice on behalf of the United States.

12              The federal government filed this action because

13    H.B.85 poses substantial threat to public safety and does so

14    in a manner that squarely violates the United States

15    Constitution.  Since the enactment of H.B. 85 it has become

16    harder for federal law enforcement to investigate violent

17    crime and to share evidence.  Some state and local law

18    enforcement agencies are no longer inputting ballistics data

19    into national databases.  The state information fusion center

20    has stoped working with us.  And the Kansas City Police

21    Department has stopped testing firearms.  That all makes it

22    harder to investigate violent crimes at the front end which

23    must happen before the government can even decide what

24    possible federal or state charges it may bring.

25              THE COURT:  Let me ask you, it seems when I was

1    reviewing the briefing it's the argument of the Supremacy

2    Clause.  And what this statute does is to nullify federal law

3    and you site to two statutes in which it nullifies.  Does it?

4    Let me ask this question in this sense, what it says is that

5    we will not have law enforcement officials at the state level

6    in essence assist the federal government and the carrying out

7    of those federal laws.

8         MS. SNYDER:  Yes, Your Honor, it does nullify

9    federal law.  This is not just a law about the federal

10   government forcing the state to use state resources to enforce

11   federal law.  That's not what this is about.  That, of course,

12   is protected under the Tenth Amendment under the anti

13   common-dearing doctrine.  In particular the principle in

14   prince, which states that Congress shall pass no law that

15   requires either the state legislature or state officials to

16   enact or enforce a particular regulatory scheme.  That is not

17   what is happening here.  Rather, the state has passed a law

18   that not only purports to nullify federal law.  In particular,

19   the National Firearms Act and the Gun Control Act, but then

20   operational that nullification in later provisions.  So, for

21   example, imposing a duty on courts and law enforcement

22   entities to protect against these federal gun laws as

23   described in Section 1.420.  Penalizing the use of federal

24   authority in the Civil Penalty Act.  This is not a case where

25   the federal government has passed a law that is requiring the

1    state to take any particular action.  Rather, the state's law

2    H.B.85 is affirmatively interfering with and discriminating

3    against the use of federal authority.  In particular, many

4    informs information sharing that the state once considered to

5    be an established practice is no longer happening.  So as I

6    stated, no longer inputting ballistics information, refusing

7    to test firearms, even assuming that these statutes provisions

8    only apply to state and local entities, which we do not

9    believe is true, but even assuming that --

10         THE COURT:  -- why don't you believe it's true?  Why

11   don't you believe that it only applies to that?  It seems like

12   the argument, and I'll talk to counsel, that it just applies

13   to Missouri.  They're saying -- at least part of what I'm

14   reading, my understanding again, is that, well, we don't

15   believe -- we are not suggesting in anyway usurping federal

16   statute, you still can enforce, but it will not -- it will not

17   be with the cooperation of the law enforcement of the state of

18   Missouri.

19         MS. SNYDER:  Only to look is at both the tangible

20   effects of this law, and of the plain language of this law.

21   So in regards to tangible effects, for example, task force

22   officers are being limited not only in participation in task

23   forces but also in the types of federal law that they can

24   enforce while serving on task forces.  So of course task force

25   officers are state and local law enforcement officials who

1 have deputized with federal authority, and when they serve on

2 task forces they act with federal authority.  The Missouri

3 State Highway Patrol has instructed many of task force

4 officers that they can only enforce certain types of federal

5 laws when acting as federal task force officers.  So you see a

6 direct regulation of federal government in that sense.  Also

7 looking -- to return to your initial question, looking at just

8 the text of the stature, nothing in the text of the statute

9 actually limits this to state and local officials.  The

10 language of the statute says no entity or person shall have

11 the authority to enforce these laws, the civil penalty schemes

12 impose penalties on any political subdivision or law

13 enforcement entity.  So just the plain text of the statute

14 applies both to state and federal entities.

15        THE COURT:  But what if they just modify or amend

16 the part to take out just the entities or kind of that broader

17 language and make it more specific to subdivisions of

18 Missouri.  That still wouldn't change the argument would it,

19 for you?

20        MS. SNYDER:  Right.

21        THE COURT:  That would change that part of the

22 argument, because now we have plain language that I know you

23 interpret as being broader than simply just law enforcement

24 for the state of Missouri, it would be arguably applicable to

25 federal agents.  Say you take that part out, that doesn't

Denise Carroll Halasey CCR, CVR-CM, RVR
United States Court Reporter

1    change your argument, does it?

2            MS. SNYDER:  Exactly, Your Honor.  It does not

3    change the argument for two reasons.  First, it would still

4    apply to these task force agents who are still state and local

5    officials.  They simply serve with federal authority.  That is

6    the first reason.  Moreover, we still see the tangible affects

7    of this law affirmatively discriminating against the use of

8    federal authority.  So again, the civil penalty scheme

9    penalizing federal officials for using federal authority,

10   penalizing state employees for using federal authority.  In

11   particular 1460 and 70 impose hefty substantial monetary

12   penalties on any political subdivision and law enforcement

13   agency.  And again, even assuming that that is only state and

14   local entities, any of them that either employ an individual

15   who enforces or attempts to these federal laws or who hires an

16   individually who has previously enforced these laws.  So

17   effectively baring federal officials from employment with the

18   state.  And that is a direct regulation of federal 3, direct

19   interference with federal authority.  You will also see the

20   state withdrawing certain forms of information sharing in a

21   discriminatory manner.  The doctrine of intergovernmental

22   says, no state can discriminate against the federal government

23   on the basis of governmental status.  That is exactly what is

24   happening here.  You have these long standing practices of

25   information sharing, and suddenly with the enactment of H.B.85

1　those practices have been withdrawn.  Our federal partners are

2　saying, the state and local partners are saying because of

3　H.B.85 we are no longer able to share information with you.

4　　　　　THE COURT:  Have there been any other states that

5　have taken the position or any similar position to that of the

6　state of Missouri in terms of any legislative or any

7　enactments by any other state legislatures who have been

8　imposed like or similar statutes as this one?

9　　　　　MS. SNYDER:  There have been a couple of other

10　states who have imposed similar laws, similar anti-federal

11　firearms laws.  Some of them are more abstract.  H.B. 85 is

12　unique in that it imposes, again, these really affirmatively

13　interfering provisions.  So it's not only the central

14　notification scheme, but operationalizing that nullification

15　by imposing penalties on federal officials, imposing a duty on

16　courts and law enforcement to protects against these laws,

17　prohibiting any person or entity from enforcing these laws.

18　But there have been some other laws that are similar.  Those

19　laws have been held preempted where sort of comparably have

20　been held to not constitute a defense against a federal

21　firearms conviction for the reason that states cannot nullify

22　federal firearms laws.

23　　　　　So you have Montana.  Montana held a comparable law

24　to be preempted by federal firearms law.  The Tenth Circuit

25　held that Kansas, Kansas' is similar -- it is actually called

SAPA as well, they held that law to be not a defense against a
federal firearms conviction because states cannot nullify
federal law.  And we have actually seen H.B. 85 addressed in
courts within Missouri, so both the Eastern District and the
Western District in the context of criminal cases have held
that H.B. 85 is preempted by federal firearms law.

THE COURT:  I think you might've cited that, you
said from the Western District.  Was that a Judge Ketchmark
opinion or she adopted that from one of our magistrates I
think?

MS. SNYDER:  Yes, it was definitely an adopted
recommendation.  I couldn't tell you the judge's name off
hand.

THE COURT:  I think it was.  Thank you.

Go ahead.

MS. SNYDER:  I'd like to return to the central
nullification provision in-states 1.420.

THE COURT:  Sure.

MS. SNYDER:  Again, states cannot nullify federal
law.  This is a fundamental principle, it goes all the way
back to McCulloch v. Maryland.  You saw the Supreme Court
expressly reject the nullification doctrine in Copper v. Aaron
when southern state legislatures attempted to nullify Brown v.
Board of Education.

Supreme Court has just repeatedly and emphatically

1  emphasized states cannot nullify federal law and states cannot

2  impose their own interpretation upon federal law.  Their own

3  interpretation of the constitution on federal law.  That is

4  exactly what H.B. 85 purports to do.  The central

5  nullification scheme declares that these broad categories of

6  federal firearms laws are nullified and then the remaining

7  provisions, as I say, operationalize that nullification.  And

8  that overrule nullification scheme is what violates both the

9  Supremacy Clause and long-standing Supreme Court precedent.

10          THE COURT:  And so you're talking the scheme, just

11  clarify that for this the Court.  I think I know what you're

12  saying but I just want to make sure I'm understanding that

13  correctly.

14          MS. SNYDER:  Yes.  So the scheme is really how all

15  these provisions interact.  You have the central nullification

16  sort of premise or effort in 1.420, and all of the other

17  provisions are necessarily dependent upon that premise.  They

18  all explicitly cross-reference back to that scheme except I

19  believe 1.430 which sort of implicitly cross-references back

20  to 1.420.

21          THE COURT:  And that is why you say it is

22  non-severable?

23          MS. SNYDER:  Exactly.

24          THE COURT:  But you're saying even if -- isn't there

25  a provision within that statute I thought I read that it's

Denise Carroll Halasey CCR, CVR-CM, RVR
United States Court Reporter

1    severable?

2        MS. SNYDER:  There is a provision that sort of

3    mirrors Missouri's severability rule.

4        THE COURT:  Yeah.

5        MS. SNYDER:  Yeah, exactly.  That severability rule,

6    it's a two part test.  The first part is once we find the

7    unconstitutional provision to be invalid are the remaining

8    provisions still complete and susceptible of constitutional

9    enforcement?

10       THE COURT:  Okay.

11       MS. SNYDER:  And then second part of this test is

12   again, taking away the unconstitutional provision, would the

13   remaining provision still have been enacted by the Missouri

14   state legislator?  And H.B.85 fails on both of these prongs.

15   We can see that none of these provisions would be complete

16   without the central nullification provision because none of

17   them make sense.  They don't simply cross-reference back to

18   1.420, they are necessarily dependent upon 1.420.  The duty,

19   for example, in 1.440 makes no sense without reference to what

20   that duty means in 1.420.  The civil penalty schemes can't be

21   brought against anybody unless you know that they can be

22   brought for the enforcement of these federal firearms laws in

23   1.420.  So all of these provisions necessarily refer back to

24   1.420.

25       THE COURT:  Okay.

1    MS. SNYDER: It's worth also mentioning very quickly

2    that this is not a case about the Second Amendment. This is a

3    case about the Supremacy Clause. Missouri does not attempt to

4    justify its nullification attempt on controlling precedent

5    regarding the Second Amendment. Nothing in either the text of

6    H.B.85 or in any of the state's briefly justifies this

7    nullification based on actual controlling Second Amendment

8    precedent. This is instead a case about Missouri trying to

9    interpose its own interpretation upon federal firearms laws.

10   Its own interpretation of the Second Amendment.

11        And just to kind of review some of these tangible

12   harms that we've already talked about. Based on these

13   tangible harms we know that these provisions are far more than

14   just simply some abstract declaration of policy by the state.

15   Again, we know this because the tangible harms that this

16   statute has already imposed, the restriction of information

17   sharing in a discriminatory manner, the withdrawal of task

18   force officers, the limitations on the types of federal

19   authority that task force officers can wheeled. So really

20   these are, these provisions are imposing affirmative rights

21   and obligations on the citizens of Missouri.

22        We also know just this just based on Missouri's

23   statutes -- sorry -- statutory interpretation. The Missouri

24   state legislature shall not be presumed to have inserted

25   verbiage in its statutes. And it shall be presumed to have

1   meant every word that it says.  So looking at these provisions

2   we know just based on the plain language they are, the plain

3   language is affirming, affirmatively imposing duties and

4   obligations.  If they were merely declaratory, they would be

5   declaring the same thing over and over again.

6           H.B.85 also independently violates the doctrine of

7   intergovernmental immunity which we briefly mentioned already.

8   This doctrine prevents states from passing any law that either

9   regulates the United States directly or discriminates against

10  the federal government or those with government deals, so for

11  examples, employees, contactors.  And we just saw a great

12  example of the doctrine of intergovernmental immunity applied

13  a couple weeks ago by the Supreme Court in the United States

14  for Washington.  We filed a short supplemental brief on this

15  case.  That case confirmed that a state law violates this

16  doctrine if it singles an individual or entity out for less

17  favorable treatment or if it regulates them unfavorably based

18  on their governmental status.

19          And H.B.85 specifically violates this doctrine in

20  three general ways.  It's also worth noting the state does not

21  dispute any of these facts on the merits.  First of all,

22  H.B.85 penalizes federal officials and those who act with

23  federal authority.  Again, we see this in the civil penalty

24  scheme which effectively bars former federal officials of

25  employment with the state.  Imposing this unique disability on

1    federal officials by attaching liability only to the exercise

2    of federal authority and not to comparable state authority.

3            The second way that H.B 85 violates the doctrine of

4    intergovernmental immunity is by denying federal authority to

5    enforce federal law.  And again, you see this in overlapping

6    provisions in H.B.85. 1.440 imposing a duty on the courts and

7    law enforcement agencies of this state to protect against the

8    federal firearms laws nullified in 1.420.  1.450 saying that

9    no person or entity.  Again, the plain language of this.  No

10   person or entity encompasses federal persons and federal

11   entities.  And again, as we already discussed, even if this

12   applies only to state agencies, you still run into the problem

13   of regulating task force officers.

14           And the third way that H.B.85 violates the doctrine

15   of intergovernmental immunity is through restricting

16   information sharing in a discriminatory manner.  And we know

17   first of all, that information sharing is different from a

18   Tenth Amendment prospective based on Reno v. Condon, and then

19   we also have these defendants refusing, discriminatorily

20   refusing to share information only with the federal

21   government, not with comparable state authorities.

22           I'd like to also discuss conflict preemption.  The

23   express purpose of this statute is nullification, and

24   therefore, H.B. 85 acts as an obstacle to the accomplishment

25   and execution of the full purposes and objectives of Congress.

1  In particular, again, it conflicts with the National Firearms

2  Act and the Gun Control Act.  And again, multiple courts have

3  confirmed this preemption.

4          For those reasons this Court should enter an

5  injunction baring Missouri and its officials from enforcing

6  H.B.85.

7          THE COURT:  Thank you, counsel.

8          Mr. Talent.

9          MR. TALENT:  Good afternoon, Your Honor.  Michael

10  Talent representing the state defendants.

11          I will confess to being a bit at a loss here because

12  the United States has come to this Court and said that SAPA,

13  the Second Amendment Preservation Act, or H.B. 85, denies the

14  federal government authority to enforce federal law.  And that

15  I think is the crux of this case.  Because that is the basis

16  from which their nullification argument, their supremacy

17  argument flows.  And as the Court noted in its questions to

18  counsel, the state takes a different position.  That SAPA

19  simple effects state entities, SAPA implements the state

20  policy position provides state resources to the federal

21  government, to enforce and implement federal laws and policies

22  that infringe on the fundamental right according to state of

23  law.

24          THE COURT:  Isn't the state of Missouri making some

25  interpretation of the Second Amendment?  This isn't a Second

1  Amendment issue.  Would you agree?  Do you understand what I'm

2  saying?  Part of their argument, at least as I understand it,

3  I'm sure counsel will come back up and maybe clarify for the

4  Court.  But my position is this, it is you making some level

5  of determination of an interpretation of the Second Amendment,

6  are you not?

7          MR. TALENT:  The general assemble is, Yes, Your

8  Honor.  And there is also embodied in the state constitution.

9  I think you're getting to the government's quote.  And I think

10 that this is a direct quote from my friend on the other side.

11 "That states cannot impose their own interpretation of federal

12 law."  That states can't interpret federal law.  That is not

13 consistent with the constitutional structure.  This is kind of

14 an overarching I think federalism structural issue.  States

15 are constitutional actors.  They take an oath to interpret the

16 Constitution.  They have to implement the Constitution when

17 they engage and create policy.  So the state of Missouri has a

18 right and yet creates, for example, its own firearm criminal

19 laws, and the state has such laws to determine whether those

20 laws are consistent with the Second Amendment.

21         THE COURT:  They can't preempt federal law.

22         MR. TALENT:  They can't preempt federal law.  And

23 that's where we get to the question about what SAPA means.

24         THE COURT:  Right.

25         MR. TALENT:  And this is the crux.  The government

says SAPA denies the federal government the right to enforce
federal law, the state says, SAPA simply alters how the state
can state resources.  State resources don't go to the federal
government to help the federal government enforce federal law
which my friend concedes is constitutional under Printz.  The
state has the better of the argument and Missouri Supreme
Court has said so.  In City of St. Louis v. State reported at
Volume 643 S.W.3d, this is location site 297 and 298.  The
Missouri Supreme Court has provided an interpretation of SAPA
that is consistent with how the state has interpreted the law.
And I quote, SAPA's first four sections -- so that's Sections
410 to 440, contain legislative findings and declarations.  It
is truly declaratory as this state as argued.  SAPA's five
remaining sections, so that's Sections 1.450 through 485
comprises substantive provisions to enforce its legislative
declarations.  Section 1.450 removes from Missouri entities,
persons, public officers, state employees and political
subdivisions, the authority to enforce or attempt to enforce
any federal gun law, infringing on the right to keep and bear
arms as described under 1.420.  So contrary to what my friend
came up here and said, 1.450 does not enforce a duty on
federal law enforcement.  Sections 1.460 and 1.470, the
Missouri Supreme Court continued.

        THE COURT:  Sure it does, if a state which is
commonly held practice my understanding, if a state law

1   enforcement officer, they have a designation with federal

2   authority, I think it is impacting, is it not?

3           MR. TALENT:  I think that gets to the question of

4   whether the state is providing state resources to implement

5   federal policy.  And then the question then the government

6   doesn't provide any evidence for those deputations.  Those

7   deputations carry with them a vested right to that

8   cooperation.  Basically a vested right for Missouri law

9   enforcement entities to implement these aspects of federal law

10  enforcement, federal firearms policy and federal firearms law.

11          THE COURT:  Isn't for the safety of the community at

12  large though?  That's why they have worked together, they have

13  always done that.  Have they not?

14          MR. TALENT:  Yes, Your Honor.  And they continue to

15  work together.

16          THE COURT:  They can't.  They can't.  They can't.

17  Because what the statute says, if you do there are

18  consequences for that.  So the effect of it, has a chilling

19  effect on any law enforcement officer who may be this

20  designation state and also federal task force -- it has a

21  chilling effect.  Why?  If you do it then you can be liable

22  for up to $50,000 -- I think that's the language.  Or it can

23  impact you for further employment.  Could it not?

24          MR. TALENT:  No, actually that's not quite right.

25          THE COURT:  Okay.

1          MR. TALENT:  So the civil enforcement provisions

2    that you were discussing aren't penalties on an individual

3    officer.  They are imposed -- and this is again from the

4    Missouri Supreme Court, they're imposed on state political

5    subdivisions and law enforcement agencies.  So as structure of

6    the law, the law is not penalizing any individual officer for

7    engaging in any individual act.

8          THE COURT:  Okay.  It is penalizing Missouri State

9    Highway Patrol?

10          MR. TALENT:  The liability would in this case run to

11    whatever political subdivision or entity.

12          THE COURT:  Therefore, what are they not going to

13    do?  I'm not going to deputized or have someone act in the

14    capacity.  You can bring it down to the individual or you can

15    make it to the subdivision, but the point is this, it has a

16    chilling effect on the ability to effectuate federal law.

17          MR. TALENT:  The underlying premise of that though,

18    Your Honor, is that the state must effectuate federal law.

19    And Printz says the state doesn't have to do it.  So the state

20    is allowed to tell the Highway Patrol for any reason to be

21    quite honest under Printz -- Printz did not turn on the

22    underlying constitutionality, either the Brady Act or the

23    underlying validity of the state law at issue.  The state is

24    allowed to tell the Missouri Highway Patrol that as a matter

25    of policy, you will not go and enforce these gun laws.

```
1              THE COURT:  Right.

2              MR. TALENT:  And that's all that SAPA does, and

3    that's what the Missouri Supreme Court says.  SAPA is not a

4    regulation on the federal government.  And that really --

5              THE COURT:  You really didn't answer my question

6    though.

7              MR. TALENT:  Does it show?

8              THE COURT:  Yes.  Answer my question.

9              MR. TALENT:  Well, I think the chilling effect is a

10   factual matter, and the record doesn't support that there is

11   actually major chilling effect.

12             THE COURT:  We can both understand if we have a

13   governmental or subdivision of a state entity, i.e, state

14   patrol who have officers who commonly work with federal

15   agents, and some of which are deputized in a way to give them

16   some level of federal authority, and now we know that that

17   highway or state department they didn't do it because they

18   could be held liable.  Is that not true?

19             MR. TALENT:  Under SAPA, yes.

20             THE COURT:  So we could agree notwithstanding having

21   the data, now you're gonna have officers who normally would

22   unable to do it for the fear of the scheme set up by SAPA that

23   somehow you are going to be penalized or fined up to $50,000,

24   is that not the case?

25             MR. TALENT:  The subdivision could be, but that is a
```

constitutional question whether Missouri can implement that

policy.

THE COURT:  Right.

MR. TALENT:  There is nothing preventing the federal

government from filling any gap left by the highway patrol or

local law enforcement from cooperating with the federal

government.  Nothing prevents the federal government from

devoting all the resources it wants into the --

THE COURT:  Say that again.  I think this whole

statute prevents you from cooperating?

MR. TALENT:  And that is Missouri's right under

Printz, Your Honor.  The Printz says the degree of cooperation

is left up to the states.  To quote from Printz as Madison

expressed it, this is Printz quoting federalists 39, "The

local and municipal authorities from distinctive and

independent portions of the supremacy no more subject within

the respective spheres to the general authority, than the

general authority is subject to them within their own

spheres."  The nullification question that the government has

deposited here, from their exhibit, Exhibit 5, nullification

is the claim that federal law is void and that no entity

including the federal government can force it in a state.

That's how they define it in the exhibit that they provided to

this Court.  Before SAPA, what happened was the federal

government could enforce federal law in the state of Missouri

1   using as many RSV federal resources as it wanted to.  After

2   SAPA, the federal government can still enforce federal

3   firearms law in the state of Missouri using as many or as few

4   federal resources as it wants to.

5           THE COURT:  What about the argument that the USA

6   makes with regard to -- they are talking about the remedies

7   tangible effects, right?

8           MR. TALENT:  Yes, sir.

9           THE COURT:  What are you thoughts on those?

10          MR. TALENT:  Well, I think --

11          THE COURT:  -- meaning, hey, you only can enforce

12  certain things.  There is not the cooperation with collecting

13  information and data and those sort of things that would

14  impact may be larger and greater than the state of Missouri,

15  but you're unable to do those things.

16          MR. TALENT:  The federal government can enforce

17  federal firearms law all it wants, it's just not getting the

18  cooperation from the state of Missouri to the same extent that

19  it was before.  I think it's worth pointing out that the

20  record does not support this great, grand tangible kind of sky

21  is falling affect.  Their is still cooperation.  All the

22  declarations still pop a note that there is still some degree

23  of cooperation between the federal government and the state.

24          THE COURT:  Hold on, it's got to be cooperation

25  first that -- it can't be cooperation related to any thing

1    federal law, stamps, imposed firearms -- there is a long list.

2    So it has to be cooperation not related to those things which

3    seems very encompassing, to be honest, it's very encompassing.

4    And I don't know what the narrowness of that would be, maybe

5    you have an example of it. I can't think of one, maybe you

6    can.  But that has to be very narrow to the level of

7    cooperation, would you not agree with me on that?  I mean,

8    that goes right to what the statute was trying to do.  I mean,

9    it wouldn't be -- I mean, right now it's saying level of

10   cooperation with the federal agents enforcing --

11           MR. TALENT:  And the level of cooperation by the

12   Missouri state entities is left to the sound discretion of the

13   state of Missouri under Printz.

14           THE COURT:  Right.

15           MR. TALENT:  Because SAPA does not tell the federal

16   government you can't enforce our federal law --

17           THE COURT:  It doesn't matter, it could be some or

18   no cooperation?

19           MR. TALENT:  That's correct.  Under Printz it is up

20   to the state's discretion.  That's entirely true, Your Honor.

21   That's why there is no Supremacy Clause problem.  Because SAPA

22   is a regulation, it's a declaration, an implementation of

23   Missouri's policy to protect the fundamental right of law

24   abiding citizens to keep and bear arms.  And I know Your Honor

25   said this is a Second Amendment case, we aren't debating any

1   particular aspects of any federal firearms law or state law,

2   but the Second Amendment does lure in the background here.

3            THE COURT:  Is it about the Second Amendment?

4            MR. TALENT:  It's Missouri's policy and

5   interpretation of the Second Amendment.

6            Now, I think in this case it's worth while to point

7   out that Missouri's policy and interpretation of the Second

8   Amendment as a fundamental right of the state constitution

9   references it as unamiable and shall not be questioned.  It is

10  consistent how the US Supreme Court just interrupted the law

11  in Broom as right on par with the right for free speech, free

12  exercise and to confront one's accuser.  And what Printz says

13  is that Missouri is allowed to implement its policy, its

14  policy, its policy relating to the Second Amendment, and it

15  does so through the last five sections of SAPA.  Missouri is

16  allowed to implement that and to prevent and to prohibit its

17  state resources from going to enforce and implement federal

18  policy relating to firearms that the state finds

19  objectionable.  That is not just by the way a merits issue,

20  this also gets to the issue of injury and fact as to standing.

21  And we talked a little bit about this here.

22            THE COURT:  Right.

23            MR. TALENT:  The government does not have a right to

24  these state resources.  Missouri's level of cooperation -- the

25  government doesn't cite to any statute provision or anything

                    Denise Carroll Halasey CCR, CVR-CM, RVR
                         United States Court Reporter

like that that gives it a right to these resources.  It relies

solely on the Supremacy Clause which the Supreme Court in

Armstrong said is not a source of right, it's a rule of

decision for this Court and for the courts across the country.

So the level of cooperation from the state of Missouri is

voluntary because the government doesn't have a right to these

resources.  It doesn't have a right to man power from the

Missouri State Highway Patrol for Missouri political entities.

To implement data or information in a timely fashion or in a

procedure the government likes.  There's no cognizable injury

here.  And therefore, there is not an injury in fact.

The standing issue though, there was a lot of

discussion up here about Sections 1460 and 1470.  The injury,

in fact, I think is fairly straightforward.  There's a second

defect in the government's jurisdiction regarding traceability

and redressability.  As I pointed out Sections 1.460 and 1.470

apply to state political entities and subdivisions.  And

again, that's our statutory interpretation, but it's also the

construction of the Missouri Supreme Court has put on the

stature.  So it's authoritative and binding here.  The

government sues the state of Missouri, sues the governor of

the state of Missouri, and sues the Attorney General.  On the

Eighth Circuit precedent, Calzone v. Hawley, Digital

Recognition Networking v. Hutchinson, I think two of the main

ones, establishes that the governor and attorney general by

1  their general enforcement authority do not have the requisite

2  direct connection to enforcement sufficient to establish

3  traceability and redressability.  Calzone I think is notable

4  because that involved a suit regarding a law impleted

5  expressly by the Missouri State Highway Patrol.  The plaintiff

6  their sued the superintendent of the Highway Patrol, the

7  governor and the Attorney General.

8          THE COURT:  I'm going to back you up again.  I know

9  we're going to standing issue but I want to talk a little bit

10  more about a couple things.

11          MR. TALENT:  Of course.

12          THE COURT:  And I'm trying to get your perspective

13  when the United States, they talk specifically about the

14  National Firearms Act and the Gun Control Act of 1968.  To me,

15  and maybe I'm wrong, and counsel maybe will correct me.  That

16  seems to be the impact of what House Bill 85 usurps in terms

17  of not allowing the federal government and the law that

18  controls that to enforce that.  Does that make sense?

19          MR. TALENT:  I think that is what the United States

20  says.

21          THE COURT:  Yes.  Yes.  So I want to hear your

22  thoughts on that.

23          MR. TALENT:  This gets back to what SAPA does.  And

24  I think you referenced tangible effects, facts in the record,

25  I think the best thing to do is when the government says SAPA

1   prevents enforcement of the law, I think the thing to point

2   out is in the facts that they provide.  The federal government

3   is enforcing the law, prosecution is happening, the federal

4   government is arresting people for federal gun crimes.  My

5   friend came up here and cited cases from the Eastern District

6   and the Western District.  I think one was Thomas v. United

7   States.  I don't remember off the top of my head, I skimmed

8   them too.  Those involve gun prosecutions, I think felon in

9   possession charges.  Enforcement is happening and the federal

10  government is allowed to enforce its law.  What SAPA does is

11  it says the state will not aid the federal government in

12  enforcing these categories of law.  And that's it, it's a

13  cooperation provision, so it falls squarely within Printz.

14          THE COURT:  And one last thing, you know, your time

15  is running a little short and partially fault getting you off

16  track.

17          Talk about this doctrine of intergovernmental

18  immunity.  Are you familiar with that?

19          MR. TALENT:  I am, Your Honor.

20          THE COURT:  Let's talk about that.  Let me hear your

21  position with respect to that.

22          MR. TALENT:  Sure.  So that is also answered fully

23  by the fact that SAPA does not actually regulate the federal

24  government.  It doesn't discriminate against the federal

25  government.  It is set at a level of which Missouri state

1  resources could go to aiding the federal government and

2  enforcing federal law in policy.  That is squarely within

3  Printz, and because it is squarely within Printz there is not

4  intergovernmental immunity issue.

5          This also gets I think to kind of a question you

6  asked earlier something my friend on the other side said about

7  1460 and 1470, and I think this tailors it in to I think the

8  standing argument as well.  1460 and 1470 do not penalize

9  federal entities.  They don't penalize third parties.  So

10 United States v. Washington involved third parties who

11 contracted with the government.  1460 and 1470 involve state

12 entities, and put a penalty on state entities who violate the

13 -- who violate Section 1.420 who employ individuals who

14 knowingly violates the law.  It's kind of a kin, I think, you

15 can maybe draw a line or analogy at least to the idea of

16 municipal liability in the context of 1983.  It's just a way

17 to do that, and SAPA does that.  Because SAPA is about

18 calibrating that level of cooperation that falls within

19 Printz.

20         THE COURT:  And my understanding -- and then I'll

21 have counsel address this.  When counsel kind of names those

22 three or identifies those three areas, how the doctrine of

23 intergovernmental immunity kind of plays out.  One, the

24 argument is with federal officers and this civil penalty

25 scheme.  But you would suggest it doesn't limit that?

1          MR. TALENT:  No, Your Honor.  It's a civil penalties

2     scheme on state entities.

3          THE COURT:  On state entities.  And to the extent

4     that -- let's say, this has been my example, the highway

5     patrol and deputizing, for lack of a better word, those agents

6     who serve that dual role, they just don't provide those sort

7     of resources so it doesn't impact right?  That would be your

8     argument, it doesn't penalize federal officers?

9          MR. TALENT:  It doesn't, no, Your Honor.

10          THE COURT:  It may prevent some from aiding and

11     assisting, but it doesn't penalize?

12          MR. TALENT:  That's right, Your Honor.  I think --

13          THE COURT:  I just want to make or correct me.

14          MR. TALENT:  Yes.

15          So a case that falls squarely within Printz, I don't

16     think violates under governmental immunity because there is no

17     Supremacy Clause problem.  But these further defects here, I

18     think you are kind of getting at this issue.  The government

19     brings a facial attack on the statute.  The civil penalty

20     provisions involve local political subdivisions, and to the

21     extent they touch on federal officers or employees, they touch

22     on political subdivision and entities who hire those

23     employees.  The federal government doesn't have standing to

24     raise any claims about the civil liabilities as opposed on

25     political subdivisions and entities, that's an issue for them.

1    And the government doesn't claim third-party standing to do

2    that either.  As for the former governmental employees, the

3    government doesn't cite any interest it has in the future

4    employment of its individuals.  And secondly, the cases the

5    government cites for that proposition, I think Davis v.

6    Michigan State Treasury Department and Tiffany v. Meyers, the

7    former, the former governmental employee was the one that

8    brought the suit.  So this kind of gets at this issue with

9    this whole lawsuit here.  The government wants this Court to

10   rule on an abstract question of law.  Is SAPA constitutional?

11   Well, after the Missouri Supreme Court has come in and agreed

12   with the state's interpretation of the law --

13          THE COURT:  What does the Missouri Supreme Court

14   said about this?

15          MR. TALENT:  The City of St. Louis.  It agrees with

16   the state's interpretation.  The first four provisions are

17   declaratory.  The last five regulate Missouri entities only.

18   It doesn't regulate the federal government, it doesn't impose

19   a duty on the federal government.  It doesn't allow -- it is

20   exactly what the state has said the law means.  And it's an

21   authoritative instruction.  So we are here with a very

22   abstract of law.  And it's abstract both because the Missouri

23   Supreme Court has settled the main issue here, which is does

24   SAPA prevent the federal government from enforcing federal law

25   and it said no.  So the main issue of the government's case is

abstract, going to the traceability and-redressability

standpoint, the government would never be an adverse litigant.

And this also gets to your intergovernmental immunity

question, Your Honor.  The government under the scheme of the

statute will never be an adverse litigant.  It is state and

local entities who will be defendants in lawsuits brought

under 1.460 and 1.470.  So this is a Muskrat case that we

cite.  So it's abstract in that sense.  It's abstract in the

sense, it's abstract in the sense that he individuals the

federal government has sued don't have primary enforcement

authority for this law.  Again, I point this Court to Calzone,

to Digital Recognition Network, as very, as good examplars of

the idea that the general executive and power of the Governor,

the fact the Attorney General has a general duty to implement

or enforce state law are not sufficient to establish that

direct causation sufficient for Article III standing.  It

relates also to the idea of sovereign immunity and ex parte.

And for that reason as well, it's not redressable.  I would

also end with the cause of action we can get to another level

of abstraction here.  The government has brought an equitable

case to this Court.  And equity -- pardon me, they also sue

the state, but I glided over that so I'm moving a little

quickly to be aware of the Court's time.  They sued the state,

but as kind of Black Letter law, you can't sue the state.  You

have to sue to enjoin officers from enforcing the law of the

state.  You can't enjoin a statute.  But this gets to the

cause of action point.  Recognize in the most recently Whole

Women's Health, that the equitable jurisdiction of this Court

extends only to causes of actions and forms of relief that

were available at common law.  What the Court noted in Whole

Women's Health, this stretches back to Fitts v. McGhee, 1898,

but the idea is that there is no law, there's no cause of

action, equitable cause of action that would permit this Court

to issue an injunction running to the Governor, running to the

Attorney General, Whole Women's Health involve the Attorney

General, that would also bind private parties who enforce a

lawsuit.  And it is the private parties that would impose any

harm associated, any harm on the federal government.  It is

those private parties that impose a harm on the federal

government and as the Eighth Circuit noted in Digital

Recognition Network.  The Governor and Attorney General do not

have authority to enforce the Reader's System Act, just like

the Governor and Attorney General don't enforce SAPA.  So they

do not cause injury to Digital Recognition Network here.  The

federal government, even assuming, right, all their injuries

are cognizable.  The Act provides for enforcement only through

private actions for damages.  Digital Recognitions injury,

here the federal government, is fairly traceable only to the

private civil litigants who may seek damages under the Act,

and thereby enforce the statutes.

1          THE COURT:  Okay.  That's time.

2          The Court is going to take a brief recess and I'll

3     come back and then give the parties the opportunity to

4     respond.  I may have a few more questions at that time.

5     (THEREUPON, a short recess was had; WHEREUPON, the following

6     proceedings were had.)

7          THE COURT:  Okay.

8          Ms. Snyder, my first question is this.  Maybe I'm

9     not understanding and maybe I need to go review what the

10    Missouri Supreme Court said.  What is your interpretation of

11    what the Missouri Supreme Court has already said and the

12    impact that it will have on maybe what this Court does or does

13    not do?

14         MS. SNYDER:  That decision should not impact this

15    Court's decision.

16         THE COURT:  What did the Supreme Court say?

17         MS. SNYDER:  The Supreme Court did not consider H.B.

18    85 on the merits.  It remanded for the trial court to consider

19    on the first instance.  The trial court had initially

20    dismissed on procedural grounds unrelated to this case.  The

21    Missouri Supreme Court in its background section did describe

22    the first half of H.B. 85 as being declaratory legislature

23    findings, and then the second half as being the substantive

24    enforcement provisions.  It is unclear if that was actually

25    meant as a holding, given that of course, they remanded

1    without considering the merits.  And even to the extent that

2    it was a holding, it was Dicta, because it didn't go to the

3    merits of the ultimate decision of that case.  And we know

4    from binding Eighth Circuit and Supreme Court precedent that

5    Dicta even from a state's highest court interpreting state law

6    is still merely persuasive.  And here we know that these

7    provisions are far more than declaratory because they have all

8    of these tangible harms.  We also know that these harms are

9    extending to federal authority.

10            THE COURT:  Okay.  And it seems like the state of

11   Missouri is suggesting that the United States doesn't have

12   standing.  They're suggesting their standing comes from, hey,

13   we have to work harder doing our job now.

14            MS. SNYDER:  That's definitely not true, Your Honor.

15            THE COURT:  And maybe he didn't say that

16   necessarily, but I kind of take it as, hey, we got to work

17   harder.  How do you have standing in this case?

18            MS. SNYDER:  We have standing because the United

19   States is the target of this law.  The United States is being

20   directly harmed by this law.  I think a good example is to

21   consider if there were a similar law passed targeting a

22   corporation in a similar way, telling other entities you

23   cannot contract with this corporation, if you hire people from

24   this corporation we are going to penalize you.  That

25   corporation would certainly have standing.  And in this case

```
 1   Missouri is implementing and enforcing H.B. 85 that is having

 2   tangible harms on the United States.  Multiple courts have

 3   confirmed that the United States has standing to challenge

 4   state laws that are affirmatively interfering with the

 5   accomplishment of federal authority.

 6            THE COURT:  The argument may be and I'll know for

 7   sure when counsel comes up, what is it inhibiting the federal

 8   government from doing?

 9            MS. SNYDER:  I think that defendants are really

10   trying to make this case about Printz.

11            THE COURT:  I noticed that.  I need to get a full

12   understanding of that case.  Go ahead, please.

13            MS. SNYDER:  They're really trying to argue this is

14   just a lack of cooperation.  It's just the state refusing to

15   dedicate state resources.  This case is not about Printz.

16   This case is not about the Tenth Amendment at all.  This case

17   is about a state law that has not only purported to nullify

18   federal law, but also affirmatively penalizes federal

19   authority, interferes with federal authority, discriminates

20   against federal authority.

21            THE COURT:  But you know what Mr. Talent would say

22   as to that argument?

23            MS. SNYDER:  That it's still cooperation.  It's not

24   just about cooperation.

25            THE COURT:  Because it doesn't penalize federal
```

1    agents, nor does it prohibit you from doing anything or

2    otherwise.  It makes it harder.

3         MS. SNYDER:  Even if we take Missouri's argument as

4    true that it only applies to state and local entities, we are

5    still seeing the tangible effects that this has on -- again,

6    task force officers, the discriminatory refusal to provide

7    information.  This isn't just about Missouri not providing

8    information.  This is about Missouri targeting the federal

9    government and saying because you are the federal government

10   we will not provide information to you, we will not cooperate

11   with you.  And we saw, again, we saw the doctrine of

12   intergovernmental immunity recently reaffirmed by the Supreme

13   Court just a couple weeks ago.  If you target, if there is a

14   state law that targets federal authority or targets a federal

15   person or a federal entity based on their federal status, that

16   is illegal, that is unconstitutional.  That is exactly what

17   the state is doing here.

18        THE COURT:  And I will let you continue with any

19   comments you may want to make without interruption so you can

20   make any points that you want to with your remaining time.

21        MS. SNYDER:  I have really touched on many of my

22   points, but I'd like to also talk about the tangible harms.

23   Just because the federal law-enforcement in Missouri is still

24   able to effectuate some arrests, some prosecutions, does not

25   mean that the United States has no harm.  We've talked about

1    our tangible effects, they do not contest those facts.  Those

2    facts stand for themselves.  Again, I don't want to

3    reiterate --

4         THE COURT:  -- He tried to a little bit, but I get

5    it.  Mr. Talent, he's like, okay Judge, that's okay.  It

6    doesn't penalize them, it just says we don't have to.  Maybe

7    he is relying again on the case of Printz to say, okay.

8         MS. SNYDER:  Much of the state's argument is based

9    on the fact that, for example, the civil penalty provisions

10   don't apply directly to federal officials.  But as Your Honor

11   pointed out, these penalty provisions still regulate and still

12   discriminate against and effect federal authority.  And that

13   is the problem here.  Even taking as true Missouri statement

14   that these only apply to state and local entities, you are

15   still having these tangible harms against federal authority.

16        THE COURT:  Okay.

17        MS. SNYDER:  I'd also like to briefly mention

18   standing.  I'm happy to talk about it more now.  I know we

19   didn't get to discuss it in our initial discussion.  Missouri

20   mentioned Calzone.  Calzone affirms our position that we have

21   standing here.  Calzone involves a plaintiff who sued Missouri

22   State Highway Patrol, and she had standing because the

23   superintendent of the Missouri State Highway Patrol was

24   implementing that statute.  The same goes here, Missouri and

25   its officials are implementing H.B. 85 so we have standing on

1    that alone.

2           Again, standing is also confirmed by both the recent

3    case in the United States v. Washington from a couple weeks

4    ago, also from the 2012 decision from the Supreme Court in the

5    United States v. Arizona.  There was not standing problem in

6    these cases.  These were exclusively cases brought under the

7    Supremacy Clause, very similar essentially the same posture as

8    here.  The Supreme Court considered no problem with standing.

9    So the state's position here means that the Supreme Court

10   necessarily ruled incorrectly in those decisions.

11          THE COURT:  Okay.

12          MS. SNYDER:  I'm happy to for go the rest of my time

13   unless you have any further questions.

14          THE COURT:  Not at this time.

15          Mr. Talent.

16          And Mr. Talent, on your way up I'm going to shoot a

17   question to you.

18          MR. TALENT:  Please do.

19          THE COURT:  The United States -- Ms. Snyder seems to

20   have a disagreement.  And I just want to be clear and I'll go

21   back and look what the Missouri Supreme Court, what you

22   believe it stands for, if anything, that would impact maybe

23   what I do here today.

24          MR. TALENT:  So two answers to that.  The first, I

25   will concede that the discussion of SAPA, it's two paragraphs.

1          THE COURT:  How long is the opinion?  You said it's

2    two paragraphs?

3          MR. TALENT:  Yes.  She is correct that it is in the

4    factual and background section.

5          THE COURT:  Okay.

6          MR. TALENT:  I just find it very hard to believe

7    that the Missouri Supreme Court is misstating Missouri law in

8    its factual and background section.  And I'm not going to

9    casually believe that is the case.

10          My friend on the other side references Dicta,

11    perhaps it's Dicta.  It's very persuasive, it's consistent

12    with the text context as the state has pointed out its

13    briefing.  To call this Dicta brings to mind a statement by

14    Judge Hill in the Fifth Circuit concurring in Williams v.

15    Simonbach.  That's not a drive-by, that's sitting down

16    ordering cocktails, having a full meal and getting dessert.

17    That's fairly a detailed line by line, section by section

18    discussion of the law.  That tracks by the way the text and

19    context of the law.  I think it is very odd that the

20    government is pushing an interpretation of SAPA that would

21    render it unconstitutional.  That -- they are trying to tell

22    this Court that this law means something different from what

23    the Attorney General's office is telling this Court it means.

24    That it means something very different from the Missouri

25    Supreme Court means.  That therefore, because it means what

1    the government says it means, it's unconstitutional, it's a

2    black letter candid interpretation that courts read statutes

3    to avoid constitutional infirmity.  The government I think can

4    see at the end of the day that if SAPA does what the Missouri

5    Supreme Court says it does, what the state says it does here,

6    it's entirely consistent with Printz.  This is a Printz case.

7    I think the best way to show that this is a Printz case, is to

8    grab a little bit with these tangible harms the government

9    discusses.  What is in the record is that the tangible harms

10   stem from the fact that Missouri law enforcement is not

11   cooperating with the federal government to the same level it

12   did before SAPA.  An injunction to remedy those harms, right?

13   The actual injunction that would remedy those harms would

14   basically be to order state of Missouri to cooperate with the

15   federal government at the same level as it was doing before.

16   That is exactly what the Court said is unconstitutional in

17   Printz, that trenches -- if the federal government does it.

18   That trenches on the states' rights under the Tenth Amendment

19   under the federal Constitution.  So even spotting the tangible

20   harms, I think the tangible harms in the case, I think it just

21   simply illustrates that this is about state cooperation with

22   the federal government and so therefore Printz is fully

23   controlling.

24          I'd like to point out again, going back to the

25   enforcement, the public safety side of this, these tangible

1    harms.  My friend on the other side she just came up here and

2    told you there are still -- the federal government still

3    enforcing federal law in the state of Missouri.  That is not

4    nullification.  Nullification is what she said earlier, the

5    federal government cannot enforce federal law in the state of

6    Missouri.  That is not what SAPA does.

7              THE COURT:  What about this notion that the state of

8    Missouri is just or the statute is just targeting the federal

9    government or the federal authority.  I think I know your

10   answer, but go ahead.

11             MR. TALENT:  Two responses.  One is it's not.  It

12   explicitly references and regulates state level entities.  To

13   the extent federal law and federal regulation, and federal --

14   the stuff in Section 1.470, about individuals who enforce

15   federal law and violation of the law, that is what I think she

16   is referencing as well.  There is really only two

17   jurisdictions that enforce any type of gun law in the state of

18   Missouri and it's the federal government and the state of

19   Missouri.  I don't know how else you would draw this law.  The

20   targeting is just a reference to the basic reality of who

21   enforces a law in the state of Missouri.  The federal

22   government is enforcing that law so there is no nullification

23   issue here at all.  Happy to answer any other questions on

24   that as well.

25             THE COURT:  Nope.
                   Denise Carroll Halasey CCR, CVR-CM, RVR
                        United States Court Reporter

1          MR. TALENT:  I think my friend on the other side,

2     and I want to get a little into standing.  She discussed

3     Calzone, saying that it affirms her case.  She did not discuss

4     a portion of Calzone saying that the Governor's standing, that

5     standing to sue the Governor and standing to sue the Attorney

6     General on the theory that they have some role in enforcing

7     the law.  That there is no traceability and no redressability.

8     And so no standing to seek an injunction or declaration

9     against those entities.  That is what lawsuit is about.  They

10    are not suing the people who have primary enforcement of SAPA

11    under 1.460 and 1.470.  They are suing individuals -- that is

12    a private parties.  They are suing the state level actors.

13    Her argument that because the Governor and the Attorney

14    General has some implementation authority in general is

15    sufficient to establish standing, was explicitly rejected in

16    Calzone, explicitly rejected in Digital Recognition Network,

17    explicitly rejected in many other cases as well.  So the

18    government simply fails to address that aspect of the

19    enforcement provision of SAPA, and therefore, fails to a

20    stress and establish its standing.  And fails to establish as

21    I pointed out earlier an equitable cause of action.

22          I think at the end of the day -- I'm happy to answer

23    any other questions.  But I think the best way to end is

24    actually with what the Eighth Circuit said in Digital

25    Recognition Network which quoting Fitts v. McGhee said that,

1    "It would be a very convenient way for obtaining a speedy

2    judicial determination of questions of constitutional law

3    which may be raised by individuals, but it is a mode which

4    cannot be applied to the states of the union consistently.

5    But the fundamental principle that they cannot without their

6    assent be brought into court at the suit of private persons."

7          Now, the federal government is different.  It's not

8    a private person.  But the logic of that quote that a claim

9    that because of an executive authority has some general

10   implementation authority is sufficient to establish Article

11   III standing, opens up the Court to opine on abstract

12   questions of the constitutionality of the stature and the

13   absence of concrete facts.  That is exactly what this case is.

14   The federal government doesn't point to any particular action

15   that a Missouri officer has done under SAPA that they say

16   actually does violate constitutional law, they say SAPA in

17   total is unconstitutional.  It's simply not the case,

18   inconsistent with the reading of the law.  It's a very

19   abstract kind of constitutional issue that it is asking this

20   Court to address, which means there is no Article III

21   standing.

22          I'm happy to answer any further questions you may

23   have.

24          THE COURT:  I don't have any further questions.  You

25   know, I certainly appreciate the argument of counsel.

1   Certainly the Court will have to do its due diligence and then

2   I'll take the matter under advisement.

3           Let me ask this question, and maybe this is a moot

4   issue.  You know, I think I'll reserve comment on it for now,

5   and if I need to get the parties on the phone to address it

6   I'll do so.  But I do appreciate the argument of counsel and

7   the Court is going to take this matter under advisement.

8   (THEREUPON, the following proceedings were adjourned.)

9

10                          CERTIFICATE

11

12          I certify that the foregoing is a correct transcript

13  from the record of the proceedings in the above-entitled

14  matter.

15          September 22, 2022

16

17                  /s/ Denise C. Halasey
                    Denise C. Halasey, CCR, CVR-CM, RVR
18                  United States Court Reporter

19

20

21

22

23

24

25

                Denise Carroll Halasey CCR, CVR-CM, RVR
                    United States Court Reporter